**Roger JELINEK, Petitioner,**

v.

**Joseph COSTELLO, Superintendent, Mid–State Correctional Facility, Respondent.**

**No. 97–CV–2327 (JBW).**

United States District Court, E.D. New York.

Feb. 27, 2003.

---

Gregory Cooper, Esq., New York, NY, for Petitioner.

Denis Dillon, District Attorney, Nassau County, Mineola, NY, Tammy J. Smiley, Margaret E. Mainusch, Assistant District Attorneys, of Counsel, for Respondent.

## MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge.

*Table of Contents*

I. Introduction.................................................224

II. Facts.......................................................226
 A. Overview...............................................226
 B. Testimony of Complaining Witnesses.....................226
 1. Child J.N..........................................227
 a. Charges Related to J.N..........................227
 b. Grand Jury Testimony of J.N. ...................227
 c. State Examination of J.N. at Trial .............229
 d. Defense Examination of J.N. at Trial ...........229
 e. Jury Verdicts on Charges Related to J.N. .......232
 f. Disposition of Charges Related to J.N. on Appeal.................232
 2. Child J.C..........................................232
 a. Charges Relating to J.C. .......................232

 b. Grand Jury Testimony of J.C. ...................................232
 c. State Examination of J.C. at Trial ..............................233
 d. Defense Examination of J.C. at Trial ...........................235
 e. Jury Verdicts on Charges Relating to J.C. ......................237
 f. Disposition on Appeal of Charges Relating to J.C. .................237
 3. Child C.H. ....................................................237
 a. Charges Related to C.H. ........................................237
 b. Grand Jury Testimony of C.H. ..................................237
 c. State Examination of C.H. at Trial ..............................237
 d. Defense Examination of C.H. at Trial ...........................238
 e. Jury Verdicts on Charges Relating to C.H. ......................239
 f. Disposition of Charges Related to C.H. on Appeal ................239
 4. Child G.B. ....................................................239
 a. Charges Related to G.B. ........................................239
 b. Grand Jury Testimony of G.B. ..................................239
 c. "Vulnerable Child Witness" Hearing ............................240
 d. State Examination of G.B. at Trial ..............................242
 e. Defense Examination of G.B. at Trial ...........................242
 f. Jury Verdict on Charges Related to G.B. .........................244
 g. Disposition of Charges Related to G.B. on Appeal .................244
 5. Child B.D. ....................................................244
 a. Charges Related to B.D. ........................................244
 b. Grand Jury Testimony of B.D. ..................................244
 c. State Examination of B.D. at Trial ..............................245
 d. Defense Examination of B.D. at Trial ...........................245
 e. Jury Verdicts on Charges Related to B.D. .......................246
 f. Disposition of Charges Related to B.D. on Appeal ................246
 6. Child P.W. ....................................................246
 a. Charges Related to P.W. ........................................246
 b. Grand Jury Testimony of P.W. ..................................247
 c. State Examination of P.W. at Trial ..............................247
 d. Defense Examination of P.W. at Trial ...........................247
 e. Jury Verdicts on Charges Related to P.W. .......................247
 f. Disposition of Charges Related to P.W. on Appeal ................247
 7. Child C.S. ....................................................247
 a. Charges Related to C.S. .........................................247
 b. Grand Jury Testimony of C.S. ...................................248
 c. State Examination of C.S. at Trial ..............................248
 d. Defense Examination of C.S. at Trial ............................249
 e. Jury Verdicts on Charges Relating to C.S. .......................249
 C. Testimony of Other State Witnesses ..................................249
 1. Detective Vashti Anderson .........................................249
 2. Child Protective Services Caseworker Daniel Speicher ................250
 3. Parents of the Victims ............................................251
 D. Defense Case ......................................................251
 1. Defense Fact Witnesses ...........................................251
 2. Testimony of Defendant ...........................................251
 3. Character Witness ................................................252
 E. Defendant's Application to Proceed Pro Se ...........................252
 F. Appointment of Standby Counsel ....................................252
 G. Summation .......................................................253
 H. Motions at End of Case .............................................253
 I. Verdict and Sentence ...............................................253

III. Procedural History of Direct Appeal ....................................254
 A. Summary of Jelinek's Post–Trial Representation ......................254
 B. Direct Appeal .....................................................254
 C. Material Variance Issue in State Court ...............................254
 D. Leave to Appeal to State Court of Appeals ...........................255

IV. Procedural History of Initial Federal Habeas Proceedings (Filed as 97–CV–2327) ...................................................255

V. Procedural History of First State Section 440 and Coram Nobis Proceedings .......................................................255

VI. Procedural History of Recommenced Federal Habeas Proceedings (Filed as 98–CV–2298) .............................................256

VII. Procedural History of Second State Section 440 and Coram Nobis Proceedings .......................................................257

VIII. Procedural History of Current Federal Habeas Proceedings (Filed as 01–CV–2566) ...................................................258
 A. Pleadings ....................................................258
 B. Factual Hearing ..............................................259

IX. Law...........................................................261
 A. AEDPA Standard of Review ...................................261
 B. Statute of Limitations ........................................261
 C. Exhaustion ..................................................262
 D. Procedural Bar ..............................................263
 1. In General .............................................263
 2. Cause for the Default ...................................263
 3. Actual Innocence .......................................263
 E. Ineffective Assistance of Counsel ...............................264
 1. In General .............................................264
 a. Ineffective Assistance of Trial Counsel ...............264
 b. Ineffective Assistance of Standby Counsel ............265
 c. Ineffective Assistance of Appellate Counsel ...........266
 d. Strategic Choices ..................................267
 e. Exhaustion of Individual Claims of Ineffectiveness .....267
 2. Failure to Dispute Government's Variance from the Indictment ........267
 3. Failure to Object to the Sufficiency of the Evidence....................270
 4. Failure to Call Expert Witness...........................271
 5. Failure to Call Fact and Character Witnesses.........................272
 6. Failure to Consult with Defendant.......................272
 7. Failure to Read Rosario Material ........................273
 8. Failure to Request a Bill of Particulars and to Move for Severance of Child Endangerment Charges ...............................273
 9. Failure to Object to Indirect Hearsay....................274
 10. Failure to Introduce Witness's Prior Inconsistent Statements into Evidence............................................274
 11. Failure to Object to Introduction of Defendant's Inculpatory Statements ...........................................275
 12. Spillover Effect .......................................276
 F. Confrontation Clause..........................................277
 G. Due Process Clause ...........................................278
 1. Variance from the Indictment............................278
 2. Admission of Uncharged Crimes Testimony into Evidence .............279
 3. Prolonged and Suggestive Questioning of Child Witnesses by the Police............................................279
 4. Trial Court's "Vulnerable Witness" Inquiry............................279
 H. Sixth Amendment Right to Notice ..............................280
 I. Discretion to Fashion Relief....................................280

X. Application of Law to Facts .....................................280
 A. Timeliness ..................................................280
 B. Ineffective Assistance of Trial and Appellate Counsel ......................281

224

1. Preliminary Observations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281
 a. Wealth and Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . : . . . . . 281
 b. Generally Competent Performance of Trial Counsel . . . . . . . . . . . . . . . 281
 c. Separate Claims of Ineffective Assistance of Trial and Appellate
 Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282
2. Unexhausted Ineffective–Assistance Claims . . . . . . . . . . . . . . . . . . . . . . . . . 282
 a. Failure to Object to Indirect Hearsay . . . . . . . . . . . . . . . . . . . . . . . . . . . 283
 b. Failure to Consult Experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 283
 c. Failure to Challenge Variance from the Indictment . . . . . . . . . . . . . . . 285
3. Exhausted But Procedurally Defaulted Ineffective Assistance
 Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 288
 a. Failure to Call Character Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289
 b. Failure to Call Defendant's Wife as Fact Witness . . . . . . . . . . . . . . . . . . 289
 c. Failure to Consult with Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 290
 d. Failure to Read Rosario Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 290
 e. Failure to Request Bill of Particulars and Keep Out Uncharged
 Crimes Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291
 f. Failure to Object to Inculpatory Statements . . . . . . . . . . . . . . . . . . . . . . 291
 g. Failure to Impeach with Prior Inconsistent Statements . . . . . . . . . . . . 292
 h. Failure to Object to Sufficiency of Evidence . . . . . . . . . . . . . . . . . . . . . . 293
C. Confrontation Clause Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294
D. Due Process Clause Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294
 1. Uncharged Crimes Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294
 2. Suggestive Questioning of Child Witnesses . . . . . . . . . . . . . . . . . . . . . . . 294
 3. Vulnerable Witness Inquiry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 295
 4. Variance from the Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 295
E. Sixth Amendment Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 295

XI. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296

Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296

## I. Introduction

The crux of the case is this: At a state trial, defendant's otherwise competent standby trial counsel may have performed inadequately by failing to advise his pro se client to move to dismiss two sodomy counts (Seven and Eleven) because of a variance between the indictment and proof—essentially how, when and where relevant incidents occurred. *See* Part X.B.2.c, *infra.* To now challenge his convictions on these counts, petitioner must show that otherwise competent appellate defense counsel was ineffective for failing to argue this point on direct appeal—an argument that has not been explicitly raised in the Appellate Division collaterally. The sexually abusive acts the jury found defendant guilty of would have had a devastating impact on the children and their parents whether the instrument of defendant's violation was his hands, his mouth or his penis. Nevertheless, those distinctions are important in determining whether there were legally significant variances between two felony counts as charged and as proved. The instant federal case seeking a writ of habeas corpus must be stayed to permit petitioner to attempt to exhaust his state coram nobis rights in the Appellate Division. To explain how and why this conclusion is reached, this memorandum addresses the applicable federal and state criminal collateral attack practice.

This long-delayed case raises profound questions of due process, of the intricacies of procedure in state and federal courts, and of the inadequacies of state counsel. Total innocence is not implied.

Roger Jelinek, a New York State prisoner sentenced to up to twenty-seven years

in prison for abusing a number of children, alleges, among other complaints, that he received ineffective assistance of trial and appellate counsel in violation of the Sixth and Fourteenth Amendments, and that trial and appellate errors resulted in the violation of his federal constitutional rights under the Confrontation and Due Process Clauses.

This matter has moved back and forth between the state and federal courts for some years. To the law's chagrin, its resolution must be delayed yet again. The case will be stayed to allow the petitioner to present apparently non-exhausted claims to a state court. Should state relief be denied, he will have the opportunity to return once again to the federal courts.

A reasonable reading of the record supports the conclusion that Jelinek was probably in fact guilty of a number of the counts for which he was convicted. Compare the miscarriages of justice in such cases described in Dorothy Rabinowitz, No Crueler Tyrannies (2003). Six boys, aged eight to sixteen, testified at trial that Jelinek sexually molested them over four years. Most of the allegations concerned improper touching, but several of the counts in the indictment charged sodomy in the first degree—that is to say, insertion of a penis into a mouth or rectum. For the most part the testimony of the child victims was convincing and compelling. Of the forty-three charges, the jury convicted on all but five.

Like most trials, this one was not error free. On direct appeal half of the counts for which Jelinek was convicted were vacated by the Appellate Division, including one-third of the felony convictions—on the ground that the indictment was duplicitous with respect to those counts. Another felony conviction was reversed because, as the state itself acknowledged, the jury had convicted Jelinek on that count despite the fact that absolutely no evidence had been presented at trial in its support. The re-maining convictions were therefore allowed to stand.

In committing these odious crimes, petitioner abused his positions of trust in the community. Substantial punishment was justified. A thorough review of the state court proceedings nonetheless strongly suggests a constitutional violation. Germane was the critical failure of counsel to protect Jelinek's rights by moving to dismiss two of the first-degree sodomy counts charged against Jelinek after it became clear that the evidence presented at trial varied materially from what was alleged in the indictment. Appellate counsel apparently failed to bring this aspect of trial counsel's deficient performance to the attention of the Appellate Division.

As compelling as his claim to denial of due process may be, at this juncture a federal court is not authorized to provide relief. The reason is the labyrinthian structure of modern habeas jurisprudence—a sometimes befuddling conglomeration of procedural complexities, strict time limits and confounding case law—which society expects prisoners to noctambulate without the guiding hand of counsel. It is no surprise that state prisoners—or judges or lawyers themselves—pursuing complex claims of error-ridden trials, should fail repeatedly to assert the proper claims in the proper manner at the proper times before the proper tribunal. See, e.g., Miller–El v. Cockrell, —— U.S. ——, 123 S.Ct. 1029, 1042, 154 L.Ed.2d 931 (2003) (federal court of appeals misunderstands its role on appeal).

A state prisoner seeking a writ of habeas corpus plays a giant and deadly game of Chutes and Ladders. Every advance through the court system holds the potential for significant frustration as the pro se petitioner tries to move through such bewildering hazards as time bars, exhaustion doctrine, procedural defaults, independent

and adequate state grounds, cause and prejudice, and mixed petitions. The prize in this game, even if skillfully played by an often uncounseled, ill-educated and penurious player, is the reward of having his constitutional claim actually adjudicated on the merits in federal court. It is a prize not often won in this Sisyphean-like contest. And, even when the federal court is freed to consider the merits, the sought after award—a "Get Out of Prison" card—is rarely granted.

The present case is complicated. Represented at trial by an attorney who had lost interest in the case when his full fee was not paid, counseled on appeal by a lawyer who achieved a great deal but missed one of the main points of a meritorious constitutional argument, left without an attorney to contend with technical post-conviction doctrines, Jelinek is once again before a federal court.

He has been back and forth from state court to this court three times, and must return to the state for a fourth cycle. Each time Jelinek fails to state his claims precisely he is in danger of defaulting on those claims, risking that they can never be heard on the merits. His predictably deficient pro se attempts in the state to present even his meritorious claims for adjudication may, in the end, require a federal court to deny him all relief. For the reasons set forth below, Jelinek's petition will be stayed to allow him to return to state court, should he choose to do so, in order to exhaust his remaining, arguably viable claims.

## II. Facts

### A. Overview

Jelinek, a married man with six children, was arrested in 1991 and tried in 1993 for sexually abusing seven boys from his neighborhood over several years. The state's case rested almost entirely on the testimony of these boys—the youngest of whom was six years old when he appeared before the grand jury—along with the testimony of an investigating detective and a Department of Social Services caseworker. One of the alleged victims was allowed to testify via two-way, closed-circuit television. No medical evidence was introduced.

The defendant testified, recalled several state witnesses, and presented a pair of character witness. He delivered a closing argument himself after dismissing his attorney.

What emerges from the trial testimony is a chiaroscuro portrait of Jelinek as both pillar of the community—natural and adoptive father, Little League coach, Cub Scout official, volunteer meal-provider to the elderly—and sexual predator who abused his positions of trust. The jury convicted Jelinek on most, but not all counts. It acquitted him altogether of the charges he faced with respect to the youngest of the alleged victims.

The following encapsulation of the trial evidence presented demonstrates the strength of the state's case with respect to many of the counts of conviction. It is also testament to the largely professional and competent representation that Jelinek received from trial counsel on his behalf at most stages of the trial. At the same time, the summary makes clear that trial counsel's failure to recognize and object to substantial variances from the indictment relating to two of the most serious charges lodged against Jelinek arguably fell well below the constitutional minimum required of effective counsel. Because the ineffective assistance of counsel related most clearly to the alleged sodomy of J.N. and J.C., the synopsis begins with a description of their testimony.

### B. Testimony of Complaining Witnesses

Each of the dozens of criminal acts for which Jelinek was indicted with respect to

the alleged victims was listed in the indictment as having taken place in Nassau County. More specific information about the location of the alleged crimes was provided to the defendant by the state in a bill of particulars, and was presented to the jury by the prosecutor during her reading of the charges in her opening statement.

There were many inconsistencies between the Grand Jury and trial testimony of a number of the complaining witnesses. Jelinek's counsel in the Appellate Division compiled a chart, titled "Summary of Trial Testimony of Prior Uncharged Acts," which sets forth many of these discrepancies and was presented on direct appeal. *See* Appendix. Although the chart is not complete, it accurately summarizes the views of appellate counsel. It may be of some service as a rough road map to many of the inconsistencies discussed below.

### 1. Child J.N.

Jelinek was charged with a number of counts alleging that he improperly touched and sodomized J.N., an eight-year-old boy, who was a friend of two of Jelinek's sons, all at defendant's home.

The most serious of the counts charged Jelinek with placing his mouth on the penis of J.N. When asked at trial whether the incident had occurred, J.N. unequivocally responded that it had not. Trial counsel nonetheless failed to move at any time to dismiss the count, and the jury convicted Jelinek on that sodomy count. There were substantial other discrepancies among J.N.'s testimony at two Grand Jury hearings and at trial.

### a. Charges Related to J.N.

Count Eleven was for sodomy in the first degree, relating to an alleged incident on or about July 1991 in which Jelinek put his mouth on the penis of J.N.

Five of the charges were for sexual abuse in the first degree. Count Twelve charged Jelinek with touching the penis of J.N. on or about and between June 15 and July 15 of 1991. Count Thirteen charged him with putting his mouth on the buttocks of J.N. on or about and between June 15 and July 15 of 1991. Count Fourteen charged him with touching the buttocks of J.N. on or about and between June 15 and July 15 of 1991. Count Fifteen charged him with touching the penis of J.N. on or about June 1991. Count Sixteen charged him with touching the buttocks of J.N. on or about June 1991.

Count Seventeen charged Jelinek with the misdemeanor of endangering the welfare of a child, J.N., by engaging in sexual acts, "in the presence of or upon the person of" J.N. on or about and between June 1990 and July 1991. As the prosecutor explained, "all of the sexual acts that the defendant performed on [J.N.] or in front of him constitutes and will be proof of endangering his welfare . . . ." (Trial Tr. at 111.)

### b. Grand Jury Testimony of J.N.

J.N. was eight years old when he testified before the Grand Jury in August and September of 1991. He testified at this first Grand Jury appearance that he was friends with two of Jelinek's sons, that one of Jelinek's daughters often babysat for him, and that he was often at the Jelinek home after school, occasionally sleeping over. When asked about an incident that allegedly occurred at Jelinek's home after J.N. was released from school in June 1991, he responded in the hesitant, disjointed manner typical of the children examined in this case that touching only occurred:

Q Did anything happen when you came home from school and went to Roger Jelinek's house?

A Yes.

Q What happened?

A I forgot.

Q Did you forget?

A Yes.

Q You really forgot? Well, did the defendant do anything to you?

A Yes.

Q Do you know what it was that he did?

A Yes.

Q Can you tell us what he did?

A He gave me a little squeeze and he squeezed my tushie.

Q I didn't understand the first thing you said.... What did you say first?

A He gave me a weenie squeeze.

Q A weenie squeeze?

A Yes.

Q What's a weenie squeeze?

A When he squeezes it.

Q What's it?

A My penis.

Q This was in June when you came home from school?

A Yes.

Q You said he gave you a weenie squeeze. What else did he squeeze?

A My tushie.

(Aug. 22, 1991 Grand Jury Tr. at 40–42.)

J.N. was then asked about another incident that allegedly occurred in July 1991:

Q Do you remember a day when you were at the defendant's house when [J.C., another alleged victim] was there too?

A I can't remember it.

Q What?

A I can't remember it.

Q Has [J.C.] ever been to Roger's house?

A Yes.

Q How do you know that?

A When I come over, he is there.

Q Okay. When you went over there and [J.C.] was there, did anything happen?

A Yes.

Q What?

A He gave me a weenie squeeze and he squeezed my butt.

Q Who gave you a weenie squeeze?

A Roger [Jelinek].

Q [J.C.] was there at the time?

A Yes.

Q Did the defendant do anything else after he gave you a weenie squeeze on the day that [J.C.] was there?

A No.

Q When the defendant gave you a weenie squeeze, did you have your clothes on?

A Yes.

Q Did you ever not have your clothes on when you were with the defendant?

A Yes, when I came from the shower.

Q Did anything happen when you didn't have your clothes on?

A Yes, he gave me a tushie bite.

Q A tushie bite?

A Yes.

Q Did anything else happen?

A No.

Q Do you remember when it was that he gave you a tushie bite?

A After he started—after he did the penis squeeze and the butt squeeze.

(*Id.* at 42–43.)

In his testimony at a subsequent Grand Jury appearance in September, J.N. ex-

panded upon this account and testified for the first time that Jelinek put his mouth to J.N.'s penis:

Q Did [the defendant] ever put his mouth anyplace?

A Once.

Q *Where did he put his mouth?*

A *On my penis.*

Q Was that in July of this year also?

A Yes.

(Sept. 27, 1991 Grand Jury Tr. at 36 (emphasis added).)

c. State Examination of J.N. at Trial

J.N. was nine years old at the time of the trial. He first testified that in June of 1991 Jelinek "touched my penis, gave me a tuschy squeeze, a tuschy bite, and wanted to put his, and went to put his—what do you call it?—penis in my mouth, once." (Trial Tr. at 597.) According to J.N., this type of incident occurred every time he went over to Jelinek's home, which was nearly every day.

He further described an incident in which Jelinek "put his penis in my mouth" in the presence of J.C. (*Id.* at 598.) Later on direct examination the following exchange occurred:

Q Did [Jelinek] do anything to you [in July]?

. . . .

A He gave me a tuschy squeeze, a tuschy bite, and he put his hands down my pants and once touched my penis and put his penis in my mouth.

Q Did he put your penis in his mouth?

A No.

Q What did he do?

A *He put his penis in my mouth.*

(*Id.* at 601 (emphasis added).)

Neither the prosecutor nor defense counsel called the jury's attention to the fact that the trial was the first time J.N. had made the accusation that defendant had put his penis in J.N.'s mouth, or that the story diverged widely from that which he had told before the Grand Jury—i.e., that Jelinek had placed his mouth on J.N.'s penis rather than placing his penis in J.N.'s mouth.

J.N. at trial also testified for the first time about an incident in July 1991 in which Jelinek allegedly took a picture of J.N. naked after emerging from the shower:

Q And can you tell us what, if anything, happened, when you got out of the shower?

A He took a picture.

Q And did you have clothes on or no clothes on?

A No clothes on.

Q And what, if anything, did he say about the picture?

A He was going to hang the picture on the bulletin [board] in the school.

(Trial Tr. at 600.)

d. Defense Examination of J.N. at Trial

On cross-examination, J.N. agreed with defense counsel that his initial interview with a police detective and caseworker from Children's Protective Services ("CPS") lasted for nearly four hours. J.N. disagreed with counsel, however, that he was told by them that "they knew pretty much something had happened . . . [and] had [his] name from other kids." (*Id.* at 605.) He also acknowledged that before speaking with the caseworker and detective he never told anyone about the sexual abuse he allegedly suffered at Jelinek's hands.

Defense counsel sought to impeach aspects of J.N.'s trial testimony with the inconsistent statements he had made be-

fore the Grand Jury. In particular, counsel sought to show that although J.N. claimed to remember specific dates of events at trial, before the Grand Jury he stated that he could not remember such specifics. Even after defense counsel sought to refresh his recollection, however, J.N. stated that he did not recall the questions he was asked or the answers that he gave before the Grand Jury. Counsel then sought, unsuccessfully, to introduce into evidence the transcript of the Grand Jury testimony showing contradictions with the trial testimony:

Q Now, do you remember going to the Grand Jury twice in 1991 . . . ?

A I don't think so.

Q Well, do you remember being asked these questions and making these answers—

MS. WATSON [the prosecutor]:

Judge, I object. He doesn't even remember being at the Grand Jury.

MR. KRIEGER [defense counsel]:

Well, if I read it perhaps it will refresh his recollection, Judge.

THE COURT: Well, refresh his recollection, if you can, first. Let him look at it to see if it refreshes his recollection.

. . . .

Q Read [the transcript of the Grand Jury testimony] to yourself from line 11 down to the bottom of that page.

. . . .

THE WITNESS: I don't understand this.

THE COURT: Let us know when you're finished reading it and the lawyer will ask you questions.

THE WITNESS: I don't understand that.

THE COURT: Ask your question.

Q [J.N.], were you asked these questions—

THE COURT: No, no. Does that refresh your recollection?

Q Does that refresh your recollection?

A No.

THE COURT: Okay.

Q Were you asked—

MS. WATSON: Objection.

THE COURT: No, sustained.

MR. KRIEGER: I'd ask that the witness be shown . . . page 42, lines 6 through 11?

. . . .

Q Do you remember being asked—

THE COURT: No, no.

Q The question—

MS. WATSON: Objection.

THE COURT: Sustained.

Q Does that refresh your recollection about some questions and answers that you were asked and answers you gave in the Grand Jury? Do you know what the term "refresh" means?

A No.

THE COURT: If you can remember, if you look at that and then it triggers your memory of what happened, you would say yes. And if it doesn't, you would say no?

THE WITNESS: It don't.

THE COURT: Okay.

MR. KREIGER: May we approach?

THE COURT: Yes.

(The following discussion took place at the bench:)

THE COURT: Now, I'm not going to tell you how to present your case. One procedure is to refresh his recollection, another procedure, if you believe there is some inconsistency between testimony and anything he

swore to previously, there is a way to get that in. But I'm not going to say now, and you have to show the inconsistency first.

MR. KRIEGER: Well, the offer of proof—

THE COURT: Where is the inconsistency?

MR. KRIEGER: The inconsistency is done on the prior occasion.

THE COURT: What prior occasion?

MR. KRIEGER: On the Grand Jury. This witness under oath swore that he had forgotten two incidents that he was asked about by ADA Ennis.

THE COURT: I don't understand. He said under oath that he forgot what?

MR. KREIGER: He asked—Let me show you.

. . . .

THE COURT: Where is the inconsistency?

MR. KREIGER: Wherever he's asked about a specific day and a specific month that he remembers now, but he didn't remember then.

(*Id.* at 608–13.) Counsel thereupon read to J.N. several portions of his testimony before the Grand Jury, asking him if he remembered the questions and answers. To all of counsel's queries J.N. responded that he did not remember either the questions or the answers.

After this bungling and hacking in a failed attempt to show a critical contradiction in the child's testimony before the Grand Jury and at trial, defense counsel elicited from J.N. the more pallid admission that his recollection of events from about two years earlier was hazy at best, and may have resulted from practice in answering:

Q So, would it be fair to say, then, that some things that happened back in August of 1991 in sort of an official setting you don't remember?

A No.

Q And would it be fair to say that there are other things from the summer of 1991 that you don't really remember?

A I don't remember.

Q Actually, are there some things that you were telling when you were speaking today, when Ms. Watson [the assistant district attorney] was questioning you—She was the first one that talked to you here after the jury came in, right?

A Yes.

. . . .

Q When you answered Ms. Watson's questions here this afternoon and you gave some answers, were those from having practiced those answers or did you really remember?

A I remembered.

Q And was there a time back in August of 1991 when you didn't really remember?

A Yes.

Q You didn't?

A Not all of it.

Q Well, you remember more of it now than you did then?

A A little, yeah.

Q That's because you went over it a lot of times?

A A little.

(*Id.* at 616–17.)

Defense counsel failed to demonstrate to the jury the fact that J.N. had outright denied the facts of the sodomy allegation that was charged in Count Eleven of the indictment or that the Grand Jury testimony and the trial testimony were quite in-

consistent with respect to whose mouth was placed on whose penis.

### e. Jury Verdicts on Charges Related to J.N.

The jury convicted Jelinek on all seven of the counts in the indictment charging J.N. as the victim.

### f. Disposition of Charges Related to J.N. on Appeal

The Appellate Division dismissed four of the seven counts of conviction relating to J.N. because these counts were duplicitous—meaning that there was evidence at trial of multiple crimes for which the jury might have found the defendant guilty with respect to each of these counts, leaving it unclear whether the jury had decided unanimously to find Jelinek guilty for the same conduct. The dismissed counts were for sexual abuse in the first degree with respect to the four alleged incidents in which Jelinek touched J.N.'s buttocks and penis. The remaining convictions, including that for first-degree sodomy, were affirmed.

### 2. Child J.C.

Jelinek was charged with a number of counts alleging that he improperly touched and sodomized J.C., an eight-year-old boy who was a friend of one of his sons and whom he coached in Little League. As was the case with the sodomy count relating to J.N., the evidence offered at trial with respect to the alleged sodomy of J.C. varied from what was charged in the indictment. Specifically, Jelinek was charged with putting his penis to the anus of J.C. at Jelinek's home, but evidence at trial indicated only that such an incident occurred at a public beach.

### a. Charges Relating to J.C.

In all, eight counts in the indictment were for conduct in which J.C. was the alleged victim. Jelinek was accused of sodomy in the first degree relating to two incidents. In Count One—as amplified by the bill of particulars—he was charged with putting his mouth on the penis of J.C. in his home on or about June 1991. In Count Seven he was charged with placing his penis on the anus of J.C. at his home on or about July 1991.

Jelinek was accused of sexual abuse in the first degree relating to another five alleged incidents. In Count Two, he was charged with touching the penis of J.C. in his home on or about June 1991. In Count Three he was charged with touching the penis of J.C. at Tobay Beach, in Nassau County, on or about July 1991. In Count Four he was charged with rubbing his penis against the leg of J.C. at Tobay Beach on or about July 1991. In Count Five he was charged with touching the penis of J.C. in his home on or about June 1990. In Count Six he was charged with touching J.C.'s buttocks at his home on or about June 1990.

In Count Eight Jelinek was charged with the misdemeanor offense of endangering the welfare of a minor, J.C., by, on or about and between June 1990 and July 1991, engaging in sexual acts in the presence of and upon the person of J.C.—a charge which, as the prosecution explained to the jury, "incorporates the other acts, the touching of the penis, the touching of the buttocks, and the other acts alleged in the earlier counts of the Indictment with respect to [J.C.]." (Trial Tr. at 104.)

### b. Grand Jury Testimony of J.C.

J.C. was eight years old at the time he gave his Grand Jury testimony. He testified that he knew Jelinek both as his Little League baseball coach and as the father of

his friend, Jason. During his Grand Jury testimony, J.C. first described an incident in June 1990 in which Jelinek "tickled me and touched my private spots"—i.e., his "weenie and butt." (Aug. 22, 1991 Grand Jury Tr. at 12–13.) He also testified that Jason Jelinek and J.N. were in the house while this incident occurred (Sept. 27, 1991 Grand Jury Tr. at 18), and that the same type of touching occurred "like five" times between June 1990 and June 1991 (Aug. 22, 1991 Grand Jury Tr. at 13).

J.C. then told the Grand Jury that Jelinek, in June 1991 at his house, "asked me to sit on his lap and I sat on his lap. And Jason ... was upstairs, and me and [the defendant] went downstairs in the living room watching TV, and he would put like—he would touch me in my private spots and put his mouth on my weenie." (*Id.* at 14.) Before the Grand Jury in September, J.C. testified that J.N. was also present during this incident.

J.C. next described an incident that allegedly occurred at Tobay Beach in July 1991. He and a number of boys—including alleged victims J.N. and B.D., as well as Jelinek's sons Michael and Jason—had been taken to the beach by Jelinek. At one point everyone was swimming except for J.C. and Jelinek. J.C. testified that Jelinek wrapped a towel around him, sat him on his lap, touched J.C.'s penis over his bathing suit, and "put his weenie on my leg and rubbed it." (*Id.* at 16–17.) J.C. did not testify about the rubbing incident at trial.

After describing the Tobay Beach incident, J.C. further testified that his "butt" had hurt:

Q Do you remember telling your mommy you hurt someplace?

A Yes.

Q Where did you hurt?

A My butt.

Q When you told your mommy you hurt in your butt, did you know why you hurt in your butt?

A Yes.

Q Can you tell the Grand Jurors why you hurt in your butt?

A Roger Jelinek did it.

Q What did Roger Jelinek do?

A He put his weenie on my butt.

Q When you say he put his weenie, that's he put the same kind of thing that you have, right?

A Yes.

Q *He put that in your butt? Did he actually put it inside?*

A *No, not really.*

Q *Did he touch your butt with his weenie?*

A *Yes.*

(*Id.* at 17–18 (emphasis added).) It is not clear from the August Grand Jury testimony whether this incident occurred at Tobay Beach, but during his September Grand Jury appearance, J.C. testified that it was while *in Jelinek's house* in July 1991 that Jelinek *"put his weenie on my butt,"* leading him to eventually tell his mother that he had pain in the buttocks area. (Sept. 27, 1991 Grand Jury Tr. at 21–22 (emphasis added).)

Finally, J.C. testified at the Grand Jury that, sometime between the middle of June and the middle of July 1991, he witnessed the defendant *"put his mouth on [J.N.'s] weenie"* at Jelinek's home. (Aug. 22, 1991 Grand Jury Tr. at 19 (emphasis added).)

c. State Examination of J.C. at Trial

Just prior to J.C.'s testimony, defense counsel learned that J.C. would testify concerning uncharged criminal acts allegedly performed by Jelinek. Defense counsel objected that the defense was unfairly surprised by the prosecution and moved to

preclude such testimony as fatally prejudicial. The court denied the motion after defense counsel inaccurately conceded that he had not requested a bill of particulars with respect to the charge of endangering the welfare of a child.

J.C., who was now ten years old, testified, as he had before the Grand Jury, that on several occasions Jelinek tickled him or touched him on his "private spots." (Trial Tr. at 392.) He then testified about criminal acts that were not specifically charged in the indictment:

> Q Now, in June of 1990 when you were inside of the house and you say this happened, [J.C.], was there anybody else there?
>
> A Yes.
>
> Q Who else was there?
>
> A [J.N.] and Jason Jelinek.
>
> . . . .
>
> Q Now, [J.C.], in June of 1990, can you tell us what, if anything, you saw Roger Jelinek do to other people?
>
> A *I saw him put [J.N.'s] weenie in his mouth.*
>
> Q Who was present at the time?
>
> A What does present mean?
>
> Q Who else was there?
>
> A Jason Jelinek.

(*Id.* at 393–97 (emphasis added).) Jelinek was not charged in the indictment with putting the penis of J.N. in defendant's mouth in June of 1990; rather, he was charged with performing a similar act in June or July of 1991. At the Grand Jury, J.C. said defendant put his mouth *on* J.N.'s penis, while at the trial he said defendant put J.N.'s penis *in* defendant's mouth. As noted above, during the trial J.N. testified that *defendant put his penis in J.N.'s mouth,* and flatly denied that the defendant had placed J.N.'s penis in defendant's mouth.

J.C. did testify that in June of 1991 Jelinek put his mouth over J.C.'s penis, an act that *was* charged in the indictment:

> Q [I]n June of 1991 can you tell us what, if anything, Roger Jelinek, the defendant, did to you?
>
> . . . .
>
> A Well, he still touched me on my private spots and he put my weenie in his mouth.
>
> Q Now, when you say he still touched your private spots, can you tell us how many times that happened in June of 1991, approximately?
>
> . . . .
>
> A Five times.
>
> Q And was that both of your private spots?
>
> A Yes.
>
> Q And where did that happen?
>
> A Either at his house or at the beach.
>
> Q And when you say he put your weenie in his mouth, where did that happen?
>
> A At his house.

(*Id.* at 397–98.)

J.C. was next queried about an incident in which Jelinek allegedly placed his penis to J.C.'s anus. J.C.'s testimony at the Grand Jury indicated the incident occurred at Jelinek's home, the bill of particulars indicated the incident occurred at Jelinek's home, and the jury was advised in the prosecution's opening that the state would prove that the incident occurred at Jelinek's home. Nonetheless, J.C. unequivocally *denied* at trial that such an incident occurred at Jelinek's home:

> Q Now, [J.C.], I next want to ask you about July of 1991. Can you tell us what, if anything, the defendant did that time in July of 1991?
>
> A At his house or at the beach?

Q Let's start with at his house.

A *Nothing happened at his house, but at the beach things happened.*

Q What is it that would happen at the beach?

A In July, 1991, when I went to the beach with him—.... with his son, Jason, Michael, Brett, [J.N.], and he was sitting in a chair.

Q Who is "he"?

A Roger Jelinek. And he told me to sit in his lap, and I sat in his lap, and he put a towel around us and he touched my private spots, and *he put his weenie in my butt.*

Q Now, where were the other boys that you say went to the beach with you at that time?

A In the water.

Q Now, [J.C.], how many times since you've known Mr. Jelinek, Roger Jelinek, *has he put his weenie on your butt?*

A Once.

Q And what did you do after that happened?

. . . .

A I went home and I told my mom that my butt hurt.

Q And what did she do?

A She put Vaseline on it.

Q Now, other than at the beach in July of 1991, at any time, other time, during that month, did Mr. Jelinek do anything to you?

A No.

(*Id.* at 398–400 (emphasis added).) It will be noted that the direct testimony of J.C. was not consistent with respect to whether defendant's penis was placed "in" or "on" J.C.'s "butt." Testimony of J.C. before the Grand Jury that a butt-penis incident occurred at defendant's home was inconsis-

tent with testimony at trial that it occurred at the beach.

Finally, J.C. provided the only testimony in support of the charge that Jelinek put his mouth to J.N.'s penis, stating that he "saw [Jelinek] put [J.N.'s] weenie in his mouth" between June and July of 1991. (*Id.* at 400.) J.N. himself, as already noted, flatly denied at trial that this incident occurred.

J.C. did not testify about the incident he described before the Grand Jury during which Jelinek allegedly rubbed his penis against J.C.'s leg at Tobay Beach. As pointed out below, although *no* evidence of this alleged crime was offered at trial, Jelinek was nonetheless convicted of it.

### d. Defense Examination of J.C. at Trial

On cross-examination, defense counsel tried to establish that J.C. had been subjected to suggestive and unreasonable questioning by the state officials who first interviewed him. This was a strategy counsel deployed throughout the trial, presumably in anticipation of arguing at closing that the children's testimony was largely the product of suggestion. As was the case with respect to his questioning of J.C., this examination strategy yielded very little of substance from any of the children that might be used in support of such an argument.

Counsel did elicit from J.C. an acknowledgment that he never told his parents about any of these incidents. J.C. also stated, however, that he was interviewed by police detectives for less than an hour and that the detectives did not tell him they thought Jelinek had done anything wrong:

Q Well, you're outside with the two detectives and they told you that they are police detectives and you

have seen their badges. What's the next thing that they said?

A They asked me if I knew Roger Jelinek.

Q What did you say?

A Yes.

Q What's the next thing they said?

A They asked me if he did anything to me.

Q Now, did they suggest to you the type of things that they thought he had done?

A No.

Q Did they tell you any type of things that they thought he might have done?

A No.

Q Now, did you want to help the police?

A No.

Q Pardon me?

A No, I just told them my story.

Q Now, you talked to them for two hours?

A I didn't talk to them for two hours. They talked with my whole family for about two hours.

Q For how long did you talk to them?

A 45 minutes, half an hour.

(*Id.* at 403–04.)

Defense counsel proceeded to cross-examine J.C. about the sodomy incident allegedly perpetrated at Tobay Beach—an accusation, as noted above, that at least with respect to location and to whether or not Jelinek's penis was "in" or "on" J.C.'s butt—varied from what was charged in the indictment:

Q Now, when you went to the beach did the defendant take you alone or were there other people there?

A There were other people there.

Q And you say something happened with the towel. Did you bring the towel?

A No.

Q You went to the beach without a towel?

A I went to the beach with a towel, but it wasn't my towel that he put around us.

Q Did you go swimming at the beach when you say he put a towel around you?

A Yes.

Q Were you cold after you went swimming?

A After I dried myself off I wasn't cold.

Q Let's understand something. What the name of this beach?

A Tobay.

Q Were there life guards?

A Yeah.

Q Other people around?

A Yeah.

Q This is daytime?

A Yes.

Q Now, you said that Mr. Jelinek touched you in your private spots and *touched his weenie to your butt.* Is that what you said?

A Yes.

Q Was that outside?

A Yes, but when that happened he had a towel around us so no one could see.

Q But it was outside your butt?

A Yes.

Q Now, did you ask to leave?

A No, after that I fell asleep.

Q Was this in the morning or the afternoon?

A The afternoon.

Q You went home that night?

A Yes.

Q And you say that the defendant *touched the outside of your butt* with his weenie?

A *No, he touched my butthole.*

(*Id.* at 417–19 (emphasis added).) Unremarked by either side at trial was the testimony J.C. gave at his second Grand Jury appearance, in which he testified that Jelinek "put his weenie *on my butt*" and that the incident had occurred at Jelinek's home. (Sept. 27, 1991 Grand Jury Tr. at 21.)

e. Jury Verdicts on Charges Relating to J.C.

The jury convicted Jelinek on each of the eight counts charged in the indictment relating to J.C., including the count alleging Jelinek had rubbed his penis against J.C.'s leg.

f. Disposition on Appeal of Charges Relating to J.C.

The Appellate Division found that no evidence was presented at trial tending to prove that Jelinek rubbed his penis against J.C.'s leg and, accordingly, reversed Jelinek's conviction for sexual abuse in the first degree with respect to that count. The court also dismissed three other counts of sexual abuse in the first degree, concluding that the indictment was defective because these counts were duplicitous. The dismissed counts related to the incidents in which Jelinek allegedly (1) touched J.C.'s penis in June 1991 in his home; (2) touched J.C.'s penis in June 1990 in his home; and (3) touched J.C.'s buttocks in June 1990 at his home. The remaining four convictions, including that for the sodomy incident that allegedly occurred at Tobay Beach, were affirmed.

3. Child C.H.

a. Charges Related to C.H.

Two counts in Jelinek's indictment related to nine-year-old C.H., another of the boys whom Jelinek coached in Little League. Count Nine of the indictment was for sexual abuse in the first degree, in which Jelinek was accused of touching C.H.'s penis on or about and between March 10 and April 10 of 1991 outside of his home. Count Ten charged Jelinek with endangering the welfare of a child, C.H., by engaging in sexual acts upon C.H. on or about and between March and April of 1991.

b. Grand Jury Testimony of C.H.

C.H. was nine at the time of his Grand Jury appearance. He lived within two blocks of Jelinek's home, was a friend of Jason Jelinek, and was on the Little League baseball team that Jelinek coached. His brief testimony concerned an incident that allegedly took place in front of the Jelinek home in April 1991:

Q Can you tell us, please, what did [the defendant] do, if anything, in front of the house, what happened?

A Well, my side of the door was locked so I asked him to open it, and he went to open it and he touched my stomach, then he rolled it down and touched my private spot.

Q What did he touch your private spot with?

A His hand.

Q When you say your "private spot," what spot are you talking about?

A The penis.

(Sept. 27, 1991 Grand Jury Tr. at 74–75.)

c. State Examination of C.H. at Trial

C.H. was eleven at the time of the trial, and testified substantially as he had before

the Grand Jury, indicating that Jelinek touched his penis while he was in defendant's car outside of Jelinek's home.

### d. Defense Examination of C.H. at Trial

On cross-examination, defense counsel attempted—with some success—to show that C.H.'s story might have been the product of suggestive police interrogation. C.H. acknowledged on cross that he did not discuss the alleged abuse with his parents until after speaking with police detectives, and described speaking for about an hour with the detectives who explained they were interviewing him because "other kids mentioned [his] name" in connection with their investigation of Jelinek. (Trial Tr. at 327.) The cross-examination included the following exchange:

Q Did [the detectives] tell you that they knew [Jelinek] did bad things?

A Yes.

Q And did they tell you that they knew he had done bad things to you?

A No.

Q What did they say?

A They asked me if he did anything to me.

Q What were the words that they used?

A I don't know; I'm not sure. It was a long time ago.

Q So they told you that, if I'm correct, that other kids had given—they showed you their badges, they told you that other kids had given your name to them, and they asked you if he had done anything?

A Yes.

Q And did they describe to you the types of things they thought he might have done?

A No.

Q What did you say to them when they asked you if they thought, if he had done anything?

A I said, yes, he did.

Q And what did they say?

A They said, can you tell me what happened?

(Tr. at 328–29.)

Defense counsel was more successful in demonstrating that C.H. might have simply told the police detectives what they wanted to hear:

Q Now, when the detectives showed you the badges were you afraid?

A No.

Q Do you like to please people?

A Yeah.

Q And did you want to please the detectives?

A I guess, yes, I did, because—yes, I wanted to please the detectives.

Q What were you going to say?

A I was going to say what happened.

Q Well, did the detectives tell you what they thought had happened?

A No.

Q Did the detectives tell you what the other children said had happened?

A No.

. . . .

Q Where was Jason [Jelinek]?

A It was a long time ago, I'm not totally sure. He was either in the car or outside of the car.

Q Now, you say this happened a long time ago, and you're not that sure of the date or the weather or other things. Would it be fair to say that your memory of the events is a little less than perfect?

A Yes.

(*Id.* at 338–39.)

In addition, counsel briefly addressed the substance of C.H.'s testimony, seeking to show that C.H. could not even be certain that Jelinek touched him with his hand or with an umbrella.

e. Jury Verdicts on Charges Relating to C.H.

The jury convicted Jelinek on both counts of the indictment for which C.H. was the alleged victim.

f. Disposition of Charges Related to C.H. on Appeal

Both convictions were affirmed on appeal.

4. Child G.B.

Unlike the other six alleged victims, G.B. was the only complaining witness to have initiated contact with the police to allege that he had been sexually abused by Jelinek. He was also the only child to be declared a "vulnerable child witness" and allowed to testify via closed-circuit, two-way television from another room in the courthouse—something that defense counsel strongly objected to as an infringement of Jelinek's rights under the Confrontation Clause.

a. Charges Related to G.B.

Fourteen of the counts lodged against Jelinek in his indictment related to conduct of which G.B. was the alleged victim. Thirteen of the charges concerning G.B. were for sexual abuse in the first degree. Count Eighteen charged Jelinek with touching the penis of G.B. in his home on or about February of 1991. Count Nineteen charged him with touching the penis of G.B. on or about February 1991 at his home in a separate and distinct act.

Count Twenty charged him with touching the penis of G.B. on or about February 1991 in another separate and distinct act. Count Twenty–One charged him with touching the buttocks of G.B. on or about February 1991 at his home. Count Twenty–Two charged him with touching the buttocks of G.B. on or about February 1991 at his home in a separate and distinct act. Count Twenty–Three charged him with touching the buttocks of G.B. on or about February 1991 at his home in another separate and distinct act. Count Twenty–Four charged him with touching the penis of G.B. on or about July 1991 at Tobay Beach. Count Twenty–Five charged him with touching the penis of G.B. on or about July 1991 at Tobay Beach in a separate and distinct act. Count Twenty–Six charged him with touching the penis of G.B. on or about July 1991 at his home. Count Twenty–Seven charged him with touching the buttocks of G.B. on or about July 1991 at Tobay Beach. Count Twenty–Eight charged him with touching the buttocks of G.B. on or about July 1991 at Tobay Beach in a separate and distinct act. Count Twenty–Nine charged him with touching the buttocks of G.B. on or about July 1991 at his home. Count Thirty charged him with putting his mouth on the buttocks of G.B. on or about July 1991 at his home.

Count Thirty–One charged Jelinek with the misdemeanor of endangerment of a child, G.B., by, on or about and between June 1987 and July 1991, engaging in sexual acts at his home and at Tobay Beach in the presence of and upon the person of G.B.

b. Grand Jury Testimony of G.B.

G.B., ten years old at the time of his Grand Jury appearance in October 1991, contacted police to initiate a complaint against Jelinek. He was the catalyst for

the subsequent investigation. Before the Grand Jury, he testified that although he presently lives with his mother in Buffalo, several years earlier they had been neighbors of the Jelineks on Long Island. G.B. was a friend of Jelinek's son Jason. He visited the Jelinek home almost every day when he lived in the neighborhood. He described a very close relationship with the defendant, whom he apparently considered a surrogate father.

G.B. explained before the Grand Jury that he had made several trips to Jelinek's home since moving upstate. He testified that during one such trip in October of 1990, Jelinek "rub[bed] my penis and my butt" while his clothes were on and that he "sometimes . . . put his hands under my clothes." (Oct. 1, 1991 Grand Jury Tr. at 11.) At a subsequent Grand Jury appearance the next day, G.B. corrected himself and stated that this trip occurred in February rather than October.

G.B. also testified that during another trip, in July of 1991, Jelinek touched him "on [his] penis and on [his] butt" while they were in the water at Tobay Beach, and that Jelinek did so "once to three times" on separate days. (*Id.* at 12.)

He next described an incident that allegedly occurred on July 23, 1990, in which Jelinek accosted him as he got out of the shower in Jelinek's home. As G.B. described it,

> I was coming out of the shower and he told me to give him a hug. And I didn't want to. And he told me to. So I came over. He took my towel away and he tried touching me, and I wouldn't let him. And he was—and he was kind of forcing my—I was covering myself with my hand. And he was forcing my hand away. And he was—and he held onto me. And, finally, I got away from him, took my towel, unlocked the door, by the

way, it was locked, and I ran upstairs and got dressed.

(*Id.* at 13.) G.B. further stated that Jelinek had given him a "tushee bite"—where "he places you down on the bed and bites your butt"—at the time of the incident. (*Id.* at 14.)

### c. "Vulnerable Child Witness" Hearing

Prior to testifying at trial, G.B.'s mother was questioned at a hearing in order to allow the trial court to determine whether G.B. would be psychologically harmed if forced to testify in the courtroom. G.B.'s mother testified that following the alleged incidents of abuse by Jelinek, G.B. had become

> defiant with authority, especially all male figures. He has a hard time maintaining any friendships. He is very argumentative, he will only do something if it's put to a point where, would you like to do it? The moment you tell him to do something, that it is a command or something that has to be done, he refuses to do it, no matter what the consequences are. He is not doing well in school; he is now failing school. He has made one suicide attempt, and three times where he indicated to a teacher, myself and his brother's ex-girlfriend, how he wished to be dead but didn't know a way to kill himself that would not be painful.

(Trial Tr. at 528–29.)

Over defense counsel's objections, the trial court found that, pursuant to New York law, G.B. was a vulnerable child witness and concluded that he should be allowed to testify via closed-circuit, two-way television:

> I make the following findings of fact: . . . . [G.B.] became very friendly with the defendant's son, Michael, and through Michael got to know the defen-

dant, essentially became a part of the defendant's family....

The relationship between Jelinek and the defendant [*sic*] was quite close. As a matter of fact, [G.B.] would refer to Jelinek as dad, and [G.B.] indicated that he felt that no one loved him as much as Roger Jelinek. It was his honest wish that his mother marry Mr. Jelinek so that they could all be one family....

He generally stayed, he did stay at defendant's home and defendant paid for his travel from Buffalo to Seaford [on occasion]. He would generally stay for two to three weeks, occasionally just one week.

During those periods of time defendant was responsible for his custody. [G.B.] stayed at his home throughout the period. And it was during these visits, in part, that the alleged criminal activities of defendant occurred.

. . . .

[Following an alleged incident of sexual abuse, G.B.'s mother] noticed certain changes in [G.B.'s] personality and described his emotions after his return to Buffalo following that incident. She indicated that she observed he was very defiant toward male authority, argumentative, unruly, began to fail in school; on one occasion, while staying with his father, attempted suicide, and on three other occasions had indicated that he wished that he was dead but was fearful because of the pain that might be involved.

[G.B.] went into therapy shortly after his attempted suicide....

When his mother asked him to come down here and testify, he became very upset, didn't want to, didn't want to talk about it, said it was a very private business. He was extremely angry. He missed school, he wouldn't do his homework, didn't sleep well, took a lot of aspirin, he said to sleep. He was terrified, she said, of who might find out about this case. Other behavioral changes that she observed was that he fought a lot, wouldn't bathe, was unkempt and withdrawn.

The Court also refers to, and incorporates by reference in its findings of fact, ... a written statement of [G.B.]. He indicated to his mother in connection with his coming down here that he was afraid of the defendant's family and the intimidation he may be facing. However, at the last minute his mother indicated he changed his mind and wished to come down and testify.

The Court makes the following conclusions of law:

The Court believes that it has been established by clear and convincing evidence that it is likely as a result of the extraordinary circumstances of this case, as stated, that [G.B.] will suffer severe emotional harm if required to testify at this criminal proceeding in the usual fashion and without the use of life [*sic*] two-way closed circuit television, which I believe, if utilized, will help to diminish the likelihood and extent of such potential harm.

That conclusion is based on the following summary: [G.B.] is quite young; he's twelve years of age. Mr. Jelinek was in a position of authority, there was a close relationship between them. He called him dad.

Furthermore, the relationship and the alleged criminal activity, particularly as set forth in count 31 of the Indictment alleging endangering the welfare of a child, extended over a long period of time, as alleged in the papers, June of '87 to July of '91.

Accordingly, I find that [G.B.], under the circumstances, is a vulnerable witness, and I authorize the personnel that

[are] present here to conduct the life [*sic* ] two-way closed television, and that the testimony of [G.B.] as a vulnerable witness be taken from the testimonial room outside of this courtroom, and that the two-way closed circuit pertain.

It is my opinion, based upon what I've heard, and I make a specific finding, that if [G.B.] and defendant were in the same room during the testimony antici-pated to be given by [G.B.], it would contribute to the likelihood that [G.B.] would suffer severe emotional harm.

(*Id.* at 550–55.)

d. State Examination of G.B. at Trial

Pursuant to the trial court's order, G.B. testified via closed circuit television. A videotape recording of the testimony was preserved for possible use on appeal and is part of the record in the present case. The videotape is a powerful illustration of the perils that await counsel considering a vigorous cross-examination of a highly in-telligent child testifying about sexual abuse.

In his testimony, G.B. first described the shower incident he had briefly testified to before the Grand Jury. As he described it at trial,

> We were coming home from Tobay Beach and I was taking a shower. I got out of the shower, and he told me—he was sitting on his back, and he told me to come and give him a hug. I didn't want to, but I did any of it [*sic* ]. I just wanted a towel, he tried to pull the towel away, and he did. But I covered myself with my hands, and he was trying with excessive force to pull my hands away. And I broke away, and the door was locked. And I opened the door, I ran upstairs, I got dressed.
>
> Later on that day I called my mother and she just told me what to do. I stayed with the Jelineks a day or two

longer, and my Uncle Robert, [who] is a police officer, he came in the park where [defendant] had a concession stand, they came and picked me up.

(*Id.* at 563–64.)

G.B. described other incidents as well, testifying that Jelinek "had a little game in which he could make sexual contact, he called it a tuschy bite. And he would place his mouth on my butt." (*Id.* at 565.) He described sitting on Jelinek's lap a number of times while watching television, during which Jelinek would give him a back rub that would "go lower and lower, and he would rub my penis and my butt." (*Id.* at 565–66). He testified that at least several times when they were at the beach Jelinek would take him out into the water, where he "would hold me in his arms to keep me up, and he would rub me on my penis and my butt in the water." (*Id.* at 566.)

e. Defense Examination of G.B. at Tri-al

As he had done when cross-examining other witnesses, defense counsel queried G.B. as to whether his testimony had somehow been coached or unduly influ-enced by the suggestive questioning of state investigators. G.B. stated that after filing his complaint he spoke with detec-tives for at least an hour and that he had spoken with a social worker before that.

Hoping to demonstrate that G.B. had been coached, counsel asked whether in his testimony G.B. was using his own language or language suggested by detectives or the prosecution:

> Q [D]o you remember a line [in your written statement to a detective] saying . . .—if you tell the truth then justice will be served? Do you remember the statement having something like that in there?
>
> A Yes, something like that.

Q And that was Detective Merriweather's language, wasn't it?

A No, it was mine.

Q You said those words?

A Yeah.

Q Those are your ordinary words?

A Yes.

Q Okay. And when you said here that Roger Jelinek, after your shower, was trying with excessive force to pull my hands away, those are your ordinary words, right?

A Yes, uh-hum.

Q You use those words every day?

A Yes. I want to some, I wanted to make it sound like—I don't know, I wanted to use a bigger vocabulary.

Q Okay. And where did you learn some of that vocabulary from? The police?

A No, from school.

Q From school?

A Uh-hum.

Q And did you learn some of it from the television?

A Yeah, I watch television; they say stuff like that.

Q So that a lot of the language that you're using here today is like police language?

. . . .

A No.

(*Id.* at 573–74.) Counsel managed through such questions only to demonstrate that G.B. was intelligent and articulate.

Counsel also wished to convey to the jury the degree to which G.B.'s home life was troubled. This attempt was hampered by the presence of G.B.'s mother sitting right beside the boy in the room from which the video issued:

Q Well, actually before you called your mother and you described [the shower incident], she hadn't been paying much attention to you, had she?

A Yes, she has.

Q Well, I'm talking about that time. Back then, that summer.

A She pays lots of attention to me.

Q I'm not talking about now. I'm talking about—

A She always has. She always has.

Q She always paid a lot of attention to you?

A She's been a great mother.

Q She's sitting right next to you, isn't she?

A Yes, she is.

(*Id.* at 578.)

Defense counsel also suggested that G.B.'s accusations might have stemmed from his jealousy of Jelinek's adopted son, or perhaps from the lack of attention he was receiving from Jelinek. As the videotape demonstrates, by this point in the cross-examination G.B. was barely holding back tears:

Q Now, in your statement do you remember saying that Roger got this kid named Jason whom he adopted later on?

A Yes, he got Jason.

Q And were you annoyed with Jason?

A No. Why would I be?

Q Well, it's really for me to ask the questions.

. . . .

Q Now, the first time you came down from Buffalo to stay with the Jelineks, you went to a lot of places; is that right?

A I don't remember.

Q You had a good time?

A Yeah, probably.

Q And the second time you weren't being taken anyplace, were you?

A I don't know. I don't even remember.

Q Weren't you upset because nothing much was happening and you were there in the summer?

A No.

Q Wasn't Mr. Jelinek busy with the new business, the concession stand?

A He might have been, but that didn't make me mad at him.

(*Id.* at 582–83.) Counsel soon brought his questioning to an end, apparently recognizing that to push this witness any further would lead to a display of emotion that would likely garner even more sympathy for the child and work to Jelinek's disadvantage.

f. Jury Verdict on Charges Related to G.B.

The jury convicted Jelinek on each of the fourteen counts for which G.B. was the alleged victim.

g. Disposition of Charges Related to G.B. on Appeal

The Appellate Division dismissed twelve of the thirteen felony counts of conviction with respect to victim G.B., on the ground that each of the counts in the indictment was duplicitous. The only felony conviction affirmed by the Appellate Division was for Count Thirty, sexual abuse in the first degree, relating to the incident in which Jelinek put his mouth on the buttocks of G.B. on or about July 1991 at his home. The Appellate Division also affirmed Jelinek's misdemeanor conviction for endangering the welfare of G.B.

5. Child B.D.

a. Charges Related to B.D.

B.D. was the oldest of the children to testify. Four counts of the indictment accused Jelinek of acts in which he was the alleged victim. Count Thirty–Two charged Jelinek with sexual abuse in the second degree for touching the penis of B.D. on or about June 1989 near defendant's home.

Two counts alleged sexual abuse in the third degree. Count Thirty–Three charged Jelinek with touching the penis of B.D. on or about June 1991 in his home. Count Thirty–Four charged him with touching the penis of B.D. on or about June 1991 in his home in a separate incident.

Count Thirty–Five charged Jelinek with endangering the welfare of a child, B.D., by, on or about and between June 1989 and June 1991, engaging in sexual acts in the presence of and upon the person of B.D. at Jelinek's home and at Tobay Beach.

b. Grand Jury Testimony of B.D.

B.D., fifteen years old at the time of his Grand Jury appearance in August 1991, testified that he was the best friend of Michael (one of Jelinek's sons), that he had known Jelinek for about four years, and that he worked part time for him at his concessions stand. He first described an incident that allegedly occurred in June 1989, in which he and Michael were being driven to the movies by Jelinek. He testified that when Michael got out of the car, Jelinek "put his arm over to the back seat and started touching me," and that he was touched "[o]n my knee and then he moved up to my penis." (Aug. 22, 1991 Grand Jury Tr. at 29.) He also described an incident in Jelinek's home in June 1991 in which Jelinek "invited me into his bedroom

to see what candy to stock because he was working—he leased out a concession stand, and he wanted to see what he should get and he asked me. Then he started touching me .... [o]n my penis .... [w]ith his hands." (*Id.* at 30–31.) Similar incidents occurred between June 1989 and June 1991, but B.D. explained he did not tell anyone about them because he "was embarrassed and ... didn't want Michael to lose his father." (*Id.* at 31.) At a subsequent Grand Jury appearance in September, B.D. testified to another similar incident, occurring in July 1991, during which Jelinek allegedly "started to rub over my clothes and then he pulled down my pants and rubbed my penis." (Sept. 27, 1991 Grand Jury Tr. at 9.)

### c. State Examination of B.D. at Trial

B.D. was sixteen at the time of the trial. He testified to a number of incidents involving improper touching by Jelinek, first describing the incident in June 1989 in Jelinek's car during which Jelinek "started rubbing my knee and he moved up to my penis." (Trial Tr. at 493–94.) He next described a pair of incidents that took place at Jelinek's home:

Q Now, again during June did anything happen between you and Roger Jelinek?

A Yes.

Q Can you tell us what happened?

A Well, we were getting ready to go to the concession stand [where B.D. worked part time for Jelinek] and he had a list of candy and he wanted me to like pick out what to get. And we were in his bedroom and he was laying on the bed and he was like on the corner of the bed and he started rubbing my penis over my clothes, then he pulled down my pants and started rubbing my penis.

Q And can you tell us where that happened, where in his house?

A In his bedroom.

Q And who took your pants down?

A He did.

Q Now, I want to direct your attention to the following month, July of 1991. Did there come a time when anything happened between you and the defendant at that time?

A Yes.

Q And can you tell us what happened?

A Well, we were in his bedroom, looking at baseball cards, and he started rubbing my penis over my clothes and then he pulled down my pants and started rubbing my penis.

(*Id.* at 495–96.)

B.D. also testified that he was at the beach when Jelinek allegedly molested J.C. He stated that although he observed J.C. and Jelinek wrapped in a large towel, he observed no abuse. Finally, he testified that there were other incidents in which Jelinek tried to rub B.D.'s penis over his clothes but that he could not estimate how many times Jelinek had done so.

### d. Defense Examination of B.D. at Trial

Trying to paint Jelinek's home as an unlikely venue for perpetrating sexual abuse, defense counsel asked B.D. whether he was aware that Jelinek's wife had Krohn's disease, making her subject to frequent, unannounced trips home from her job due to chronic diarrhea. He also inquired whether B.D. was aware that one of Jelinek's older, working daughters was usually at home during the daytime.

In response to further questioning, B.D. acknowledged that he told no one of the incidents of abuse even though they had

allegedly occurred over the course of a couple of years. He also acknowledged that he initially refused to describe these incidents to the investigating detectives:

Q So it was only after the detectives talked to you for a while that you changed what you had said?

A Yes.

Q Now, you said this happened over the course of a couple years; is that right?

A Yes.

Q Did you ever tell your parents?

A No.

Q Did you ever tell anybody at school?

A No.

Q Did you ever tell, ever tell your grandparents?

A No.

Q So the first time that you really talked to anybody about this was to the detectives?

A Yes.

Q Now, after you said no, that you had no information, what did—Who's doing the talking, Detective Merriweather or Detective Anderson?

A I'm not sure. I think both of them.

Q What did they say to you before you changed what you had to say?

A They said that they had gotten a lot of people referred to me.

Q Were those the words that they used or did they use some other words, as best you remember?

A They just said that they talked to other kids and that my name came up a lot.

Q Now, when they said that to you, were you scared?

A Not really.

Q When you said no, were you scared?

A I was more embarrassed.

(*Id.* at 507–08.)

e. Jury Verdicts on Charges Related to B.D.

The jury convicted Jelinek on each of the four counts for which B.D. was the alleged victim.

f. Disposition of Charges Related to B.D. on Appeal

All of the convictions for which B.D. was the alleged victim were affirmed by the Appellate Division.

6. Child P.W.

a. Charges Related to P.W.

Five counts of the indictment charged Jelinek with crimes of which eight-year-old P.W. was the alleged victim. Four counts were for sexual abuse in the first degree. Count Thirty–Six charged Jelinek with touching the penis of P.W. on or about and between June 15 and July 15 of 1991 at his home. Count Thirty–Seven charged him with touching the buttocks of P.W. on or about and between June 15 and July 15 of 1991 at his home. Count Thirty–Eight charged him with touching the penis of P.W. on or about and between June and July of 1991 at his home, in a separate and distinct act from that alleged in Count Thirty–Six. Count Thirty–Nine charged him with touching the buttocks of P.W. on or about July 1991 at his home, in a separate and distinct act from that alleged in Count Thirty–Seven.

Count Forty charged Jelinek with endangering the welfare of a child, P.W., by, between September 1988 and July 1991, engaging in sexual acts in the presence of and upon the person of P.W.

### b. Grand Jury Testimony of P.W.

Before the Grand Jury, P.W. explained that he was friends with one of Jelinek's sons and lived around the corner from the Jelinek home. He described an incident in June 1991 while in Jelinek's home waiting for Jason Jelinek. He testified that the defendant suggested he play Nintendo while he was waiting for his son, "And then, then I was just about to sit down and he just came up and I looked at him like I don't know. And then and then he just— he grabbed me by the penis and he just walked away." (Sept. 27, 1991 Grand Jury Tr. at 63.)

P.W. also briefly described an incident in July 1991 in which he was touched by Jelinek on the buttocks.

### c. State Examination of P.W. at Trial

P.W. was nine years old at the time of trial. He testified as he had before the Grand Jury that Jelinek once touched him on his penis while he was in Jelinek's home in June of 1991, and once on his buttocks in July of 1991.

### d. Defense Examination of P.W. at Trial

On cross-examination defense counsel elicited from P.W. that he was interviewed by an investigating detective for about two hours on one day and by a Child Protective Services caseworker for about an hour and a half on another day. P.W. denied that he was told by either of the investigators that they knew something had happened between him and Jelinek. He did testify, however, that the detective "said hi, what's your name? He said, where do you live? And he wrote it down. And he asked me what Roger Jelinek did to me." (Trial Tr. at 462.)

### e. Jury Verdicts on Charges Related to P.W.

The jury convicted Jelinek of two of the four felony counts for which P.W. was the alleged victim, as well as for the misdemeanor charge of endangering the welfare of P.W. The jury acquitted Jelinek of the charge of sexual abuse in the first degree relating to one of the charged incidents in which Jelinek allegedly touched his penis, and also acquitted Jelinek of one of the charges that he had touched P.W.'s buttocks.

### f. Disposition of Charges Related to P.W. on Appeal

The Appellate Division affirmed each of the two felony convictions as well as the misdemeanor conviction.

### 7. Child C.S.

Testimony provided at both the Grand Jury and at trial by C.S., the youngest of the alleged victims of abuse by Jelinek, was notable for its lack of consistency. It is unsurprising that the jury acquitted Jelinek of each of the counts lodged against him with respect to allegations of sexual abuse against C.S.

### a. Charges Related to C.S.

Three counts of the indictment charged Jelinek with crimes against C.S., a six-year-old neighbor of Jelinek. Two counts were for sexual abuse in the first degree. Count Forty–One charged Jelinek with touching the penis of C.S. on or about and between December 15, 1990 and January 15, 1991 at his home. Count Forty–Two charged Jelinek with touching the buttocks of C.S. on or about and between December 15, 1990 and January 15, 1991 at his home.

Count Forty–Three charged Jelinek with endangering the welfare of a child, C.S., by, on or about and between Decem-

ber 1990 and January 1991, engaging in sexual acts upon C.S. in Jelinek's home.

b. *Grand Jury Testimony of C.S.*

At the Grand Jury, C.S. stated that he was friends with two of Jelinek's sons and lived near the Jelinek home. He was asked about an incident in which Jelinek allegedly touched his penis and buttocks around December 1990 in a series of leading questions:

Q Do you remember being inside Mr. Jelinek's house?

A Yes.

Q Do you remember if he touched you at all?

A Yes.

Q Where did he touch you?

A Privates.

Q Your privates?

A Yes.

Q Where is that? Where are your privates?

A [Indicating the groin area.]

Q Did you have your clothes on then, [C.S.]?

A Yes.

Q Did he touch you anyplace else?

A Yes.

Q Where else did he touch you?

A Here (indicating). The B word.

Q The "B word"?

A Yes.

Q Would that be your butt?

A Yes.

Q How did he touch you there?

A He pulled down.

Q He pulled down what? You have to say the word. You are pointing to something?

A The pants and the underwears.

Q After he pulled those down, what did he do?

A He touched.

Q Where did he touch.

A Here (indicating).

Q Did he touch your penis?

A Yes.

Q Did he touch—when you say the "B word—"

A Butt.

Q Did he do anything else besides just touching it?

A No.

Q Did he ever hit you or do anything in the butt area?

A Yes.

Q What did he do?

A He (indicating) here.

Q You have to say what it is. You have a fist there?

A Yes, he hit my butt.

Q Was his hand open or did he have a fist?

A Fist.

Q Did that hurt you when that happened?

A Yes.

(Sept. 27, 1991 Grand Jury Tr. at 51–53.)

c. *State Examination of C.S. at Trial*

At the time of trial C.S. was eight years old. He testified that Jelinek touched his penis and buttocks while he was in Jelinek's home:

Q Did something happen?

A Yes.

Q And can you tell us what happened? Tell us what happened.

A He put his hands inside my pants.

Q And did he touch you someplace?

. . . .

A Yes.

Q Where did he touch you?

A Both private parts.

Q On where?

A Both privates.

(Trial Tr. at 346.)

When asked whether Jelinek had ever hit him, C.S. replied both "No," and "I wasn't sure." (*Id.* at 348.)

d. Defense Examination of C.S. at Trial

On cross-examination, defense counsel elicited from C.S. that detectives interviewed him for about an hour and a half and that they met "four or five times" with him (*id.* at 353), though he could not remember where. After noting that he had trouble recollecting the events surrounding the alleged incident and the police questioning, C.S. agreed with defense counsel that "the only reason you seem to have some memory of this now is because the police went over it with you again and again and again." (*Id.* at 354–55.) Counsel also asked C.S. whether the detectives were upset that he couldn't remember things, and elicited from C.S. what appears to be an acknowledgment that the police asked him leading questions:

Q In other words, when [the detectives] came to you and after they showed you their badges and they were talking to you, they showed you that they were upset with Mr. Jelinek; is that right?

A Yes.

. . . .

Q Who was doing the talking from the detectives? Was it the man or the lady?

A Both of them.

Q And did they say to you, didn't Roger Jelinek, Mr. Jelinek, didn't he put his hands into your pants?

A Yes.

Q Didn't they say didn't he put his hands into your pants in front and in the back?

A Yes.

Q So pretty much they gave you an idea of what they thought happened; is that right?

. . . .

A Yes.

(*Id.* at 358–60.) On re-direct examination, C.S. denied that the detectives had told him what to say.

e. Jury Verdicts on Charges Relating to C.S.

The jury acquitted Jelinek of all charges for which C.S. was the alleged victim.

C. Testimony of Other State Witnesses

1. Detective Vashti Anderson

Vashti Anderson, a detective with the Nassau County Sex Crime Squad, was called by the state to testify that she and her partner investigated the allegations of sexual abuse made against Jelinek. The gist of her testimony was that she had personally interviewed six of the seven alleged victims. The subtle bolstering of the children's testimony by this indirect hearsay was not objected to by defense counsel.

On cross-examination, defense counsel queried whether the detectives' interviews were unduly long, whether they presented themselves to the children in a physically imposing manner, whether the detectives displayed their badges to the children, and whether they "suggest[ed] to any of these youngsters in the course of the interviews that they were not telling the truth." (*Id.*

at 250.) Detective Anderson answered each of these questions in the negative and explained that in speaking with a child "you try to keep a very soft demeanor. We wear civilian clothes, we have civilian cars to make sure that the child is not intimidated and doesn't feel threatened and can talk with us and tell us everything that happened." (*Id.* at 260.) She also noted that although it would have been possible, they did not utilize tape recorders for any of these interviews.

After the prosecution rested, defense counsel recalled Detective Anderson and sought to inquire whether Jelinek had requested to take a lie detector test. His efforts were, however, stymied by prosecution objections that were sustained by the trial court. Counsel was also prevented from questioning the detective about the thoroughness of her investigation, including whether she or her partner had searched for the photographs of J.N. that Jelinek had allegedly taken.

## 2. Child Protective Services Caseworker Daniel Speicher

Daniel Speicher, an employee of the Nassau County Department of Social Services assigned to the sexual abuse unit as a caseworker, testified for the state that he began his investigation of Jelinek after learning that G.B. had filed a complaint alleging that he had been sexually abused by Jelinek. He described visiting Jelinek's home, accompanied by a police detective, where he met briefly with Jelinek and then with his adopted son Jason outside the home. According to Speicher, although he fully described his job responsibilities, he never told Jelinek the purpose of the visit until, after about twenty minutes, Jelinek "demanded to know why we were there." (*Id.* at 207.) He then explained to Jelinek that G.B. and his son had made statements "which put him in a very vicarious [*sic*]

situation." (*Id.*) Speicher testified that Jelinek then asked if he were investigating allegations of sexual abuse. "I asked him why he suspected sexual abuse when neither myself nor Detective Anderson had said anything about sexual abuse." (*Id.* at 210.) According to Speicher, Jelinek "then stated that he does not like penises, he likes women." (*Id.*)

Only upon completion of direct examination did the state turn over to the defense Speicher's contemporaneous notes from his interview with Jelinek. Defense counsel moved for a mistrial. The motion was denied.

On cross-examination, defense counsel queried Speicher about whether it was or was not reasonable for Jelinek to have deduced, without being explicitly told, that a CPS caseworker interviewing his family might be doing so in order to investigate charges of sexual abuse—particularly given the fact that Jelinek and his wife had themselves once contacted CPS on behalf of another boy, J.N. Defense counsel also elicited an admission from Speicher that there was nothing in either Speicher's contemporaneous notes of the conversation or in the detective's notes evidencing that Jelinek had made the "I don't like penises, I like women" statement, even though Speicher considered the statement important to his investigation and indicative of Jelinek's guilty mind.

After the prosecution rested, defense counsel recalled Speicher as a defense witness and inquired further about his failure to record the statement allegedly made by Jelinek. Speicher acknowledged that he was required to make a record of his interviews and that he had no explanation for why he did not record that particular statement. Defense counsel also queried Speicher further about his assumption that Jelinek's statement evidenced a guilty conscience:

Q Is it your sworn testimony, sir, having received a report from upstate which initiated your investigation, that you asked no questions or made no indication [to] this defendant, at that time of what was the content or nexus of [G.B.'s] complaint?

A We made no indication to Mr. Jelinek whatsoever what were the specifics pertaining to the report.

Q You indicated that you had a report concerning [G.B.]; is that correct?

A Yes.

Q And is [G.B.] a male or a female?

A He's a male.

Q And you indicated to the defendant that you were there from children's protective services?

A Yes, I did.

Q And you hadn't indicated to the defendant that you were there because of an alleged beating of [G.B.], had you?

A No, I did not.

Q Had you indicated that you were there, you were there because of any physical mistreatment of [G.B.]?

A No, I did not.

Q Had you indicated to the defendant that you were there because of any failure to feed [G.B.]?

A No, I did not.

Q And the defendant had indicated to you, you said previously, that he was aware of the functions of children's protective services, is that correct?

A That is correct.

Q And as far as you know, this conversation occurred after [G.B.] had left the defendant's household from his last visit?

A Correct.

(*Id.* at 680–81.)

### 3. Parents of the Victims

The state also called on direct examination at least one parent of each of the children who were allegedly abused by Jelinek. Cross examination was appropriate.

### D. Defense Case

### 1. Defense Fact Witnesses

In his defense, as already pointed out, Jelinek recalled two of the state witnesses—Detective Anderson and CPS caseworker Speicher. Jelinek also called Kim Olson, a young woman who babysat for the Jelinek children nearly every weekend and nearly every day from March to December of 1990. Counsel sought through his questioning of Olson to depict the Jelinek household as bustling and lively, but he found his line of questioning hindered by prosecution objections that were sustained by the trial court. On cross-examination Olson acknowledged that she had no firsthand knowledge of anything having to do with the allegations. On redirect, defense counsel sought more particularly to establish that the Jelinek family room, where many of the incidents of abuse allegedly took place, was in an open and frequently trafficked area.

Jelinek also called Jill Krzyminski, a young woman who testified that she was friends with one of Jelinek's daughters and had lived with the Jelineks from November of 1989 to July of 1990. She testified that the Jelinek household was busy. She also stated that, as far as she knew, J.N. did not visit the house until December of 1989.

### 2. Testimony of Defendant

Jelinek testified in his own defense, sketching a picture of his life as a kind of

benevolent suburban patriarch, his home the active hub of the neighborhood. He described the relationship between his son Jason and G.B., whose move to Buffalo with his mother in 1989 he described as traumatic for the boy. He detailed several visits that G.B. subsequently paid to the Jelinek home and noted that the boy had even asked to be adopted by the Jelineks. He went on to deny every allegation of improper sexual contact between him and each of the complainants.

On cross-examination Jelinek was asked, among other things, about the alleged sodomy incident at Tobay Beach. He explained that he wrapped J.C. in a towel in order to warm him up, that he held him for ten or twelve minutes, and that J.C. fell asleep standing up and leaning against him while Jelinek was holding him. He also denied ever using the terms "tuschy bite" or "tuschy squeeze" (*id.* at 766), and denied ever stating to caseworker Speicher that "I don't like penises, I like women" (*id.* at 786).

### 3. Character Witness

Jelinek called one character witness in his defense, Paul Schmiege, a pastor at the church he regularly attended. Schmiege testified that Jelinek's reputation in the community for truthfulness and veracity was good. On cross-examination he acknowledged that he had no specific knowledge about any of the incidents of abuse that were alleged in the present case.

### E. Defendant's Application to Proceed Pro Se

As the defense case drew to a close, counsel informed the trial court that Jelinek wished to proceed pro se during the summation portion of the proceedings. At an evidentiary habeas hearing before this court in January 2003, Jelinek explained his reasons for making this decision. It

began with a fee dispute that arose after Jelinek informed his attorney on the eve of trial that he was unable to pay the outstanding half of the $30,000 fee they had agreed upon. As Jelinek explained, his attorney immediately moved to be released from any obligation to continue representing Jelinek. The request to be relieved was refused.

At the hearing before this court, Jelinek also declared that his attorney had failed to sufficiently contact him while Jelinek awaited trial in jail—though he in fact described rather extensive interaction with his attorney in preparation for trial. He described counsel's failure to adequately prepare him for testifying, and criticized counsel for failing to follow the scripted order of questions which Jelinek had laid out for him. Jelinek also faulted counsel for failing to advise him, after both the state and defense rested, to make particular motions directed at deficiencies in specific counts of the indictment. In particular, he complained that counsel failed to advise him to move to dismiss Counts Seven and Eleven because the proof at trial varied materially from what was alleged in the indictment. He testified at the hearing that counsel offered him little advice in preparation for Jelinek's closing argument. Finally, he said that counsel offered little help at the time of sentencing.

### F. Appointment of Standby Counsel

The trial court, recognizing that Jelinek had the constitutional right to represent himself, was particularly concerned about the handling of post-trial motions:

THE COURT What about the handling of motions after the trial is completed?

MR. KRIEGER Certainly what the ordinary practice is, where a defendant asks to go pro se, it is that counsel will sit as an advisor to the pro se

defendant and advise the defendant what to say as to motions.

THE COURT That could be done. Do you wish to respond?

MS. WATSON .... [I]f your Honor is inclined to permit the defendant to go pro se, I would just ask that a full record with extensive inquiry be made of the defendant in terms of his rights and those that he would be waiving, so as to preserve it in the case of an appeal.

THE COURT *That's usually done if he discharges and goes pro se. This is not really that situation.* But I will charge him as requested of the dangers of proceeding on his own....

(Trial Tr. at 820–23 (emphasis added).) From this colloquy it is clear that the understanding and intent of defendant, his counsel and the trial court was to set up a kind of hybrid representation: Jelinek's attorney, Douglas Krieger, would continue to represent Jelinek in all respects except for the delivery of closing arguments. Although the court was not obliged to allow this hybrid representation, it was within its discretion to do so.

The court clearly warned Jelinek of the consequences of proceeding pro se, and suggested that adopting such a course would be foolhardy. Jelinek nonetheless decided to make his own summation to the jury. The trial court then instructed defense counsel to "advise him in whatever way you feel you can." (*Id.* at 853.)

### G. Summation

In his summation Jelinek argued that the child complainants were coerced and pressured by parents, friends and officers into making the accusations against him. He pointed out that only one child had complained of abuse without police prompting. He also emphasized some of the implausibilities in the children's testi-

mony, such as the fact that J.C. swore that he saw Jelinek sodomize J.N. at his home in June 1990, six months before J.N. ever visited Jelinek's house. He discussed the multi-hour questioning of the children engaged in by the police detectives, and reminded the jury about the absence of contemporaneous notes of the investigation.

All in all, the summation was competent, though Jelinek would undoubtedly have been better served by allowing his experienced counsel to pull together for the jury the threads of the subtle defense theory that he had prepared during the presentation of evidence.

### H. Motions at End of Case

At the close of the entire case, the trial court permitted counsel, now putatively serving in an advisory role, to renew the motion he had made at the end of the state's case to "dismiss each and every count of the Indictment on the ground that the prosecution has not made out a prima facie case as required by law." (Trial Tr. at 620.) Counsel did not make any specific requests for dismissal of any particular counts. Counsel was also allowed to argue a motion contesting venue with respect to the counts alleged to have occurred at Tobay Beach (which was partly in Nassau County and partly in Suffolk County). He asked the court to poll the jury as to whether they had followed the court's instruction to refrain from reading or hearing about the case through the media.

### I. Verdict and Sentence

Jelinek was acquitted of five counts and was convicted of thirty-eight counts. His convictions were for three counts of sodomy in the first degree, twenty-six counts of sexual abuse in the first degree, one count of sexual abuse in the second degree, two counts of sexual abuse in the third

degree, and six counts of endangering the welfare of a child. The trial court sentenced Jelinek to sixteen to forty-eight years in prison.

## III. Procedural History of Direct Appeal

### A. Summary of Jelinek's Post–Trial Representation

Jelinek was represented by assigned counsel, the Legal Aid Society, for his direct appeal. At the conclusion of the direct review process, the Legal Aid Society ceased its representation of him.

Jelinek's initial petition for a writ of habeas corpus in federal court was filed pro se. This court assigned counsel on his behalf.

Upon Jelinek's return to state court to exhaust his claims, he was unrepresented when he filed coram nobis petitions and motions before the trial court to vacate judgment.

When he returned to federal court, again pro se, this court assigned Gregory Cooper, from the Eastern District Criminal Justice Act Habeas Corpus Panel, to represent him. Jelinek again returned to state court to exhaust further claims, and again proceeded without counsel. During his present habeas proceedings he continues to be represented by Mr. Cooper.

### B. Direct Appeal

Through court-appointed counsel, Jelinek appealed his conviction, claiming that the testimony of G.B. via two-way, closed-circuit television violated New York Criminal Procedure Law and the Confrontation Clause of the Sixth Amendment; that testimony regarding a "prompt outcry" by G.B. to his mother was improperly admitted into evidence; that the indictment was defective for duplicitousness and lack of specificity; that the evidence of his guilt was legally insufficient; and that the sentence imposed was excessive. All claims relied solely on state law except for the Confrontation Clause claim.

The appeal was partly successful. Agreeing with Jelinek that nineteen counts of the indictment were duplicitous, in February 1996 the Appellate Division reversed his convictions on those counts. The court reversed an additional count—relating to the incident in which Jelinek allegedly rubbed his penis against the leg of J.C. at Tobay Beach—for insufficiency of evidence. Although the court held that Jelinek had failed to preserve for appellate review any other claims of that nature, it went on to deny them on the merits, stating that "we find that [the evidence] is legally sufficient to establish the defendant's guilt beyond a reasonable doubt with respect to the third, seventh, and eleventh counts of the indictment." (Feb. 26, 1996 Decision & Order at 2.) The court also noted that it was "improper" for the prosecutor to have elicited testimony that Jelinek had engaged in sexual activity with and within the presence of his son—a charge not specifically made in the indictment—but that this error did not require reversal of the remaining counts. (*Id.*) All of Jelinek's remaining contentions were held to be either meritless or not requiring reversal. The sentence was reduced by the Appellate Division to a term of nine to twenty-seven years. *See People v. Jelinek*, 638 N.Y.S.2d 731 (App.Div.1996).

### C. Material Variance Issue in State Court

It is arguable that, as part of his "defective indictment" argument, Jelinek raised on direct appeal the claim—as he presently does on habeas—that there was a material variance between the charges raised in Counts Seven and Eleven and the evidence that was presented at trial. For instance, his initial brief on appeal states at one point that, with respect to Count Seven, "[t]he complainant's trial testimony varied

from allegations in the indictment and his Grand Jury testimony." (Br. [on Direct Appeal] for Def.-Appellant at 49.) Nonetheless, such an isolated statement—devoid of any citation to relevant case law and embedded within a broader, distinct legal argument concerning duplicitous counts—cannot be deemed to have put the Appellate Division on notice that Jelinek was mounting an additional argument based on the variance. The state's response brief on appeal *does* characterize Jelinek as having made a variance claim. (*See* Br. [on Direct Appeal] of Resp't at 43 (variance respecting Count Seven); *id.* at 46 (variance respecting Count Eleven).) To some extent Jelinek's reply brief does not disclaim such an argument, at least with respect to Count Seven. (*See* Reply Br. [on Direct Appeal] for Def.-Appellant at 10.) Nonetheless, from the totality of the argument and the manner of its presentation, the variance argument cannot be said by this court to have been made by Jelinek before the Appellate Division on direct appeal. (The Appellate Division may, of course, have a different view of the matter.) A variance claim was apparently not among the "remaining contentions" that the Appellate Division found in its blanket statement to be meritless.

### D. Leave to Appeal to State Court of Appeals

Jelinek sought leave to appeal to the New York Court of Appeals, raising the same claims he had brought before the Appellate Division. That application was denied in May 1996. In July 1996, he applied to the United States Supreme Court for a writ of certiorari. That petition was denied on October 7, 1996.

### IV. Procedural History of Initial Federal Habeas Proceedings (Filed as 97–CV–2327)

On April 21, 1997, Jelinek petitioned this court pro se for a writ of habeas corpus.

He alleged (1) that his rights under the Confrontation Clause were abridged when G.B. was allowed to testify via closed-circuit television, and (2) that he was denied a fair trial, in violation of the Due Process Clause, as a result of the court's sanctioning of the video testimony and as a result of its admission into evidence of testimony regarding uncharged crimes.

Counsel was appointed by this court. She recognized that Jelinek's due process claim had not been properly presented to the state courts and moved to have the application for habeas corpus dismissed without prejudice in order to allow Jelinek to exhaust the claim. The motion to dismiss without prejudice with leave to renew was granted in December 1997.

### V. Procedural History of First State Section 440 and Coram Nobis Proceedings

Acting without counsel, in December 1997 Jelinek filed a motion in the state trial court to vacate judgment pursuant to New York Criminal Procedure Law section 440.10. He claimed that his due process right to a fair trial was denied by the trial court's allowing into evidence testimony concerning over one-hundred uncharged crimes; by the "[p]rolonged questioning of child witnesses coupled with suggestive interrogation techniques employed by the detectives from Nassau County [which] severely undermined the reliability of such testimonies" (Notice of Mot. to Vacate J. at 1); and by the court's failure to make an adequate finding as to the need for the closed-circuit television testimony of G.B. He also claimed that he received constitutionally ineffective assistance of trial counsel due to counsel's failure to object to the introduction of testimony concerning uncharged criminal acts;

to object on due process grounds to the questioning of child witnesses by the police; to introduce expert testimony on children's susceptibility to suggestive interrogation techniques; to adequately present character testimony; to call Jelinek's wife to testify; and to "object adequately to how the vulnerable witness hearing was conducted." (*Id.* at 2.)

By order dated January 23, 1998, the trial court summarily denied this motion in its entirety on procedural grounds, citing New York Criminal Procedure Law section 440.10(2)(a) (issue raised was previously determined on the merits), New York Criminal Procedure Law section 440.10(2)(c) (sufficient facts were on the record to allow the issue to be raised on appeal but the defendant unjustifiably failed to do so), and New York Criminal Procedure Law section 440.30(1) (if motion is based on new facts, papers must contain supporting sworn allegations). Application for leave to appeal this decision to the Appellate Division was denied in March 1998.

■ Jelinek also applied pro se to the Appellate Division to reopen his direct appeal via a writ of error coram nobis in December 1997. The remedy of coram nobis, which has largely been subsumed in New York by section 440 of its Criminal Procedure Law, remains available to prisoners asserting that their appellate counsel was ineffective. *See State v. Bachert,* 69 N.Y.2d 593, 516 N.Y.S.2d 623, 509 N.E.2d 318, 321–22 (1987); *see generally* Stanley H. Fuld, *The Writ of Error Coram Nobis,* N.Y. L.J., June 5, 1947, at 2210 (recounting the history of the common law writ in England, noting its resurrection in American law, and anticipating its equitable expansion in modern times).

Jelinek claimed that his appellate counsel was ineffective for failing to assert that Confrontation Clause and Due Process Clause violations arose from the admission into evidence of testimony relating to numerous uncharged criminal acts; for failing to raise a due process claim arising from the improper questioning of child witnesses by the police; and for failing to raise a due process claim arising from G.B.'s closed-circuit television testimony. The Appellate Division denied his application for a writ of error coram nobis on the merits in February 1998. It summarily stated that "appellant has failed to establish that he was denied the effective assistance of appellate counsel." (Feb. 23, 1998 Decision & Order at 1.)

## VI. Procedural History of Recommenced Federal Habeas Proceedings (Filed as 98–CV–2298)

Jelinek refiled his application for habeas corpus relief pro se in this court in March 1998. New counsel was assigned by this court. Petitioner's counsel, after much understandable delay, submitted a substantial memorandum of law on his behalf.

In the new petition, counsel argued that there was a fatal variance between the charges listed in the indictment and the facts introduced into evidence at trial; that the admission into evidence of a statement by Jelinek to CPS caseworker Speicher was made in violation of New York Criminal Procedure Law section 710.30(1)(a) and his due process rights; that he was deprived of his right to effective trial counsel; and that his right to effective appellate counsel was abridged. With respect to the claims of ineffective assistance of trial counsel, Jelinek specifically alleged that trial counsel failed to be "even remotely aware" of the divergence of trial evidence from the indictment and from grand jury evidence (Jan. 20, 2000 Mem. of Law at 12); failed to object to the admission of his statement to caseworker Speicher; and failed to object to the admission into evi-

dence of a large number of uncharged crimes. He also contended that collectively, if not singly, such inadequate representation abridged his constitutional right to effective counsel. Appellate counsel, in turn, was alleged to have been inadequate for failing to raise these arguments on appeal.

At a March 2000 hearing, this court heard argument concerning the petition. It entertained Jelinek's request that his application for habeas relief be again dismissed without prejudice in order to exhaust his newly raised claims in state court. This court noted that there was a "substantial probability" that this case "represented a serious miscarriage of justice," but that as a matter of comity the state court should have the first opportunity to address the matter. (Mar. 28, 2000 Tr. of Mot. at 29.) On September 6, 2000, the application for habeas relief was again dismissed without prejudice with leave to renew.

VII. Procedural History of Second State Section 440 and Coram Nobis Proceedings

Jelinek returned to the state trial court, once again without counsel. He sought to vacate the judgment against him pursuant to New York Criminal Procedure Law section 440.10—again claiming that he received ineffective assistance of trial counsel. In support of this application, he alleged ineffectiveness in trial counsel's failure to "notice[ ]" the discrepancies between what was charged in Counts Seven and Eleven of the indictment and what was proven at trial (Aff. Re [Second] Mot. to Vacate J. at 4); failure to impeach the child witnesses with their inconsistent prior statements before the Grand Jury concerning those two counts; failure to move to dismiss Count Four due to insufficiency of the evidence;

failure in general to preserve for appellate review a challenge to the legal sufficiency of the evidence; failure to read material provided to defendant as per *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961); failure to discuss trial strategy with Jelinek; failure to present certain character testimony; failure to call Jelinek's wife to testify; failure to introduce into evidence the prior statements of some witnesses; and failure to request a bill of particulars with respect to the misdemeanor endangerment charges. Jelinek also "flagged" for the trial court two areas of concern raised during colloquy in his second habeas proceeding—the failure of trial counsel to object to the indirect hearsay testimony of the police officers, and the failure of trial counsel to interview experts on child suggestibility.

By order dated November 30, 2000, the County Court denied this motion in its entirety on the procedural grounds "that (1) most, if not all, of his current claims were raised in his prior motion to this Court; (2) those claims not previously raised should have been so raised; and (3) the failure to have raised these 'of record' claims on direct appeal bars defendant from proceeding by 440.10 motion." (Nov. 30, 2000 Order at 3.) In denying the motion, the court stated that it had not been asked to address the allegations of ineffective assistance with respect to the indirect hearsay and failure to call expert witnesses, and that it would not therefore reach those claims.

As was the case with his direct appeal, it is arguable that Jelinek raised a "variance" argument with respect to Counts Seven and Eleven of the indictment, this time couched in terms of ineffective assistance of trial counsel. Jelinek's pro se petition states,

Counsel barely performed his role as trial counsel ... as shown by the following:

As to Count 7 re [J.C.].... Until the time of trial, [J.C.'s] testimony was that there had been sexual abuse many times at the *Defendant's home*. However, at trial, this testimony changed completely with [J.C.] now testifying that the single occurrence took place at *Tobay Beach*, a good 30 miles from Defendant's home. The prosecutor had to change her summation.... Krieger never noticed these changes nor even attempted to impeach the witness related to it. Krieger's questioning of [J.C.] concerning his written statement consisted solely of asking him if he had written his name on each page and had read it....

Similarly, as to Count Eleven re [J.N.]. In the indictment based upon Grand Jury testimony, [J.N.] states that [J.N.'s] penis was touched by Defendant's mouth (i.e.), Defendant put his mouth *on* [J.N.'s] penis. At trial he reversed the testimony: now it was Defendant's penis *in* [J.N.'s] mouth—and the date changed as well. Krieger never noticed these changes nor attempted to impeach the witness related to it.

([Def.'s] Aff. Re [Second] Mot. to Vacate J. at 3–4 (emphasis in original; citations to record omitted).)

Arguably, Jelinek was contending in these passages that counsel was ineffective for failing to impeach the witnesses with their prior testimony. No explicit variance argument was made. There is no indication that the state trial court understood such an argument to have been advanced when it denied Jelinek relief in this second section 440 petition. (*See* Nov. 30, 2002 Order at 2–3) ("It appears ... that [petitioner] has raised the same alleged errors as he raised in his prior 440.10 motion to this Court.").

Jelinek applied again to the Appellate Division for a writ of error coram nobis, claiming that his appellate counsel was ineffective for failing to raise a claim of ineffective assistance of trial counsel with respect to each of the claims he raised in his second section 440 application. The Appellate Division, by order dated December 26, 2000, denied this application on the merits, holding that Jelinek had failed to establish that he was denied the effective assistance of appellate counsel. It did not state whether it reached the merits of his indirect-hearsay and expert-witness claims.

In advancing his claim of ineffective assistance of appellate counsel, Jelinek used the same language with respect to Counts Seven and Eleven that he used in his section 440 petition. For the same reason discussed above, it seems he did not explicitly raise the variance issue in the context of ineffective appellate counsel in the second coram nobis petition. (*See* [Def.'s] Aff. Re [Second] Coram Nobis at 3–4.)

## VIII. Procedural History of Current Federal Habeas Proceedings (Filed as 01–CV–2566)

### A. Pleadings

Jelinek refiled his application for a writ of habeas corpus in April 2001. Counsel was reappointed for him. After understandable further delay, counsel forcefully pressed petitioner's case, arguing for relief on three broad grounds.

First, Jelinek alleges more than a dozen ways in which his trial counsel was ineffective, claiming that counsel failed: to recognize an impermissible variance between what was charged in Counts Seven and Eleven of the indictment and the evidence that was presented at trial; to impeach witnesses whose testimony at trial with respect to those two counts was inconsis-

tent with their testimony before the Grand Jury; to move to dismiss Count Four of the indictment after no evidence was presented to prove that charge at trial; to preserve a general claim that the evidence of Jelinek's guilt was legally insufficient; to read the *Rosario* material provided to him at trial; to meet with Jelinek to discuss trial strategy or to prepare him for his testimony; to adequately present character testimony; to call Jelinek's wife to testify; to introduce into evidence prior statements of witnesses; to request a bill of particulars with respect to some of the misdemeanor charges; to object to indirect hearsay testified to by police officers; to object to the introduction into evidence of the statement made by Jelinek to caseworker Speicher; and to call an expert to testify concerning the suggestibility of child witnesses. Jelinek also claims that his appellate counsel was ineffective for failing to raise these claims on direct appeal. Petitioner also urges that his rights under the Confrontation Clause were denied when the trial court allowed G.B. to testify via two-way, closed-circuit television. Finally, he claims that he was denied a fundamentally fair trial and that his rights under the Due Process Clause were abridged as a result of the prejudicial admission into evidence of testimony concerning uncharged crimes; as a result of the prolonged questioning of child witnesses by detectives (coupled with the deployment of suggestive interrogation techniques); and as a result the failure of the trial court to make an adequate finding as to the need for G.B. to testify via closed-circuit television.

Jelinek apparently does not now claim that his Fourteenth Amendment due process rights were further violated, and that he received a fundamentally unfair trial due to the state's arbitrary denial of his state constitutional right to indictment by a grand jury as a result of the variance between the crime alleged in the indictment and the evidence presented at trial. Nor does Jelinek seem to claim that his Sixth Amendment right to notice of the charges against him was abridged due to the variance between the indictment and the evidence offered at trial.

## B. Factual Hearing

A factual hearing was conducted with the petitioner physically present on two days in early January. The court sought the participation of Douglas Krieger, Jelinek's trial counsel, at the hearing. *See Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir.1998) (per curiam) ("[A] district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs."). Mr. Krieger was subpoenaed but stated by letter that he was unable to attend due to health problems. Neither petitioner's counsel nor respondent's counsel took any further steps to produce a letter or affidavit from Mr. Krieger.

At the hearing petitioner's counsel called two witnesses—Jelinek himself and Assistant District Attorney Joy Watson, the prosecuting attorney. As noted earlier, *see* Part II.E, *supra,* Jelinek described in some detail his interaction with counsel before and during trial. He testified to having received *Rosario* material from the prosecution and claimed to have had no practical chance to review it. Jelinek stated that he and counsel discussed retaining an expert on children's susceptibility to suggestive questioning, but decided that it was too expensive. He also acknowledged discussing with counsel the possibility of putting Jelinek's wife on the witness stand, but that they decided doing so would be

dangerous because she was "too volatile." (Tr. of Jan. 2, 2003 Hr'g at 39.)

The second witness called at the hearing was Joy Watson, the prosecuting attorney on the case. She acknowledged that with respect to Count Seven (involving the alleged incident in which Jelinek allegedly put his penis to J.C.'s anus), her response to defendant's request for a bill of particulars was that the crime occurred "[o]n or about July 1991 inside of 4042 Arthur Street, Seaford, New York" (Tr. of Jan. 2, 2003 Hr'g at 86), rather than at Tobay Beach, as J.C. testified to at trial. She also acknowledged that in her opening statement she informed the jury that the state intended to prove that Jelinek "placed [his] penis to the anus of [J.C.], this incident also having occurred inside of the defendant's home." (*Id.* at 97.) In response to questions from Jelinek's habeas counsel, Ms. Watson testified concerning the sodomy incident charged in Count Seven:

Q It is very clear that when you opened, you said the sodomy alleged against [J.C.] occurred at this defendant's house?

A Yes.

Q The grand jury testimony of [J.C.] indicated it happened at his house because it had to be the basis of the indictment.

A Dare say so, yes.

Q The bill of particulars you submitted in response said it happened at the house, is that right?

A Yes.

Q When [J.C.] said it didn't happen at the house, it happened at the beach, you told the jury, am I correct, that how ridiculous Roger Jelinek's testimony was about the incident at the beach, is that right?

A You've just read it, yes. What you read, I have no dispute with.

Q Did you realize at the time when you [were] making this argument that [J.C.], seven or eight years old, whatever he was, had changed his testimony from the time that he had testified in the grand jury, the times that he had spoken to you as you prepared him for trial, and what he said on the witness stand?

A I don't agree with the characterization that he changed it. There were so many incidents where Mr. Jelinek abused these children both at his home and subsequently at the water. Might the children have been confused about it, that's possible, but I don't know—If I may just finish it. I don't know that I would characterize anything about as changed.

(*Id.* at 104–05.)

Ms. Watson was also asked about Count Eleven, which involved Jelinek's alleged sodomy of J.N. She acknowledged that although the indictment stated that Jelinek put his mouth to J.N.'s penis, the only testimony from J.N. at trial was that Jelinek put his penis in J.N.'s mouth.

During the hearing respondent indicated that all of Jelinek's present claims have been exhausted in state court. (*See* Tr. of Jan. 3, 2003 Hr'g at 26.) In response to a letter query from this court, however, the state indicated that, should the court determine that any claim remains unexhausted, the respondent does not waive the exhaustion requirement of section 2254(b) of Title 28 of the United States Code, discussed below. (*See* Feb. 14, 2003 Letter from Margaret E. Mainusch at 1.)

The three iterations of the federal proceedings have been consolidated under one

case number, 97–CV–2327, nunc pro tunc to the time the first petition was brought.

## IX. Law

### A. AEDPA Standard of Review

 Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir.2001) (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir.1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently [than the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supremem Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495.

### B. Statute of Limitations

Congress has set a one-year period of limitations for the filing of an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment. *See* 28 U.S.C. § 2244(d)(1). This limitations period ordinarily begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). Prisoners whose convictions became final before the effective date of AEDPA, April 24, 1996, had a grace period of one year, until April 24, 1997, to file their habeas application. *See Ross v. Artuz*, 150 F.3d 97, 103 (2d Cir.1998). In calculating the one-year limitation period, the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted...." 28 U.S.C. § 2244(d)(2). In addition, the term "pending" in the statute has been construed broadly to encompass all the time during which a state prisoner attempts, through proper use of state procedures, to exhaust state court remedies with regard to a particular post-conviction application. *See Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir.1999); *Barnett v. Lemaster*, 167 F.3d 1321, 1323 (10th Cir. 1999).

The Supreme Court held in *Duncan v. Walker* that "an application for federal habeas corpus review is not an 'application for State post-conviction or other collateral review' within the meaning of 28 U.S.C. § 2244(d)(2)," and that therefore the section does "not toll the limitation period during the pendency of [a petitioner's] first federal habeas petition." 533 U.S. 167, 181–82, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). *Duncan* reversed a case in this circuit which held to the contrary. *See Walker v. Artuz*, 208 F.3d 357, 361–62

(2000). Although the Supreme Court has now declared that AEDPA's one-year limitations period is not tolled during the pendency of a properly filed federal habeas petition, this statute of limitations is not jurisdictional and may be tolled equitably. *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir.2000). As Justice Stevens noted in his concurring opinion in *Duncan*,

[N]either the Court's narrow holding, nor anything in the text or legislative history of AEDPA, precludes a federal court from deeming the limitations period tolled for [a first habeas] petition as a matter of equity. The Court's opinion does not address a federal court's ability to toll the limitations period apart from § 2244(d)(2). Furthermore, a federal court might very well conclude that tolling is appropriate based on the reasonable belief that Congress could not have intended to bar federal habeas review for petitioners who invoke the court's jurisdiction within the 1–year interval prescribed by AEDPA.

533 U.S. at 183, 121 S.Ct. 2120 (Stevens, J., concurring in part and in the judgment) (citation omitted). Heeding Justice Stevens' advice, the Second Circuit has indicated that tolling would be manifestly appropriate for an out-of-time petition where the petitioner has with diligence brought his federal habeas petition, moved to have the petition dismissed without prejudice in order to fully exhaust state remedies, proceeded to exhaust his claims in state court, and thereupon renewed his habeas petition. *Rodriguez v. Bennett*, 303 F.3d 435, 438–39 (2d Cir.2002).

In addition, the Second Circuit has directed that, after *Duncan*, the "only appropriate course in cases ... where an outright dismissal could jeopardize the timeliness of a collateral attack" is to stay further proceedings. *Zarvela v. Artuz*, 254 F.3d 374, 380 (2d Cir.) (quotation omit-

ted), *cert. denied, Fischer v. Zarvela*, 534 U.S. 1015, 122 S.Ct. 506, 151 L.Ed.2d 415 (2001); *see also Duncan*, 533 U.S. at 182, 121 S.Ct. 2120 (Stevens, J., concurring in part and in the judgment) ("[I]n our post-AEDPA world there is no reason why a district court should not retain jurisdiction over a meritorious claim and stay further proceedings pending the complete exhaustion of state remedies. Indeed, there is every reason to do so...."). Thus, where a petitioner has acted with reasonable diligence it is appropriate to treat a prior dismissal as a stay. *See Musgrove v. Filion*, 232 F.Supp.2d 26, 29 (E.D.N.Y.2002) ("[T]he Court should have stayed the petition and allowed the petitioner to exhaust his state remedies. Because it did not do that, extraordinary circumstances prevented the petitioner from filing a timely petition. Accordingly, the Court will treat his dismissed habeas petition as if it had been stayed provided he acted with reasonable diligence between the dismissal and his return to federal court."); *Butti v. Giambruno*, No. 02–CIV–3900, 2002 WL 31885973, at *3, 2002 U.S. Dist. LEXIS 24708, at *8–*9 (S.D.N.Y. Dec. 26, 2002) (applying equitable tolling principles in similar situation).

### C. Exhaustion

 A state prisoner's federal habeas petition must be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims. *See Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1989). "This exhaustion requirement is ... grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The exhaustion requirement requires the petitioner to have presented to the state court

"both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (en banc).

An exception to the exhaustion requirement set forth in *Rose v. Lundy* has been provided for by statute, though it provides little comfort to prisoners seeking habeas corpus relief. A district court may, in its discretion, *deny* on the merits habeas petitions containing unexhausted claims—so-called "mixed petitions." *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *Id.* § 2254(b)(3); *see also Ramos v. Keane,* No. 98 CIV. 1604, 2000 WL 12142, at *3, 2000 U.S. Dist. LEXIS 101, at *10 (S.D.N.Y.2000) (state's failure to raise exhaustion requirement does not waive the issue).

### D. Procedural Bar

#### 1. In General

A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546; *see also,* Edward Smock, *Federal Habeas Corpus, in A Jailhouse Lawyer's Manual* 207, 209 (Columbia Human Rights Law Review, 5th ed.2000) ("In most situations you have only one chance to get it right. This means that you have to meet all the deadlines, follow all the court procedures correctly, and include all the necessary information in your first petition for a writ of habeas corpus. If you make a mistake, you may not be able to ask for habeas relief again. If you do not take these rules seriously, the federal court will deny your claim.").

A state prisoner is not required to seek collateral relief on facts and issues already decided on direct review. *Brown v. Allen,* 344 U.S. 443, 447, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

#### 2. Cause for the Default

Ineffective assistance of appellate counsel may be a cause sufficient to excuse a procedural default, but such a claim must itself be presented to the state courts before it receives federal habeas review. *See Murray v. Carrier,* 477 U.S. 478, 488–89, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Claims of ineffective assistance of appellate counsel are themselves subject to procedural default. *See Edwards v. Carpenter,* 529 U.S. 446, 453, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000). *But see id.* at 458, 120 S.Ct. 1587 (Breyer, J., concurring in the judgment) ("*Why* should a prisoner, who may well be proceeding *pro se,* lose his basic claim because he runs afoul of state procedural rules governing the presentation to state courts of the 'cause' for his not having followed state procedural rules for the presentation of his basic federal claim?").

#### 3. Actual Innocence

Because habeas corpus "is, at its core, an equitable remedy," *Schlup v. Delo,* 513 U.S. 298, 319, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Supreme Court has stated

that "in appropriate cases, the principles of comity and finality that inform the concepts of cause and prejudice must yield to the imperative of correcting a fundamentally unjust incarceration," *id.* at 320–21, 115 S.Ct. 851 (quotations omitted). To ensure that this exception remains rare and will be applied only the extraordinary case, the Court has "explicitly tied" the miscarriage of justice exception to the petitioner's innocence. *Id.* at 321, 115 S.Ct. 851. "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence ... that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id.* at 324, 115 S.Ct. 851.

■ A showing of actual innocence serves merely as a gateway to the airing of the petitioner's defaulted claim and is not itself cognizable in habeas as a freestanding claim. *See Herrera v. Collins,* 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("[C]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."). A habeas court is, in short, concerned " 'not [with] the petitioners' innocence or guilt but solely [with] the question whether their constitutional rights have been preserved.' " *Id.* (quoting *Moore v. Dempsey,* 261 U.S. 86, 87–88, 43 S.Ct. 265, 67 L.Ed. 543 (1923)); *cf. Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (habeas court may review an *independent constitutional claim* that the evidence adduced at trial was insufficient to convict a criminal defendant beyond a reasonable doubt); *Thompson v. Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) (reversing conviction of

"Shuffling Sam" *on direct review* from conviction in Louisville's police court where there was no evidence that defendant violated city ordinances).

### E. Ineffective Assistance of Counsel

### 1. In General

### a. Ineffective Assistance of Trial Counsel

■ The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to counsel is "the right to *effective* assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (emphasis added). The Supreme Court has explained that in giving meaning to this requirement we must be guided by its purpose—"to ensure a fair trial"—and that therefore the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688, 104 S.Ct. 2052, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052. *See also United States v. Eyman,* 313 F.3d 741, 743 (2d Cir.2002). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

■ The performance and prejudice prongs of *Strickland* may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Id.* at 697, 104 S.Ct. 2052. In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the "cumulative weight of error" in order to determine whether the prejudice "reache[s] the constitutional threshold." *Lindstadt v. Keane,* 239 F.3d 191, 202 (2d Cir.2001). The court must also keep in mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052. "The result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Purdy v. Zeldes,* No. 02–7468, —— F.3d ——, ——, 2003 WL 253144, at *18 (2d Cir.2003) (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). Ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others. *See Eze v. Senkowski,* 321 F.3d 110, 113 (2d Cir.2003).

■ There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

b. Ineffective Assistance of Standby Counsel

■ In an appropriate case, a defendant who proceeds pro se may make out a claim that he received ineffective assistance of standby counsel. A defendant in a state criminal trial has the constitutional right to proceed without counsel if he voluntarily and intelligently elects to do so. *See Faretta v. California,* 422 U.S. 806, 807, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The exercise of this right entails the abandonment of some correlative rights associated with the constitutional assurance that the defendant will receive the effective aid of counsel. As the *Faretta* Court noted, "whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.' " *Id.* at 834 n. 46, 95 S.Ct. 2525. While such sentiments are unexceptionable where a defendant has been solely responsible for his own defense, the *Faretta* footnote does not address the situation in which a defendant receives the assistance, with the trial court's benediction, of an attorney acting in a stand-by or advisory role. *See McKaskle v. Wiggins,* 465 U.S. 168, 183, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (although a defendant has no constitutional right to "hybrid" representation, a trial court has discretion to permit such an arrangement).

■ Where a defendant is initially represented by counsel but subsequently requests to proceed pro se, he may allege that counsel was ineffective at least up to the point where the defendant began to represent himself. *See, e.g., Hance v. Zant,* 696 F.2d 940, 950 (11th Cir.1983); *Rodriguez v. State,* 763 S.W.2d 893, 896 (Tex.Ct.App.1988). In addition, where standby or advisory counsel assumes an advisory role or exercises a degree of control over a defendant's case, "his or her potential for ineffectiveness, though diminished by the defendant's primary role, is not completely eliminated." *Ali v. United States,* 581 A.2d 368, 379 (D.C.1990); *see also Hance v. Kemp,* 258 Ga. 649, 373

S.E.2d 184, 185–86 (1988) (pro se defendant stated claim of ineffective counsel where he was told by the trial court that by electing to act as co-counsel he would not waive his right to later raise an ineffectiveness claim as to his attorney's performance). Counsel's competency may thus reasonably be challenged "within the limited scope of the duties assigned to or assumed by counsel." *People v. Bloom*, 48 Cal.3d 1194, 259 Cal.Rptr. 669, 774 P.2d 698, 718 (1989) (emphasis removed); *see also Downey v. People*, 25 P.3d 1200, 1204 (Colo.2001) (en banc); *State v. Bettney*, 529 A.2d 1356, 1357 (Me.1987) (per curiam). Pursuant to the Supreme Court's caution in *Faretta*, any claim of ineffectiveness of counsel must rely solely upon *counsel's* failures rather than on an alleged inadequacy in defendant's own representation of himself. *See, e.g., People v. Doane*, 200 Cal.App.3d 852, 246 Cal.Rptr. 366, 373 (1988).

Although it has yet to reach the matter, the court of appeals for the Second Circuit seems substantially in accord with these observations. As the court explained in *United States v. Schmidt*, "[p]erhaps in a case where standby counsel held that title in name only and, in fact, acted as the defendant's lawyer throughout the proceedings, we could consider a claim of ineffective assistance of standby counsel." 105 F.3d 82, 90 (2d Cir.1997). Even those circuits most hostile to the idea of a claim of ineffective assistance of standby counsel refuse categorically to reject the possibility of such a claim succeeding. *See United States v. Cochrane*, 985 F.2d 1027, 1029 n. 1 (9th Cir.1993) (per curiam) ("We need not decide if a *pro se* defendant may ever challenge the assistance of standby counsel whose assistance he has sought and received to conclude that the circumstances of this case do not warrant an exception to the rule articulated in *Faretta*."); *United States v. Windsor*, 981 F.2d 943, 947 (7th

Cir.1992) (expressing doubts that standby counsel can ever be considered constitutionally ineffective, but dismissing petitioner's claim on the ground that counsel's representation was, at any rate, not constitutionally deficient).

At the very least, it is clear that where the trial court has ordered counsel to act as an advisor for the defendant, has allowed standby counsel to argue and make motions on the defendant's behalf, has allowed standby counsel to proceed on legal matters outside of the presence of the defendant, and has encouraged the defendant to rely upon the legal advice proffered by his standby counsel, a petitioner is entitled to claim that he received constitutionally ineffective assistance from his standby counsel with respect to such court-sanctioned representation. *See generally* Anne Bowen Poulin, *The Role of Standby Counsel in Criminal Cases: In the Twilight Zone of the Criminal Justice System*, 75 N.Y.U. L.Rev. 676, 726 (2000) (acknowledging that courts have "difficulty accepting the proposition that a defendant who has no constitutional right to the assistance of standby counsel can complain if that assistance, granted by the trial court as a discretionary act, fails to meet some minimum standard," but arguing that such a claim is compelling particularly where the trial court encourages the pro se defendant to rely upon the advice of the standby counsel).

c. Ineffective Assistance of Appellate Counsel

 Although the *Strickland* test was formulated in the context of an ineffective assistance of trial counsel claim, the same test is used with respect to claims of ineffective appellate counsel. *See Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir.1992). Appellate counsel does not have a duty to advance every nonfrivolous argument that

could be made, *see Jones v. Barnes,* 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994). Either a federal or a state law claim that was improperly omitted from an appeal may form the basis for an ineffective assistance of appellate counsel claim, "so long as the failure to raise the state ... claim fell outside the wide range of professionally competent assistance." *Id.* (quotations omitted).

#### d. Strategic Choices

 As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052. Counsel, in other words, "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. Where counsel fails to make a reasonable investigation that is reasonably necessary to the defense, a court must conclude that the decision not to call an expert cannot have been based on strategic considerations and will thus be subject to review under *Strickland's* prejudice prong. *See Pavel v. Hollins,* 261 F.3d 210, 223 (2d Cir.2001) (counsel ineffective in a child sexual abuse case where his failure to call a medical expert was based on an insufficient investigation); *Lindstadt,* 239 F.3d at 201 (same). The court of appeals for the Second Circuit has recently gone so far as to imply that all of counsel's significant trial decisions must be justified by a sound strategy—a significant raising of the bar that would appear to require an unrealistic degree of perfection in counsel. *See Eze,* at 112 (remanding to district court for factual hearing because it was "unable to assess with confidence whether strategic considerations accounted for ... counsel's decisions").

#### e. Exhaustion of Individual Claims of Ineffectiveness

 Each substantially independent factual claim made in support of an allegation of ineffective assistance of counsel must be fairly presented to a state court before a federal habeas court may rule upon it. *See Rodriguez v. Hoke,* 928 F.2d 534, 538 (2d Cir.1991) (dismissing petition as unexhausted where petitioner's claim of ineffective assistance of counsel alleged more deficiencies before the habeas court than were presented to the state court, because "[t]he state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole" (quotation omitted)). Where an additional factual claim in support of the ineffective-assistance allegation merely "supplements" the ineffectiveness claim and does not "fundamentally alter" it, dismissal is not required. *Caballero v. Keane,* 42 F.3d 738, 741 (2d Cir.1994). Each significant factual claim in support of an ineffective-assistance allegation premised on appellate counsel's deficient performance must be exhausted. *See Word v. Lord,* No. 00 CIV. 5510, 2002 U.S. Dist. LEXIS 19923, at *34–*35 (S.D.N.Y. Mar. 18, 2002) (Magistrate's Report and Recommendation).

### 2. Failure to Dispute Government's Variance from the Indictment

 In general, a defendant's "Sixth Amendment right to the effective assistance of counsel can be violated if counsel

failed to raise a significant and obvious state law claim." *LanFranco v. Murray*, 313 F.3d 112, 118 (2d Cir.2002); *see also United States ex rel. Williams v. Brown*, 721 F.2d 1115, 1120 (7th Cir.1983) (counsel must be sufficiently familiar with state trial procedure so as to provide meaningful representation to his client).

■ A defendant in federal court has a right to indictment by a Grand Jury pursuant to the Fifth Amendment, but such a right is not guaranteed to defendants in state court by the Fourteenth Amendment. *Alexander v. Louisiana*, 405 U.S. 625, 633, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Fields v. Soloff*, 920 F.2d 1114, 1118 (2d Cir.1990). Nonetheless, New York State's constitution provides a defendant with a right to indictment by a grand jury and notice of the charges against him: "No person shall be held to answer for a capital or otherwise infamous crime . . . unless on indictment of a grand jury. . . ." N.Y. Const. art. I, § 6. In addition, a defendant has a separate constitutional right to "be informed of the nature and cause of the accusation." *Id.* New York's criminal procedure law sets forth what must be included in the indictment. *See* N.Y.Crim. Pro. Law § 200.50.

Under New York law the indictment serves at least three constitutional purposes. First, it provides a defendant with fair notice of the accusation that have been made against him, thus allowing him to prepare a defense. *People v. Miles*, 64 N.Y.2d 731, 485 N.Y.S.2d 747, 475 N.E.2d 118, 119 (1984) (mem.). Second, the indictment indicates just which crimes the defendant has been tried for, in order to avoid subsequent attempts to retry him for the same crimes in violation of constitutional protections against double jeopardy. *See id.* Third, the indictment provides "some means of ensuring that the crime for which the defendant is brought to trial is in fact one for which he was indicted by the Grand Jury, rather than some alternative seized upon by the prosecution in light of subsequently discovered evidence." *People v. Iannone*, 45 N.Y.2d 589, 412 N.Y.S.2d 110, 384 N.E.2d 656, 660 (N.Y. 1978).

Because New York procedure does not elevate form over function, the indictment is not the only method by which the state can assure that the above-listed constitutional rights of a defendant will be protected. The New York Court of Appeals has explained, for example, that an indictment that sets forth little about the nature of the crime the defendant is accused of committing may nonetheless pass constitutional muster because the defendant has a statutory right to demand a bill of particulars. *See People v. Bogdanoff*, 254 N.Y. 16, 171 N.E. 890, 893 (1930); *see also* N.Y.Crim. Pro. L. § 200.95(1) (bill of particulars is a "written statement by the prosecutor specifying . . . items of factual information which are not recited in the indictment and which pertain to the offense charged and including the substance of each defendant's conduct encompassed by the charge which the people intend to prove at trial on their direct case"); *id.* § 200.95(2) (bill of particulars must be requested by the defendant). "Implicit in this conclusion was the rationale that an indictment need not be deemed constitutionally insufficient for a failure to conform to all the traditional requirements of a valid indictment, as long as all the requisite protections normally provided by means of the indictment are in fact made available as of right to a defendant." *Iannone*, 412 N.Y.S.2d 110, 384 N.E.2d at 662. Because a detailed indictment is unnecessary, a defendant is entitled to rely—and often *must* rely—upon other sources of information for the provision of constitutionally sufficient notice of the charges

lodged against him. *See, e.g., id.* ("[T]he development of modern discovery rules in criminal cases has diminished the significance of the indictment's function as a provider of information."). The New York Court of Appeals has further cautioned that

> the court must be vigilant in safeguarding the defendant's rights to a bill of particulars and to effective discovery. Should the prosecutor decide to use an indictment which, although technically sufficient, does not adequately allow a defendant to properly prepare for trial, he may well run afoul of the defendant's right to be informed of the accusations against him.

*Id.* at 663.

▰▰▰▰ In short, a defendant must be put on notice of the crimes for which he is to be tried, he must be protected against subjection to double jeopardy, and he must be assured that a Grand Jury has indicted him for the acts for which he is to face trial. A defendant is to be provided with enough information, of sufficient specificity, "as may be necessary to give the defendant and the court reasonable information as to the nature and character of the crime charged." *Bogdanoff,* 171 N.E. at 893. The question of whether the indictment was sufficiently specific "must be made on an *ad hoc* basis by considering all relevant circumstances." *People v. Morris,* 61 N.Y.2d 290, 473 N.Y.S.2d 769, 461 N.E.2d 1256, 1259 (1984).

▰▰▰▰ Unlike the situation in New York, a federal defendant can demonstrate that his conviction was achieved in violation of his Fifth Amendment right to a Grand Jury in two separate—though often conflated—ways. A federal prisoner may claim either that his indictment was constructively amended or that there was a variance between the charge lodged against him and what was proven at trial:

An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them. A *variance* occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.

*United States v. Pelose,* 538 F.2d 41, 45 (2d Cir.1976) (quotation omitted; emphasis in original). Constructive amendments are generally considered prejudicial per se, but variances are subject to harmless-error analysis. *United States v. Weiss,* 752 F.2d 777, 787 (2d Cir.1985). "Whether a variance between the indictment and proof is fatal to the prosecution will depend on determining whether [the] substantial rights of the accused [notice to prepare a defense and protection against double jeopardy] have been adversely affected." *United States v. D'Anna,* 450 F.2d 1201, 1204 (2d Cir.1971) (quotation omitted). New York practice apparently does not recognize the distinction between variances and constructive amendments, and prejudice in the context of a "constructive amendment" cannot be deemed prejudicial per se.

▰▰▰▰ There is an unconstitutional variance in violation of the New York constitution when the state's proof at trial contradicts the elements described in the indictment and bill of particulars. *People v. Grega,* 72 N.Y.2d 489, 534 N.Y.S.2d 647, 531 N.E.2d 279, 283 (1988). As the *Grega* court explained,

> Proof at trial that varies from the indictment potentially compromises two of the functions of the indictment—notice to the accused and the exclusive power of the Grand Jury to determine the charges. Where defendant's right to

fair notice of the charges or his right to have those charges preferred by the Grand Jury rather than by the prosecutor at trial has been violated, reversal is required. *Id.* at 282. Although extraneous or immaterial facts in an indictment need not be proved by the state in order to sustain a conviction, when the indictment "specifies a set of facts supporting a material element of the crime charged, the People at trial are [not] at liberty to present evidence that affirmatively disproves it." *Id.* at 283 (reversing manslaughter conviction where the indictment alleged the victim was killed by being struck but the evidence at trial was that the victim was strangled); *see also People v. Bigda*, 184 A.D.2d 993, 993–94, 584 N.Y.S.2d 238 (N.Y.App.Div. 1992) (reversing conviction for endangering the welfare of a child because evidence at trial established that the charged conduct occurred one year later than what was noted in the indictment, unduly prejudicing the defendant in preparing his defense); *People v. Kaminski*, 58 N.Y.2d 886, 460 N.Y.S.2d 495, 447 N.E.2d 43, 44 (1983) (mem.) (reversing first-degree sodomy convictions where the indictment charged compulsion "by means of physical force" but the trial court instructed the jury that defendant could be found guilty if it found that the victim was merely threatened with death or physical injury).

■ If the variance between an indictment and the state's proof at trial is immaterial and results in no surprise or prejudice to the defendant, it is not cause for reversal of a conviction. *See, e.g., People v. Miller*, 163 A.D.2d 627, 628–29, 558 N.Y.S.2d 269 (N.Y.App.Div.1990) (no variance where the allegation in the indictment was that a drunk-driving accident occurred during a trip *to* the victim's home when in fact the accident occurred during the *return* trip); *cf. Kowalczyk v. United*

*States*, 936 F.Supp. 1127, 1141 (E.D.N.Y. 1996) ("A variance is immaterial where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance would not deprive the accused of his right to be protected against another prosecution for the same offense.").

3. Failure to Object to the Sufficiency of the Evidence

By New York statute, at the conclusion of the people's case or at the conclusion of all the evidence, "the court may . . . upon motion of the defendant, . . . issue a 'trial order of dismissal,' dismissing any count of an indictment upon the ground that the trial evidence is not legally sufficient to establish the offense charged therein or any lesser included offense." N.Y.Crim. Pro. Law § 290.10(1). Legally sufficient evidence is defined to mean "competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant's commission thereof." N.Y.Crim. Pro. Law § 70.10(1). "Legally sufficient" describes a quantum rather than a quality of evidence, and has been likened to the standard required to establish a prima facie case. *See People v. Jennings*, 69 N.Y.2d 103, 512 N.Y.S.2d 652, 504 N.E.2d 1079, 1084 (1986).

■ In reviewing a claim that the evidence was insufficient to support a criminal conviction, the "critical inquiry" is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318, 99 S.Ct. 2781. This is not an invitation to the court to weigh the evidence itself to determine whether it believes the evidence at trial established guilt beyond a reasonable doubt. *See Woodby v. INS*, 385 U.S. 276, 282, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966). "Instead, the relevant ques-

tion is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781.

■■■ Failure to move for an order of dismissal or to preserve a "strong" claim of insufficiency of evidence for appeal may merit a finding that counsel's performance was constitutionally ineffective. *See, e.g., People v. Hoyte,* 185 Misc.2d 587, 714 N.Y.S.2d 420, 426 (Sup.Ct.2000).

### 4. Failure to Call Expert Witness

The peculiar susceptibility of children to suggestive interrogation techniques has been definitively recognized by both federal and New York state courts. The court of appeals for the Second Circuit has recently explained that

> [w]hile we recognize that there is no absolute unanimity among scholars, "a sufficient consensus exists within the academic, professional, and law enforcement communities, confirmed in varying degrees by courts, to warrant the conclusion that the use of coercive or highly suggestive interrogation techniques can create a significant risk that the interrogation itself will distort the child's recollection of events, thereby undermining the reliability of the statements and subsequent testimony concerning such events."

*Washington v. Schriver,* 255 F.3d 45, 57 (2d Cir.2001) (quoting *State v. Michaels,* 136 N.J. 299, 642 A.2d 1372, 1379 (1994)). Similar sentiments have been expressed by lower New York state courts. *See, e.g., People v. Michael M.,* 162 Misc.2d 803, 618 N.Y.S.2d 171, 177–78 (1994) (discussing at length the scientific literature on child suggestibility in abuse cases); *In re R./M. Children,* 165 Misc.2d 441, 627 N.Y.S.2d 869, 872–73 (N.Y.Fam.Ct.1995) (same).

The issue of child suggestibility in sexual abuse cases was flagged by the Supreme Court at least as early as 1990. In *Idaho v. Wright,* the Court held that a child's hearsay statements concerning her alleged sexual abuse were unreliable because of the suggestive manner in which her treating doctor had conducted his medical interview, and that admission of the statements into evidence was therefore a violation of the Confrontation Clause. 497 U.S. 805, 826–27, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). In *Maryland v. Craig,* Justice Scalia referred to a number of studies demonstrating that children are "substantially more vulnerable to suggestion than adults," 497 U.S. 836, 868, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (Scalia, J., dissenting), and illustrated the pernicious character of the problem by discussing at length a miscarriage of justice in the 1980s in which improper interrogation techniques led to the indictment and conviction of dozens of adults who were wrongly accused of molesting nearly forty children. *Id.* at 868–69, 110 S.Ct. 3157.

In two recent cases, the court of appeals for the Second Circuit has granted habeas relief to New York state prisoners partly on the ground that their counsel was ineffective for failing to consult with medical experts familiar with issues concerning child sexual abuse. In *Lindstadt v. Keane,* the court suggested that it is " 'difficult to imagine a child abuse case ... where the defense would not be aided by the assistance of an expert.' " 239 F.3d at 201 (quoting Beth A. Townsend, *Defending the "Indefensible": A Primer to Defending Allegations of Child Abuse,* 45 A.F. L.Rev. 261, 270 (1998)). In *Pavel v. Hollins,* the court likewise found that a criminal defendant had been prejudiced by counsel's failure to call a medical expert witness to testify—or at least to advise counsel—concerning indicia of physical abuse in a child

molestation case. 261 F.3d at 224–25. The *Pavel* court further noted that there is " 'little question that child sexual abuse cases often present a fertile, indeed, a necessary, area for expert assistance.' " *Id.* at 224 (quoting *United States v. Tornowski*, 29 M.J. 578, 580 (1989)); *see also Holsomback v. White*, 133 F.3d 1382, 1387 (11th Cir.1998) (counsel ineffective for failing to call medical expert to testify about physical abuse in child sexual abuse case). Failure to consult a medical expert knowledgeable about physical indicia of child sexual abuse would appear, after these cases, to be evidence of nearly per se ineffectiveness in this circuit.

In contrast to the requirement that an expert must be consulted concerning testimony of physical indicia of sexual abuse, the court of appeals has suggested that expert testimony touching on the suggestibility of children is not a sine qua non of a fair trial. In *Washington v. Schriver*, the court discussed at great length the benefits that expert testimony in this area would afford a defendant charged with a sexual crime against a child and noted that an "emerging consensus in the case law relies upon scientific studies to conclude that suggestibility and improper interviewing techniques are serious issues with child witnesses." 255 F.3d at 57. The importance of providing expert testimony concerning a child's susceptibility was not, in *Washington*, sufficient for the court to find an error of constitutional dimensions in the state court's refusal to allow such an expert to testify. Because, in that case, defense counsel's cross-examination placed the potential effects of suggestibility before the jury and counsel forcefully argued the point in his summation, "under the particular facts of [that] case, the admission of the proposed expert testimony would not have created an 'otherwise nonexistent' reasonable doubt about the petitioner's guilt." *Id.* at 61 (quoting *Jones v.*

*Stinson*, 229 F.3d 112, 120 (2d Cir.2000)); *cf. United States v. Kirsh*, 54 F.3d 1062, 1072 (2d Cir.1995) (counsel's decision not to put on testimony as to fingerprint forgery "was plainly a tactical decision and hardly bespeaks professional incompetence").

Expert testimony on the suggestibility of children in sexual abuse cases has been admissible in New York courts since the early 1990s. *See Washington*, 255 F.3d at 57 (presuming, on habeas review of a 1991 New York state conviction, that "expert testimony on these subjects is admissible"); *see also People v. Hudy*, 73 N.Y.2d 40, 538 N.Y.S.2d 197, 535 N.E.2d 250, 260 (1988) (witness can testify about factors affecting the reliability of a child who had been subjected to police questioning so long as the witness avoids commenting directly on the credibility of the child).

### 5. Failure to Call Fact and Character Witnesses

██ "The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987). The decision to call witnesses or not is "typically a question of trial strategy" that a reviewing court is "ill-suited to second-guess." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998). Nonetheless, a court will challenge a lawyer's decision not to call a witness if counsel's decision was not "conscious [and] reasonably informed." *Pavel*, 261 F.3d at 217, 218 (finding ineffectiveness where counsel failed to call any witnesses except defendant because he believed his motion to dismiss would be granted).

### 6. Failure to Consult with Defendant

██ Adequate consultation between counsel and client is essential to the com-

petent representation of a criminal defendant. *See Gaines v. Hopper,* 575 F.2d 1147, 1149–50 (5th Cir.1978) ("Informed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case are cornerstones of effective assistance of counsel."); *Coles v. Peyton,* 389 F.2d 224, 226 (4th Cir.1968) ("Counsel must confer with his client without undue delay and as often as necessary, to advise him of his rights and to elicit matters of defense or to ascertain that potential defenses are available."). "While the amount of consultation required will depend on the facts of each case, the consultation should be sufficient to determine all legally relevant information known to the defendant." *United States v. Tucker,* 716 F.2d 576, 581 (9th Cir.1983). When counsel's failure to consult with a criminal defendant materially hampers the fashioning of a defense, counsel may be deemed to have functioned below the constitutional standard. *See, e.g., Lindstadt,* 239 F.3d at 200 (counsel deemed ineffective, in part, for failing to elicit from his client alibi information contradicting the state's contention that he could have abused his daughter at the times or in the places alleged).

### 7. Failure to Read *Rosario* Material

 Pursuant to *People v. Rosario,* the state must provide a criminal defendant with the pretrial statements of any witness who will be called to testify on behalf of the prosecution. 213 N.Y.S.2d 448, 173 N.E.2d at 883–84. This rule has been codified in the New York criminal procedure law; the prosecutor is obliged to "make available to the defendant ... any written or recorded statement ... made by a person whom the prosecutor intends to call as a witness at trial, and which relates to the subject matter of the witness's testimony." N.Y.Crim. Pro. Law § 240.45(1)(a). *Rosario* material "is valu-

able not just as a source of contradictions with which to confront [a witness] and discredit his trial testimony," but also because the material "may reflect a witness' bias ... or otherwise supply the defendant with knowledge essential to the neutralization of the damaging testimony of the witness which might, perhaps, turn the scales in his favor." *Rosario,* 213 N.Y.S.2d 448, 173 N.E.2d at 883. A prosecutor's failure to deliver the prior statement of a witness who has been called at trial constitutes per se error requiring a new trial. *People v. Ranghelle,* 69 N.Y.2d 56, 511 N.Y.S.2d 580, 503 N.E.2d 1011, 1016 (1986).

 Claims of ineffective assistance when dealing with *Rosario* material typically contend that counsel neglected to preserve a claim that the state failed to turn over the required pretrial statements of prosecution witnesses. *See, e.g., Flores v. Demskie,* 215 F.3d 293, 304 (2d Cir.2000) (defendant prejudiced by trial counsel's failure to preserve *Rosario* claim); *Mayo,* 13 F.3d at 530–31, 534 (same with respect to appellate counsel). In contrast, a claim that counsel failed to *read* pretrial statements that the state *did* turn over presents an issue that, while informed by the purpose behind the *Rosario* rule, is distinct in nature and depends for its resolution on the facts of each case.

### 8. Failure to Request a Bill of Particulars and to Move for Severance of Child Endangerment Charges

In New York, a person is guilty of endangering the welfare of a child when, among other things, that person "knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old." N.Y.Crim. Pro. Law § 260.10(1). Endangering the welfare of a child is a Class A misdemeanor.

In general, a showing that defense counsel failed to make a pre-trial motion—for example, asking for a bill of particulars—is insufficient, in itself, to establish ineffective assistance of counsel, because such a failure "might . . . be motivated by strategy." *People v. Rivera,* 71 N.Y.2d 705, 530 N.Y.S.2d 52, 525 N.E.2d 698, 699 (1988). Counsel's failure to request a bill of particulars is not per se ineffective. *See, e.g., People v. Claitt,* 222 A.D.2d 1038, 1039, 636 N.Y.S.2d 247 (N.Y.App.Div.1995) ("[A]lthough counsel should have insisted that the People comply with his demand for a bill of particulars, we cannot conclude that the failure to do so is tantamount to ineffective assistance."). When a petitioner can demonstrate that counsel's failure to require a bill of particulars was not motivated by strategy and that the failure resulted in prejudice to the defendant, counsel may be deemed ineffective. *See People v. Gil,* 285 A.D.2d 7, 12, 729 N.Y.S.2d 121 (N.Y.App. Div.2001) (per curiam) (counsel ineffective for failing to request a bill of particulars and waiving all suppression motions).

### 9. Failure to Object to Indirect Hearsay

In the context of eyewitness identification, "the testimony of a third party (typically, a police officer) to the effect that the witness identified a defendant as the perpetrator on some prior occasion is generally inadmissible." *People v. Buie,* 86 N.Y.2d 501, 634 N.Y.S.2d 415, 658 N.E.2d 192, 197 (1995). This rule, with modifications, has been codified by New York Criminal Procedure Law section 60.25. *See id.*

"Indirect hearsay" describes testimony in which the "act of the hearer . . . leads by direct inference to the precise words of the speaker." *Mitchell v. Hoke,* 745 F.Supp. 874, 876 (E.D.N.Y.1990). In such a situation, the speaker's credibility must be evaluated to determine its probative force, and the hearsay rule should generally be applied in order to prevent an "end run" around the proscription against admitting otherwise inadmissible evidence.

### 10. Failure to Introduce Witness's Prior Inconsistent Statements into Evidence

Impeachment of important governmental witnesses with their own prior inconsistent statements is particularly vital in child sex abuse cases, which often boil down to a credibility contest between the defendant and one or more complainants. *Pavel,* 261 F.3d at 220–21, 224; *see also* Townsend, 45 A.F. L.Rev. at 294 ("To prepare the cross-examination, the defense counsel should know each and every statement that the child has made, to whom and when, so that he can take full advantage of prior inconsistent statements."). Federal courts have not infrequently found counsel ineffective for failing to impeach witnesses in child sex abuse cases. *See, e.g., Tucker,* 716 F.2d at 585 (counsel's "most serious dereliction of duty during trial" in a child sex abuse case "was the failure to utilize any of the prior statements given by government witnesses" in order to demonstrate inconsistencies); *Sparman v. Edwards,* 26 F.Supp.2d 450, 454–55 & n. 7 (E.D.N.Y. 1997) (counsel ineffective, in part, for failing to impeach complainants in child sex abuse case with prior inconsistent statements to police), *aff'd,* 154 F.3d 51, 52 (2d Cir.1998) (per curiam). The court of appeals for the Second Circuit has gone so far as to state that "[t]he teaching of the law in this Circuit is that defense counsel is obliged, wherever possible, to elucidate any inconsistencies in the complainant's testimony, protect the defendant's credibility, and attack vigorously the reliability of any physical evidence of sexual contact between the defendant and the complain-

ant," *Eze,* at 12—a perhaps overbroad statement that is tempered later in the court's opinion, where it recognizes the "unenviable task" faced by counsel that needs to draw out inconsistencies in the statements of alleged child victims without "cross[ing] the line by questioning ... sympathetic witnesses too severely in the presence of the jury," *id.* at at 132.

■■■ As a general rule, decisions about whether to engage in cross-examination, "and if so to what extent and in what manner, are ... strategic in nature and generally will not support an ineffective assistance claim." *Dunham v. Travis,* 313 F.3d 724, 732 (2d Cir.2002) (quotation omitted).

11. Failure to Object to Introduction of Defendant's Inculpatory Statements

■■■ A defendant who has made an inculpatory statement to a public servant has the statutory right in New York to be informed by the state, prior to trial, that it intends to use the defendant's statement at trial—*if* the statement would be suppressible at trial *had* it been made involuntarily. The relevant statute states in pertinent part:

1. Whenever the people intend to offer at a trial (a) evidence of a statement made by a defendant to a public servant, which statement if involuntarily made would render the evidence thereof suppressible ..., they must serve upon the defendant a notice of such intention, specifying the evidence intended to be offered.

2. Such notice must be served within fifteen days after arraignment and before trial, and upon such service the defendant must be accorded reasonable opportunity to move before trial ... to suppress the specified evidence. For good cause shown, however, the court

may permit the people to serve such notice, thereafter and in such case it must accord the defendant reasonable opportunity thereafter to make a suppression motion.

3. In the absence of service of notice upon a defendant as prescribed in this section, no evidence of a kind specified in subdivision one may be received against him upon trial unless he has, despite the lack of such notice, moved to suppress such evidence and such motion has been denied and the evidence thereby rendered admissible. . . .

N.Y.Crim. Pro. Law § 710.30. As the New York Court of Appeals has explained, section 710.30 has its origins in *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), in which the Supreme Court held that such statements may not be considered by a jury until there has been a determination by a separate factfinder that the statements were made voluntarily. *People v. O'Doherty,* 70 N.Y.2d 479, 522 N.Y.S.2d 498, 517 N.E.2d 213, 216 (1987). Underlying the procedural scheme framed by the statute are "considerations of fairness to the defendant" and "concerns for the efficient conduct of criminal prosecutions." *Id.* at 218. A defendant's inculpatory statements will be precluded if the state fails to show good cause for its failure to timely inform the defendant that his statement will be introduced at trial— even if the defendant cannot show that the untimely notice resulted in any harm to his defense. *Id.*

A rule of reason should be applied: The statement may be almost innocuous or easily explained as not inculpatory, or may slip into the testimony inadvertently and be harmless. Notice pursuant to section 710.30(1)(a) need not be served on a defendant "where there is no question of voluntariness." *People v. Greer,* 42 N.Y.2d 170,

397 N.Y.S.2d 613, 366 N.E.2d 273, 279 (1977).

Although the term "public servant" is not defined in New York's criminal procedure law, the Appellate Division has recently "decline[d] to interpret the reference to 'public servant[s]' in CPL 710.30(1)(a) to require notice of the statements made by [a] defendant to an employee of the Administration for Children's Services." *People v. Batista,* 277 A.D.2d 141, 142, 717 N.Y.S.2d 113 (N.Y.App.Div. 2000). Central to the court's reasoning in that case was the fact that the caseworker "was not acting as an agent of the police in obtaining either the arrest or confession of the defendant," but rather was "acting as an interpreter and investigating a child's claims of sexual abuse." *Id.*

■ For a statement to be deemed a voluntary waiver of a defendant's Fifth Amendment rights, "it must not have been 'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by exertion of any improper influence.'" *People v. Bolla,* 112 Misc.2d 703, 447 N.Y.S.2d 398, 400 (1982) (quoting *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897)) (emphasis removed).

12. Spillover Effect

■ When fewer than all criminal counts have been dismissed at trial or reversed on appeal, a court must determine whether prejudicial spillover from evidence introduced in support of the dismissed or reversed counts requires the remaining convictions to be upset. *United States v. Rooney,* 37 F.3d 847, 855 (2d Cir.1994). In assessing the "spillover effect" on the remaining counts, reviewing courts consider "whether the totality of the circumstances requires reversal of some or all of the remaining counts." *United States v. Wapnick,* 60 F.3d 948, 953 (2d

Cir.1995) (quotation omitted); *see also People v. Baghai–Kermani,* 84 N.Y.2d 525, 620 N.Y.S.2d 313, 644 N.E.2d 1004, 1007 (1994) ("Whether an error in the proceedings relating to one count requires reversal of convictions on other jointly tried counts is a question that can only be resolved on a case-by-case basis, with due regard for the individual facts of the case, the nature of the error and its potential for prejudicial impact on the over-all outcome.").

Three factors that guide the inquiry on impermissible spillover are

1) whether the evidence on the vacated counts was inflammatory and tended to incite or arouse the jury to convict the defendant on the remaining counts; 2) whether the evidence on the vacated counts was similar to or distinct from that required to prove the remaining counts; and 3) the strength of the government's case on the remaining counts.

*United States v. Naiman,* 211 F.3d 40, 50 (2d Cir.2000). With respect to the second factor, the court of appeals for the Second Circuit has explained that as a practical matter it can be difficult for a defendant to make a showing of prejudicial spillover when the evidence introduced in support of the vacated and remaining counts emanate from similar facts (since the same evidence would likely have been admissible to prove both) or where the vacated and remaining counts are premised on completely different fact patterns (since the evidence to both counts is readily separable). *United States v. Morales,* 185 F.3d 74, 82 (2d Cir.1999). "Thus, a defendant is likely to make a successful argument of prejudicial spillover only in those cases in which evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, and this evidence is presented in such a manner that tends to indicate that the jury probably utilized

this evidence in reaching a verdict on the remaining counts." *Id.* (quotation omitted).

■ In New York, the "paramount consideration in assessing potential spillover error is whether there is a reasonable possibility that the jury's decision to convict on the tainted counts influenced its guilty verdict on the remaining counts in a meaningful way." *People v. Doshi,* 93 N.Y.2d 499, 693 N.Y.S.2d 87, 715 N.E.2d 113, 116 (1999). Such spillover prejudice was recognized by the court of appeals for the Second Circuit in a grant of habeas relief when the court found that factual errors in testimony pertaining to one incident of child sexual abuse tainted the defendant's conviction for a separately charged incident of abuse. *See Lindstadt,* 239 F.3d at 205–06 ("[S]exual abuse of a child is a heinous crime and those who commit it are thought by many to be serial offenders and incorrigible; a jury that finds a defendant guilty of three counts of sexual abuse on one occasion is primed to find the defendant guilty of one count of abuse on another.").

### F. Confrontation Clause

Pursuant to the New York statute in effect at the time of Jelinek's trial, a child witness

> shall be declared vulnerable when the court … determines by clear and convincing evidence that it is likely, as a result of extraordinary circumstances, that such child witness will suffer severe mental or emotional harm if required to testify at a criminal proceeding without the use of live, two-way closed-circuit television and that the use of such live, two-way closed-circuit television will help prevent, or diminish the likelihood or extent of, such harm.

N.Y.Crim. Pro. Law § 65.10(1) (repealed as of Sept. 1, 2002). In determining whether such extraordinary circumstances exist, the court "may consider" any one or more of a dozen factors, including whether the child witness "is particularly young or otherwise particularly subject to psychological harm on account of a physical or mental condition which existed before the alleged commission of the offense," *id.* § 65.20(9)(b) (repealed as of Sept. 1, 2002), and whether the defendant "occupied a position of authority with respect to the child witness," *id.* § 65.20(9)(c) (repealed as of Sept. 1, 2002).

■ Although the Confrontation Clause "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact," *Coy v. Iowa,* 487 U.S. 1012, 1016, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), the right to such a confrontation is "not absolute," *United States v. Gigante,* 166 F.3d 75, 80 (2d Cir.1999). "The optimal way of conducting a trial under American practice is for the witness in person in court to face the defendant and the trier, and to be subject to immediate cross-examination in their presence. American criminal procedure is, however, pragmatic." *United States v. Gigante,* 971 F.Supp. 755, 756 (E.D.N.Y. 1997), *aff'd,* 166 F.3d 75 (2d Cir.1999). The Supreme Court has held that the "use of the one-way closed circuit television procedure, where necessary to further an important state interest, does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause." *Craig,* 497 U.S. at 851, 110 S.Ct. 3157. The Court has also explained that "if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face

confrontation with the defendant." *Id.* at 855, 110 S.Ct. 3157.

### G. Due Process Clause

 Federal habeas corpus relief does not lie for mere errors of state law. *Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Nonetheless, the Due Process Clause requires that state courts conducting criminal trials "proceed consistently with 'that fundamental fairness' which is 'essential to the very concept of justice.'" *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998) (quoting *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)). Errors of state law that rise to the level of a constitutional violation may be corrected by a habeas court, but even an error of constitutional dimensions will merit habeas corpus relief only if it had a " 'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quotation omitted).

### 1. Variance from the Indictment

 On its face, a state prisoner's claim that he was denied the procedural right to be indicted by a Grand Jury appears to implicate a right that is exclusively of state concern; as noted above, the federal constitutional right to indictment by a Grand Jury has not been deemed applicable to the states through the Fourteenth Amendment. Nonetheless, the Supreme Court has "repeatedly held that state statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). Such state-created rights may not be "arbitrarily abrogated." *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *see also Evitts v. Lucey,* 469 U.S. 387, 400–01, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (Due Process Clause guarantees a state criminal defendant the effective assistance of counsel on his first appeal as of right *if* the state grants appeals as of right, which the Constitution does not require); *Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (although a state may choose whether to institute a welfare program, it must operate whatever programs it does establish subject to the protections of the Due Process Clause); *Saldana v. New York,* 665 F.Supp. 271, 275 (S.D.N.Y. 1987) (once a state creates a right for a defendant to testify before a Grand Jury, "it cannot cause that right to be forfeited in a manner which is arbitrary or fundamentally unfair"), *rev'd on other grounds,* 850 F.2d 117 (2d Cir.1988); *Michael v. Dalsheim,* No. CV 90–2959, 1991 WL 99368, 1991 U.S. Dist. LEXIS 7273 (E.D.N.Y. May 22, 1991) (same).

In the analogous context of a defendant who has been denied the opportunity to exercise his state-created right to trial by jury, the Court explained:

> Where ... a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.

*Hicks v. Oklahoma,* 447 U.S. 343, 346, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980) (citations omitted). The same reasoning applies

with full force to the deprivation of a defendant's state-created right to indictment by a Grand Jury. *See Jones v. Keane,* No. 99–CV–149E(F), 2002 U.S. Dist. LEXIS 25278, at *31–*32 (W.D.N.Y. July 26, 2002) (right to a grand jury indictment under New York constitution cannot be forfeited in an unfair or arbitrary manner and must conform with the Due Process Clause of the Fourteenth Amendment).

■ In order for such a claim to be reviewed by a federal habeas court, however, a petitioner must have explicitly raised the *federal* issue in state court. *See Dennis v. Henderson,* No. 99 Civ. 0693, 1989 WL 115866, at *1, 1989 U.S. Dist. LEXIS 11452, at *2 (S.D.N.Y. Sept. 28, 1989) (dismissing as unexhausted a New York state prisoner's habeas claim that he was never informed of the charges against him because his state court motions to vacate "were based entirely on state law and were insufficient to put the state court on notice that they were to decide federal constitutional claims").

2. Admission of Uncharged Crimes Testimony into Evidence

■ Although evidence of similar uncharged crimes has probative value, under New York law it is generally excluded for policy reasons "because it may induce the jury to base a finding of guilt on collateral matters or to convict a defendant because of his past." *People v. Alvino,* 71 N.Y.2d 233, 525 N.Y.S.2d 7, 519 N.E.2d 808, 812 (1987). Such evidence may be received, however, "if it helps to establish some element of the crime under consideration or is relevant because of some recognized exception to the general rule." *Id.* The evidence will be allowed so long as its probative value and the need for the evidence outweighs the potential for prejudice to the defendant. *People v. Cook,* 93 N.Y.2d 840, 688 N.Y.S.2d 89, 710 N.E.2d

654, 655 (1999); *see also United States v. Sappe,* 898 F.2d 878, 880 (2d Cir.1990).

3. Prolonged and Suggestive Questioning of Child Witnesses by the Police

■ When a child witness has been subjected to coercive or suggestive questioning by police or civilians, his testimony may have been rendered so unreliable that it must be suppressed at trial. *See Michael M.,* 618 N.Y.S.2d at 176. Although there is no express authority in the New York penal law or criminal procedure law for it, New York courts have not ruled out the possibility that a pretrial taint hearing may be ordered by the trial court, in its discretion, in appropriate cases. *People v. Jones,* 185 Misc.2d 899, 714 N.Y.S.2d 876, 879 (2000). Expert testimony on the effects of suggestive questioning may also be introduced into evidence. *Michael M.,* 618 N.Y.S.2d at 177.

4. Trial Court's "Vulnerable Witness" Inquiry

■ In determining whether a child is a "vulnerable witness" for purposes of allowing him to testify via closed-circuit television, "the court shall make findings of fact which reflect the causal relationship between the existence of any one or more of the factors set forth in [section 65.20(9) ] or other relevant factors which the court finds are established and the determination that the child witness is vulnerable." N.Y.Crim. Pro. Law § 65.20(11). In addition, "[w]hen the court has determined that a child witness is a vulnerable child witness, it shall make a specific finding as to whether placing the defendant and the child witness in the same room during the testimony of the child witness will contribute to the likelihood that the child witness will suffer severe mental or emotional harm." *Id.* § 65.20(12). The court's findings must be established by "clear and

convincing evidence." *Id.* § 65.20(9). A showing of nothing more than the witness's young age and the fact of his or her alleged sexual abuse is insufficient for the implementation of video testimony procedures. *In re G./A. Children,* 161 Misc.2d 64, 612 N.Y.S.2d 752, 754–55 (Fam.Ct. 1994).

## H. Sixth Amendment Right to Notice

 The Sixth Amendment provides, in pertinent part, that "[i]n all prosecutions, the accused shall enjoy the right … to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. The Sixth Amendment right of the accused to reasonable notice of the charges against him is made applicable to the states by the Fourteenth Amendment and may not be abridged. *Mildwoff v. Cunningham,* 432 F.Supp. 814, 817 (S.D.N.Y.1977) ("As the Supreme Court has recently stated, because the rights guaranteed to criminal defendants through the sixth amendment, including the right ' "to be informed of the nature and cause of the accusation" … are basic to our adversary system of criminal justice, they are part of the "due process of law" that is guaranteed by the Fourteenth Amendment to defendants in the criminal courts of the States.)' " (quoting *Faretta v. California,* 422 U.S. 806, 818, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)); *see also Gannett Co. v. DePasquale,* 443 U.S. 368, 379, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) ("The Sixth Amendment, applicable to the States through the Fourteenth, surrounds a criminal trial with guarantees such as the right to notice, confrontation, and compulsory process that have as their overriding purpose the protection of the accused from prosecutorial and judicial abuses.").

## I. Discretion to Fashion Relief

 By statute a federal court has broad discretion to fashion appropriate re-

lief when issuing a writ of habeas corpus. *See* 28 U.S.C. § 2243 para. 8 ("The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require."); *Hilton v. Braunskill,* 481 U.S. 770, 775, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987) ("Federal courts are authorized, under 28 U.S.C. § 2243, to dispose of habeas corpus matters 'as law and justice require.' "). Appropriate relief where counsel has been deemed ineffective may include vacatur of fewer than all counts of conviction. *See, e.g., Lindstadt,* 239 F.3d at 205–06 (court contemplated vacating fewer than all counts of conviction but opted not to do so after concluding that an impermissible spillover effect tainted the remaining count); *cf. Boria v. Keane,* 99 F.3d 492, 498–99 (2d Cir.1996) (court granted the writ but, concluding that it would "not now be appropriate" to vacate the judgment, instead ordered that petitioner, who had already served six years in prison, be discharged and that his conviction be left undisturbed).

## X. Application of Law to Facts

### A. Timeliness

Jelinek's petition was filed on April 21, 1997, within the one-year limitations period that began to run from the April 24, 1996 date that AEDPA became effective. The court has expressed serious concern from the outset that this matter be moved along expeditiously. It has attempted to gain the services of eminent proceduralists to aid Jelinek. Nevertheless, the matter has been frequently delayed—due, in part, to its complexity, the professional obligations of assigned counsel and the fact that petitioner was incarcerated far from counsel's law offices. A number of petitions have been filed, all of which the court considered to be continuations of the original petition. While the earlier petitions

were marked as "dismissed," the initial application for habeas relief has at all times been treated by the court and the parties as a matter pending in this court. Accordingly, all of the petitions have been consolidated under the docket number of the initial petition, 97–CV–2327.

Dismissal of the instant petition on grounds of untimeliness would be profoundly unfair to the petitioner, who has proceeded as diligently as his circumstances permitted. It is therefore to the credit of the state that it has adopted the ethical course of not raising the defense of time bar in this proceeding. Briefly stated, Jelinek's initial petition was timely filed, his subsequent petitions have been accepted by the court nunc pro tunc, the court's prior dismissals were designed to serve as stays, and the matter has been deemed as at all times pending before this court. There is no timing problem.

### B. Ineffective Assistance of Trial and Appellate Counsel

#### 1. Preliminary Observations

##### a. Wealth and Representation

Some preliminary observations concerning Jelinek's trial counsel are in order before assessing Jelinek's ineffective-assistance claims. Trial counsel, Douglas Krieger, is an experienced and respected member of the New York bar. He is a skilled criminal practitioner who has defended numerous clients against charges of sexual abuse. He has been president of the Queens County Bar Association. His credentials are outstanding. He is at the same time an entrepreneur who must earn a living. He and defendant's wife agreed on a fee for his representation—somewhere between $25,000 and $30,000—only half of which was actually paid to Mr. Krieger prior to the commencement of trial. When it became clear that defendant

would be unable to pay the balance of his attorney's fee, Mr. Krieger sought unsuccessfully to be relieved by the court from having to further represent defendant. Mr. Krieger performed his basic, professional duties on behalf of defendant, but appears to have made no extraordinary effort for a client who had admittedly reneged on his fee.

Had Jelinek been wealthy (or, with respect to some matters, poverty stricken), the instant case might have turned out somewhat differently. The defendant would have been out on bail instead of in jail awaiting trial, so that he and investigators would have been helping his attorney round up the witnesses he needed for his defense. He would have been under intense psychiatric treatment in an effort to demonstrate to the district attorney and the court that he was never, or is no longer, a danger to the community. He would likely have negotiated a plea, pled to reduced charges, and received a shorter prison term. If the case had gone to trial there would have been appropriate psychiatrists and expert witnesses testifying on his behalf. There would have been full trial briefs, with co-counsel at the defense table. There would have been psychiatrists at the sentencing, and the sentencing proceeding might have been lengthy and comprehensive. While the evidence was sufficient to convict Jelinek on many of the counts lodged against him, the resulting sentence would probably have been different because of treatment and rehabilitation considerations. In this respect, Jelinek's predicament is one faced by many in the lower-middle class, who are neither sufficiently wealthy to afford a first-rate defense nor sufficiently impoverished to qualify for competent state-financed counsel.

#### b. Generally Competent Performance of Trial Counsel

Putting these observations aside, the court finds that counsel's performance was

in many respects competent. For instance, prior to trial counsel made a comprehensive omnibus motion containing the following requests: to suppress physical evidence (*Mapp* motion); to suppress evidence obtained as a result of unlawful arrest (*Dunaway* motion); to suppress statements (*Huntley* motion); to transcribe and inspect the Grand Jury minutes; to dismiss the indictment; for release of the Grand Jury minutes; to delay further proceedings pending the state's compliance with defendant's discovery requests; asking the court to direct the state to respond to the defendant's demand for a bill of particulars; and a reservation of motions for further relief. Subsequently counsel filed a reply affirmation seeking disclosure of discovery and *Rosario* material and the furnishing of particulars. After the trial court denied the omnibus motion, counsel filed an additional motion requesting the state to disclose the names of the complainants and the precise dates, times and locations of each alleged offense. The names of the complaining witnesses were furnished to the defense, but no further information was provided by the state. The trial court denied the defense motion for further disclosure.

As this memorandum's extensive quotation from the trial transcript indicates, counsel was for the most part skilled in his examination and cross-examination of the witnesses. He objected appropriately and vigorously throughout the trial. His success was somewhat limited, due in large part to the somewhat wooden evidentiary rulings of the trial court and the failure of counsel to have briefed the major evidentiary issues. In sum, counsel's motion practice and comportment during trial met minimum constitutional standards. Nonetheless, counsel failed Jelinek in a number of critical respects, only some of which were rectified by the Appellate Division on direct appeal.

c. Separate Claims of Ineffective Assistance of Trial and Appellate Counsel

Each of Jelinek's particular claims of ineffective assistance of counsel are reviewed below. In his petition he claims both that his trial counsel and his appellate counsel provided him with constitutionally ineffective assistance. The ineffective-assistance claims with respect to appellate counsel's serve two functions: they are stand-alone constitutional claims that may merit some form of relief in their own right, *see Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir.), *cert. denied*, 534 U.S. 1031, 122 S.Ct. 569, 151 L.Ed.2d 442 (2001), and they are also claims that, if deemed meritorious, would serve as cause explaining the procedural defaults of Jelinek's forfeited claims of ineffective assistance of trial counsel, *see Murray*, 477 U.S. at 488, 106 S.Ct. 2639.

2. Unexhausted Ineffective–Assistance Claims

None of Jelinek's present claims of ineffective assistance of trial counsel were clearly raised on direct appeal, and all were therefore subject to procedural default in state court. In fact, each of the ineffective-assistance claims raised in Jelinek's two section 440 motions before the trial court to vacate judgment was denied as procedurally defaulted, though for different reasons. In contrast, all of his claims of ineffective assistance of appellate counsel that were raised in coram nobis applications were denied on the merits by the Appellate Division. Before turning to those claims which *were* presented by Jelinek in his section 440 and coram nobis motions, it is necessary to address the three ineffective-assistance claims that were *not* clearly presented to the state court and which, therefore, apparently remain unexhausted.

### a. Failure to Object to Indirect Hearsay

 Jelinek now claims that his trial counsel was ineffective for failing to object to the indirect hearsay testimony of Detective Anderson, in which she in effect bolstered the children's testimony concerning abuse. The trial court explicitly stated that this claim was not raised before it by Jelinek's second section 440 motion and therefore refused to address it. Based on Jelinek's language in his section 440 application, that conclusion seems reasonable, although a federal court presented with similar papers by a pro se applicant would likely have addressed the merits of the argument. *See Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (holding pro se complaint from state prisoner to less stringent standards than formal pleadings drafted by lawyers). Jelinek's ineffective-assistance claim is therefore not exhausted with respect to this issue and may not be addressed by this court.

 Even if this court were to conclude that the claim *was* properly raised before the state court—in which case the failure of the state court to adjudicate the claim would allow de novo review of the claim rather than the deferential review prescribed by AEDPA for an "adjudication on the merits"—habeas relief on this ground would not be warranted. The detective's testimony, which on direct examination was little more than an acknowledgment that she interrogated the children concerning allegations of sexual abuse by Jelinek, should have been objected to by counsel and might have been suppressed by the court. Nonetheless, failure to object to this type of hearsay is not an unusual mistake for an attorney. Equally important, Jelinek has made no showing that he was prejudiced by the testimony. Trial counsel was not ineffective under

*Strickland*—which is the controlling federal law with respect to ineffective-assistance claims, *see Williams*, 529 U.S. at 391, 120 S.Ct. 1495—and habeas relief would therefore not be warranted on the claim. *See Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir.2002) (failure to raise an untenable issue does not fall below the *Strickland* standard).

 Jelinek also claims that appellate counsel was ineffective for failing to raise the claim that trial counsel was ineffective for not raising the indirect hearsay claim. Jelinek raised this claim before the Appellate Division in a coram nobis petition that was worded in almost identical language to that used in his section 440 petition. Unlike the trial court, however, the Appellate Division did not indicate in its dismissal of the coram nobis petition that it had refused to reach this particular question. Because there is no evidence that it did *not* reach the question, it is a fair assumption that the Appellate Division did address Jelinek's claim and rejected it on the merits. Review of the habeas claim that appellate counsel was ineffective on this ground therefore proceeds under the standards set forth by AEDPA. Because, for the reasons discussed in the above paragraph, trial counsel was not constitutionally ineffective for having failed to raise the indirect-hearsay claim, appellate counsel could not have been ineffective for failing to assert the claim that trial counsel should have raised the indirect-hearsay claim. The Appellate Division's resolution of the claim was therefore not contrary to or an unreasonable application of *Strickland,* nor was it an unreasonable determination of the facts.

### b. Failure to Consult Experts

The same analysis applies to Jelinek's claim on habeas that trial counsel was ineffective for failing to consult experts

knowledgeable about the susceptibility of children to suggestive questioning. As with the "indirect hearsay" claim, Jelinek merely noted for the trial court in his section 440 motion that the issue had been "flagged" by this court, but he did not explicitly allege in that application that trial counsel was ineffective for failing to investigate the usefulness of such experts. Again, the state trial court refused to address the issue—though a federal court would likely have construed the pro se papers as having sufficiently raised the claim.

■ The state trial court's conclusion that the issue was not raised before it was reasonable. Accordingly this court may not address Jelinek's unexhausted "expert witness" claim. Even if this court were to conclude that the claim was properly raised before the state court—and, as with respect to the "indirect hearsay" claim, therefore subject to de novo rather than deferential review—habeas relief would not be warranted on this ground.

■ Counsel's extensive cross-examination of the children, as well as of the investigating detective and CPS caseworker, failed to elicit any indication that the investigators' interrogations were improper or unduly suggestive. This is not the type of case, moreover, in which expert testimony is likely to have been of much benefit to the defendant. Both *Pavel* and *Lindstadt*—the Second Circuit cases in which counsel was deemed ineffective in part for failing to offer expert testimony—involved the state's initial introduction into evidence of proof that the alleged child victims had been physically abused. In both cases counsel was properly held to be unreasonable and ineffective for failing to consult his own medical experts in an effort to rebut the allegedly spurious claims made by the state. In the instant case there was no evidence of physical injury

that would require the analysis of an expert; the only evidence of any physical manifestation of abuse was testimony that J.C. once required his mother to apply some petroleum jelly to his anus—something that was not amenable to further illumination by an expert.

The introduction of expert testimony on child suggestibility was not common at the time of Jelinek's trial. At any rate, it would have been at best of only marginal value to him. In fact, the failure of any experts to testify—either for the defense or the prosecution—might actually have been helpful to Jelinek, allowing his attorney an opportunity during his summation to suggest to the jury that the children's testimony *was* coached or improperly gathered. Counsel cannot be faulted for failing to pull the strands of such an argument together at closing since he had been dismissed as counsel by Jelinek himself at the close of the defense's case prior to summation. Finally and decisively, Jelinek acknowledges that he and defense counsel *did* discuss the possibility of hiring an expert, but that Jelinek himself decided that he could not afford the expense. Habeas relief would not be merited on this claim.

■ Jelinek also claims that appellate counsel was ineffective for failing to raise the claim that trial counsel was ineffective for not raising the expert-witness claim. As with the indirect-hearsay claim, Jelinek raised the expert-witness claim before the Appellate Division in a coram nobis petition that was worded in almost identical language to that used in his section 440 petition. Unlike the trial court, the Appellate Division did not indicate in its dismissal of the coram nobis petition that it had refused to reach this question. It is reasonable to conclude that the Appellate Division did address Jelinek's claim and rejected it on the merits. As with the in-

direct-hearsay claim, review of the habeas claim that appellate counsel was ineffective on this ground therefore proceeds under the standards set forth by AEDPA. Because, for the reasons discussed in the preceding two paragraphs, trial counsel was not ineffective for having failed to raise the expert-witness claim, appellate counsel could not have been ineffective for failing to raise the claim that trial counsel should have raised the expert-witness claim. The Appellate Division's resolution of the claim was therefore not contrary to or an unreasonable application of *Strickland*, nor was it an unreasonable determination of the facts.

### c. Failure to Challenge Variance from the Indictment

Even more difficult to analyze is Jelinek's claim, argued at length in his latest petition and at the evidentiary hearing before this court, that his trial counsel was ineffective for failing to move to dismiss Counts Seven and Eleven of the charges filed against him on the ground that the evidence presented at trial varied materially from what was charged in the indictment. These are strong and forceful claims that call into question the validity of two of the most serious sodomy convictions achieved by the State.

■■■ Count Eleven of the Grand Jury's indictment charged Jelinek with sodomy in the first degree, and in particular alleged that "defendant put his mouth on the penis of [J.N.], that having occurred . . . inside of the defendant's home." (Trial Tr. at 107.) The prosecutor so informed the jury during her opening statement and the trial court in his charge to the jury likewise stated that Jelinek was charged with "put[ting] his mouth on the penis of [J.N.]" (*Id.* at 944.) At trial there was substantial testimony that Jelinek may have put *his* penis to the mouth of J.N.—a crime not charged in the indictment—but there was almost *no* evidence that he performed the act charged in the indictment. In fact, when asked directly by the prosecutor at trial whether Jelinek put J.N.'s penis to his mouth, J.N. responded with an unequivocal "No." (*Id.* at 601.) The *only* evidence at trial offered as proof of the act alleged in the indictment was provided by J.C., who stated that in June or July of 1991 he saw Jelinek "put [J.N.'s] weenie in his mouth." (*Id.* at 400.) It is abundantly clear that, particularly given J.N.'s outright denial at trial of the acts allegedly committed upon him, no reasonable jury could conclude beyond a reasonable doubt that the state had proved that Jelinek put his mouth to J.N.'s penis. The only reasonable explanation for the guilty verdict on this count is that the jury convicted Jelinek for the entirely different act of putting his penis to the mouth of J.N.—something testified to by both J.N. and J.C. at trial but not specifically charged in the indictment. Defense counsel did not object either to the variance between the indictment and the proof offered at trial or to the insufficiency of the evidence with respect to this charge.

The variance between what was alleged in the indictment with respect to this count was material and greatly to the prejudice of Jelinek. All three of the purposes of New York's constitutional requirement of indictment by Grand Jury were arguably undermined by Jelinek's conviction on Count Eleven: Jelinek did not receive fair notice of the accusation made against him and was thereby disadvantaged in mounting a defense; he remains in jeopardy of a prosecution for first-degree sodomy for having allegedly put his penis to the mouth of J.N.; and he has been denied the right, enshrined in the New York constitution, to be brought to trial for the crime for which he was indicted "rather than some alterna-

tive seized upon by the prosecution in light of subsequently discovered evidence," *Iannone*, 412 N.Y.S.2d 110, 384 N.E.2d at 660. By failing to preserve this obvious and meritorious state law claim, trial counsel performed below a minimally sufficient constitutional standard, prejudicing Jelinek. That counsel was nominally acting during the last stages of the trial in a "standby" or "advisory" capacity does not, under the present circumstances, affect an analysis of the ineffective-assistance claim because all concerned—the defendant, counsel and the trial court—understood counsel to be actually representing Jelinek except with respect to the delivery of closing arguments.

■ The other alleged variance concerns Count Seven of the indictment, also charging Jelinek with sodomy in the first degree, and in particular with "plac[ing] his penis to the anus of [J.C.], this incident . . . having occurred inside of the defendant's home." (Trial Tr. at 103.) The variance with respect to this count is also troubling, but might not itself be deemed so material as to merit the granting of the writ if the claim were properly before this court. Although J.C. testified before the Grand Jury that the alleged incident had occurred at Jelinek's home, no evidence was offered at trial in support of the charge that an incident of this sort occurred there. To the contrary, when directly asked whether anything had happened at Jelinek's home in July of 1991, J.C. unequivocally stated, "Nothing happened at his house, but at the beach things happened." (*Id.* at 398, 412 N.Y.S.2d 110, 384 N.E.2d 656.) Jelinek's trial counsel failed to move for dismissal of the charge on the grounds of an unconstitutional variance, even though the defense arguably was prejudiced as a result of having geared a large part of its strategy toward demonstrating that such an act was im-

probable given the hustle and bustle of life in his home. Because the location of the alleged crime was charged as occurring at Jelinek's home, it is arguable that no witnesses were called for the defense in anticipation of defending against a charge of anal sodomy that allegedly took place at a public beach.

The above discussion of these variance problems at trial is, in a sense, academic because of Jelinek's apparent failure to have clearly presented these claims to a state court for adjudication. If he now were to return to state court to exhaust these variance claims concerning the ineffectiveness of his trial counsel (and, for that matter, the indirect-hearsay and expert-witness claims concerning the ineffectiveness of his trial counsel), he would be procedurally barred from raising them in a third section 440 petition.

■ Jelinek does not face precisely the same problem with respect to his claims that appellate counsel was ineffective for failing to raise the claims that trial counsel was ineffective for not moving to dismiss Counts Seven and Eleven on the basis of a material variance. Those claims have never been raised in state court and therefore may not now be addressed by this court. Jelinek may, however, seek to return to the Appellate Division and raise these claims in a new coram nobis petition.

There appears to be no procedural obstacle in New York law that would prevent him from doing so. (*See* Feb. 14, 2003 Letter from Margaret E. Mainusch at 2.) It can only be anticipated that Jelinek will avail himself of this opportunity to put before the state appellate court, for the first time, the cogent argument that he remains convicted—at least with respect to Counts Seven and Eleven of the indictment—solely due to appellate counsel's failure to have specifically alerted the Appellate Division that trial counsel dropped

the ball on the Count Seven and Eleven variance claims. As is apparent from the chart that appellate counsel drafted (and which is an appendix to this memorandum), appellate counsel was aware that there was such a variance, yet he failed to plainly raise this obvious claim in a forceful and telling manner.

Should the Appellate Division agree with Jelinek that his variance claim is meritorious, that court may deploy its considerable equitable powers in fashioning relief for him. *See People v. Johnson,* 149 A.D.2d 534, 534, 540 N.Y.S.2d 727 (N.Y.App.Div. 1989) (Appellate Division may grant writ of error coram nobis based on appellate counsel's ineffectiveness, vacate a prior order affirming on appeal the trial court on appeal, and reconsider defendant's appeal de novo); N.Y.Crim. Pro. Law § 470.15(1) (intermediate appellate court "may consider and determine any question of law or issue of fact involving error or defect in the criminal court proceedings which may have adversely affected the appellant"); *id.* § 470.15(2) (upon an appeal, intermediate appellate court may affirm, reverse or modify the criminal court judgment); *id.* § 470.15(3) (reversal or modification of a judgment may be based upon the law or facts or as a "matter of discretion in the interest of justice"); *id.* § 470.15(6) ("interest of justice" reversal or modification may be based on error or defect at trial that "was not duly protested at trial"). The Appellate Division's equitable powers are expansive and unique, exceeding those possessed by either the trial courts, the New York Court of Appeals or the federal court of appeals.

Should the Appellate Division find no merit to his argument, Jelinek may return to this court and proceed with the stayed matter. The habeas petition will then be processed under the deferential standards of AEDPA.

The federal court of appeals' discussion of exhaustion in *Jones v. Senkowski,* 42 Fed.Appx. 485, 486–87 (2d Cir.2002) (unpublished), is not in conflict with the above observations. In *Jones,* a New York state prisoner raised in his habeas petition a "suggestive identification" claim that he had not raised on direct appeal and that was thus unexhausted. Because New York law permits only a single request for direct review of a conviction under section 500.10(a) of the New York Court Rules, the petitioner would have been procedurally barred from raising the claim if he were to return to the Appellate Division to raise it directly. He nonetheless argued in the *Jones* case that exhaustion would be possible and that a procedural bar could be avoided if he brought a coram nobis petition before the Appellate Division alleging that his appellate counsel was ineffective for having failed to raise the suggestive identification claim on appeal. He reasoned that the Appellate Division's decision on his ineffective assistance claim would necessarily entail a judgment on his underlying suggestive identification claim, and that therefore his underlying claim was still viable and not subject to default. The federal court of appeals rejected this reasoning, noting that the ineffective assistance claim and the underlying suggestive identification claims were distinct, and that the Appellate Division's consideration of the ineffective assistance claim would not be a ruling on the suggestiveness claim, which "would merely be considered as an element of the ineffectiveness claim." *Id.* at 487. In conclusion, the court stated, "As such, the coram nobis proceeding does not afford the petitioner a 'right' to raise the 'question presented' by his federal habeas petition in state court." *Id.*

The instant circumstances are quite different from those assumed in *Jones.* Jelinek's claim of ineffective assistance of ap-

pellate counsel is the very claim raised before this court which Jelinek now must exhaust. Arguably it has not been raised before a state court, but under New York rules he is apparently not barred from raising it in a new coram nobis application. The claim, if he chooses to bring it, will be addressed by the Appellate Division on the merits. Having been adjudicated, it will thereby become ripe for disposition (under AEDPA standards of review) in this court. In *Jones,* by contrast, petitioner sought to utilize an ineffective assistance claim as a "vehicle" for presenting another, underlying substantive claim to the state court for indirect review on the merits. Whether or not the court of appeals for the Second Circuit (in its nonprecedential opinion) was right to view this as an unacceptable end-run of the exhaustion doctrine by Jones, in the present case there can be no plausible contention that presenting to the state court on coram nobis the *same* claim raised before the district court on habeas is an attempt to evade the exhaustion bar.

Because Jelinek's unexhausted variance claims appear to have some merit, this court refuses to exercise its statutorily-granted discretion to deny these unexhausted claims, along with the entire petition, on the merits. 28 U.S.C. § 2254(b)(2).

### 3. Exhausted But Procedurally Defaulted Ineffective Assistance Claims

The remainder of Jelinek's ineffective assistance of trial counsel claims were raised before the state court in a pair of section 440 motions to vacate judgment, but all were denied as procedurally defaulted by the trial court. Each of the claims of ineffective assistance is thus barred from this court's review unless Jelinek can demonstrate that the rule invoked for the default by the state court was not an independent and adequate state ground, that there was cause and prejudice for the default, or that it would be a manifest injustice for this court to fail to entertain these claims. Also addressed in this Part are Jelinek's correlative claims with respect to appellate counsel's ineffectiveness, all of which have been exhausted and all of which were denied on the merits by the Appellate Division.

Jelinek reasonably declines to argue that the state trial court's invocation of New York Criminal Procedure Law sections 440.10(2)(a), 440.10(2)(c) and 440.30(1) as bases for the procedural default of Jelinek's ineffective assistance claims was not an independent and adequate state bar of any of his claims. Each of these bars has previously been held to be an adequate state ground. *See Richardson v. Greiner,* No. 97 Civ. 5448, 2003 WL 76994, at *2, 2003 U.S. Dist. LEXIS 146, at *6 (S.D.N.Y. Jan. 7, 2003) (adequacy of section 440.10(2)(a)); *Aparicio v. Artuz,* 269 F.3d 78, 93 (2d Cir.2001) (adequacy of section 440.10(2)(c)); *Turner v. Senkowski,* No. 97–CV–653H, 2000 WL 575696, at *3–4, 2000 U.S. Dist. LEXIS 6368, at *12–*13 (W.D.N.Y. Feb. 17, 2000) (adequacy of section 440.30(1)). In addition, the trial court "clearly and expressly state[d] that its judgment rests on a state procedural bar." *Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (quotation omitted).

Jelinek has also failed to bring to this court's attention evidence that was not available at trial demonstrating that he is actually innocent of the charges for which he was convicted. This is not the extraordinary instance in which a constitutional violation has probably caused the conviction of an innocent. The "manifest injustice" exception to the procedural default doctrine has not been met in the instant case.

Jelinek contends, however, that cause for the default of his ineffective assistance of trial counsel claims lies in his *appellate* attorney's constitutional ineffectiveness in failing to raise these claims on direct appeal. In theory, cause for the default of Jelinek's ineffective-assistance claims may be premised on appellate counsel's deficient performance, but only for those ineffective-assistance claims that were raised in Jelinek's *first* section 440 motion— claims that the trial court deemed defaulted because they should have been raised on direct appeal. Those of Jelinek's ineffective-assistance claims that were raised for the first time in his *second* section 440 motion were deemed by the trial court to be defaulted because they should have been raised in the first section 440 motion. Cause for the failure to raise an ineffective-assistance claim in the first petition lies (in the law's view) solely with Jelinek himself and cannot logically be ascribed to appellate counsel.

### a. Failure to Call Character Witnesses

Jelinek claims that trial counsel was ineffective for failing to call additional character witnesses. In particular, he complains that counsel was ineffective for failing to cull character testimony "from people familiar with defendant from his 10 years as a little league coach." (Pet. for Writ of Habeas Corpus at 5.3.) This claim was raised in Jelinek's first section 440 motion and deemed procedurally defaulted because it could have been raised on direct appeal. Jelinek claimed in a coram nobis petition that cause for this default lay in appellate counsel's ineffectiveness, but the Appellate Division denied his claim on the merits.

Whether or not to call a character witness is eminently a tactical decisions that another court is not in a good position to second-guess. Absent an extraordinary showing by the petitioner, such a claim will not merit a finding that trial counsel performed below the constitutional minimum. Jelinek has made no such showing here. It is unlikely, counsel might well have reasoned, that Jelinek retained a warm or wide friendship among the Little League crowd after so many children had accused him of what the parents undoubtedly viewed as despicable acts.

■ Because trial counsel cannot be deemed ineffective, appellate counsel could not be deemed ineffective for failing to raise this claim on direct appeal. The Appellate Division's adjudication of the appellate counsel ineffective-assistance claim was therefore not contrary to or an unreasonable application of *Strickland,* nor was it an unreasonable determination of the facts. Jelinek has thus not shown cause to excuse his procedural default of the trial counsel ineffective-assistance claim, and this court may not address the substance of his argument.

### b. Failure to Call Defendant's Wife as Fact Witness

■ Counsel likewise was not ineffective for failing to call Jelinek's wife as a fact witness. This claim was raised in Jelinek's first section 440 motion and deemed procedurally defaulted because it could have been raised on direct appeal. Jelinek claimed in a coram nobis petition that cause for this default lay in appellate counsel's ineffectiveness, but the Appellate Division denied his claim on the merits. As Jelinek himself testified during the evidentiary hearing before this court, he and defense counsel discussed whether to call his wife in order to establish that she was frequently and unpredictably in the house and that it was therefore unlikely that Jelinek would engage in any abuse at his home. Counsel and Jelinek jointly decided that she was "too volatile" to testify. (Tr.

of Jan. 2, 2003 Hr'g at 39.) Trial counsel was not ineffective in making this strategic decision in consultation with Jelinek.

■ Because trial counsel cannot be deemed ineffective, appellate counsel could not be deemed ineffective for failing to raise this claim on direct appeal. The Appellate Division's adjudication of the appellate counsel ineffective-assistance claim was therefore not contrary to or an unreasonable application of *Strickland*, nor was it an unreasonable determination of the facts. Jelinek has thus not shown cause to excuse his procedural default of the trial counsel ineffective-assistance claim, and this court may not address the substance of that argument.

#### c. Failure to Consult with Defendant

■ Jelinek has also failed to demonstrate that counsel failed to consult with him before and during the trial. Jelinek first raised this claim in his second section 440 motion before the trial court, where it was deemed procedurally barred because it should have been raised in his first section 440 motion. Cause for this default cannot, as noted above, lie in appellate counsel's ineffectiveness, and Jelinek argues no other cause that might excuse the default. His claim may not, therefore, be entertained.

At any rate, Jelinek's testimony before this court established that he and defense counsel interacted rather extensively in preparation for the trial—three or four times in person, once for at least an hour to an hour-and-a-half, and occasionally by telephone. Jelinek also described interactions with counsel during the trial itself. Although Jelinek may have wanted more from his attorney, this is not a case in which counsel failed in effect to consult with his client.

Trial counsel was not ineffective in this regard. The Appellate Division's conclusion that appellate counsel was not ineffective for failing to raise the claim is neither contrary to *Strickland* nor an unreasonable determination of the facts.

#### d. Failure to Read *Rosario* Material

■ Jelinek claims that counsel was ineffective for failing to read the *Rosario* material provided by the state. Jelinek also raised this claim for the first time in his second section 440 motion before the trial court, where it was deemed procedurally barred because it should have been raised in his first section 440 motion. Cause for this default cannot lie in appellate counsel's ineffectiveness, and Jelinek argues no other cause that might excuse the default. His claim may not, therefore, be entertained by this court.

Even so, this claim too is meritless. It is true that the prosecution turned over the *Rosario* material to the defense very late in the proceedings, during the trial. The practice in this court is to insist that all such materials be made available to the criminal defendant far in advance of trial. It is a sharp practice by prosecutors to withhold such information until the very last moment. Were state prosecutors to make it a practice to open their files to defendants and show them everything as a matter of course, it is unlikely that a single well-founded conviction would ever be lost. There would, to the contrary, likely be a corresponding benefit to the integrity of the process, and the need to litigate questions like that presented here would no longer arise. Though it is an unsound policy for the prosecution to hold onto such materials until the last moment, the practice is ordinary in some state courts and is not unconstitutional. *But see People v. Ranghelle*, 69 N.Y.2d 56, 511 N.Y.S.2d 580, 503 N.E.2d 1011, 1015–16 (1986) ("[O]nce it is determined that the statements sought by a defendant come within the *Rosario*

rule, the better practice is to turn over the statements immediately without further analysis as to whether the defendant is technically entitled to disclosure.").

In any event, there would be no basis in the present case for granting the writ on these grounds, because defense counsel had sufficient time to review the materials, and did review them. (*See* Trial Tr. at 818 (trial court notes that the trial was delayed for four hours while Jelinek and counsel went over the *Rosario* material).) Trial counsel was not ineffective in this regard. The Appellate Division's conclusion that appellate counsel was not ineffective for failing to raise the claim of trial counsel's ineffectiveness on this ground is neither contrary to *Strickland* nor an unreasonable determination of the facts.

e. Failure to Request Bill of Particulars and Keep Out Uncharged Crimes Evidence

Defense counsel was not ineffective for failing to request a bill of particulars with respect to the misdemeanor endangerment charges faced by Jelinek, which resulted in the admission into evidence of testimony concerning a number of uncharged crimes. This claim was raised in Jelinek's first section 440 motion and deemed procedurally defaulted because it could have been raised on direct appeal. Jelinek claimed in a coram nobis petition that cause for this default lay in appellate counsel's ineffectiveness, but the Appellate Division denied his claim on the merits.

As Jelinek's habeas counsel made clear in a hearing before this court, defense counsel did in fact request a bill of particulars with respect to these counts. (*See* Jan. 2, 2002 Hr'g at 87–94.) Although counsel failed to rebut the court's erroneous conclusion during the trial that defense counsel had *not* made this request, there is no realistic likelihood that the evidence of uncharged crimes thus admitted would not have been introduced in any case. Given state practice and the heavy burden on state trial calendars, there is likewise no reasonable likelihood that the trial court would have severed the endangerment charges from the other more serious counts if counsel had made such a request. Even if this court were to assume that the uncharged crimes evidence would have been suppressed in its entirety, there was more than ample evidence of charged crimes presented against Jelinek at trial to negate the proposition that he was prejudiced by testimony concerning similar uncharged crimes.

 Because trial counsel cannot be deemed ineffective, appellate counsel could not be deemed ineffective for failing to raise this claim on direct appeal. The Appellate Division's adjudication of the appellate counsel ineffectiveness claim was therefore not contrary to or an unreasonable application of *Strickland,* nor was it an unreasonable determination of the facts. Jelinek has thus not shown cause to excuse his procedural default of the trial counsel ineffectiveness claim on this ground, and this court may not address the substance of that argument.

f. Failure to Object to Inculpatory Statements

 Also insufficient to establish that defense counsel was constitutionally ineffective is Jelinek's claim that counsel failed to object to the introduction into evidence of an arguably inculpatory statement—"I don't like penises, I like women"—made by Jelinek to a caseworker. Jelinek first raised this claim in his second section 440 motion before the trial court, where it was deemed procedurally barred because it should have been raised in his first section 440 motion. Cause for this default cannot lie in appellate counsel's ineffectiveness,

and Jelinek argues no other cause that might excuse the default. His claim may not, therefore, be entertained by this court.

It is clear from the transcript of the trial that counsel did, in fact, object to the statement's introduction. It is immaterial whether counsel's motion was to "suppress" the statement or "preclude" it—a distinction that might, in other cases and other circumstances, have some relevance pursuant to a New York Court of Appeals case decided well after Jelinek's convictions became final. *See People v. Kirkland,* 89 N.Y.2d 903, 653 N.Y.S.2d 256, 675 N.E.2d 1208 (1996) (mem.) (defendant who moves for suppression after the denial of a motion to preclude waives the preclusion issue); *see also* Peter Preiser, *Supplementary Practice Commentaries,* N.Y.Crim. Pro. L. § 710.30 (Supp.2002) (mildly criticizing the opinion). Under New York law Jelinek's statement was admissible, both because it was not made to a "public servant" as that statutory term has been construed by the state courts and because it was not made involuntarily. Moreover, defense counsel saw the possibly poisonous nature of the statement and reasonably chose not to push his objections any further. Instead counsel provided an antidote to the venom by showing that Jelinek had every reason to believe—based on the context of the caseworker's visit and his understanding of the functions of child protection agency—that the investigation related to an allegation of sexual abuse and that his statement was therefore a reasonable one that was not indicative of a guilty mind. Counsel dealt with the issue effectively.

Because trial counsel was not ineffective in this regard, the Appellate Division's conclusion that appellate counsel was not ineffective for failing to raise a claim of ineffective-assistance of trial counsel is nei-ther contrary to *Strickland* nor an unreasonable determination of the facts.

### g. Failure to Impeach with Prior Inconsistent Statements

■ Jelinek also contends that defense counsel was ineffective for failing to introduce the prior inconsistent statements of child witnesses who appeared against him at trial. This claim was also first raised by Jelinek in his second section 440 motion before the trial court. It was there deemed procedurally barred because it should have been raised in his first § 440 motion. Cause for this default cannot lie in appellate counsel's ineffectiveness, and Jelinek argues no other cause that might excuse the default. This claim may not, therefore, be entertained by this court.

At any rate, when viewed in context, it is difficult to fault defense counsel's failure to introduce these statements. He had requested and was aware of the children's Grand Jury testimony and he was afforded ample opportunity to impeach the children's trial statements. Adopting such a strategy would, however, have been perilous. For instance, a review of the record shows that there was corroborating testimony presented at the Grand Jury but not at trial that might have come into the record if defense counsel had probed too deeply into some of the alleged inconsistencies. More importantly, the decision not to impeach with the Grand Jury minutes was arguably an appropriate tactical decision adopted in order to avoid trapping the witnesses in relatively minor contradictions that might have had the unwelcome effect of yielding even more sympathy for the children.

The videotaped testimony of G.B. on cross-examination amply demonstrates the straits in which counsel found himself, forced to choose between leaving the witness's testimony unchallenged and arguing with an emotional and sympathetic child.

Counsel reasonably opted to restrain himself and instead train his guns on G.B.'s mother rather than on G.B. himself. Doing so allowed counsel to demonstrate on cross examination, through the mother's testimony, that G.B.'s troubles at home and his problematic family life might have been the impetus for his bringing an accusation against Jelinek. Tactical decisions such as this one might have been debatable, but they were defensible as reasonable trial strategy, even with respect to the inconsistent testimony concerning Counts Seven and Eleven. Trial counsel was not ineffective in this regard, and the Appellate Division's conclusion that appellate counsel was not ineffective for failing to raise the claim of trial counsel's ineffectiveness can thus be neither contrary to *Strickland* nor an unreasonable determination of the facts.

h. Failure to Object to Sufficiency of Evidence

 Trial counsel did, arguably, perform below the constitutional standard for effective representation when he failed to object to the sufficiency of the evidence with respect to Count Four of the indictment (charging Jelinek with rubbing his penis against J.C.'s leg), since it is clear from the trial transcript that no evidence of this alleged incident was ever put before the jury. Nonetheless, this claim was not raised by Jelinek until his second section 440 motion before the trial court, where it was deemed procedurally barred because it should have been raised in his first section 440 motion. Cause for this default cannot lie in appellate counsel's ineffectiveness, and Jelinek argues no other cause that might excuse the default. His claim may not, therefore, be entertained by this court. Jelinek has no reason to complain, however, for he had already received relief when the Appellate Division dismissed this count of the indictment and vacated his conviction on the count.

Jelinek also makes the broader contention that trial counsel was ineffective for failing to preserve a general claim that the evidence of his guilt presented at trial was legally insufficient to support his convictions. This ineffective assistance claim was not raised by Jelinek until his second section 440 application, with the result that the claim was denied by the trial court as defaulted due to Jelinek's failure to raise it in his first section 440 application.

 Cause for this default cannot lie in appellate counsel's ineffectiveness, and Jelinek argues no other cause that might excuse the default. This claim may not, therefore, be entertained by this court.

Jelinek argued before the Appellate Division in his petition for a writ of error coram nobis that appellate counsel was derelict for failing to raise trial counsel's ineffectiveness with respect to the insufficiency claim. The Appellate Division rejected that claim on the merits. At least with respect to Counts Seven and Eleven—discussed in detail in the section addressing the variance issue—this claim is a troubling one. *See* Part X.D.4, *supra*. There was scant evidence presented at trial that Jelinek put his mouth to J.N.'s penis, and a motion to dismiss this count for insufficiency of the evidence might well have been granted by the trial court if it were put plainly to it. Trial counsel's failure to preserve the issue for appeal may well have been ineffective, and appellate counsel's failure to point out to the Appellate Division this dereliction might likewise be deemed ineffective. But Jelinek would be entitled to some relief on this ground only if this court were to conclude that the Appellate Division's dismissal of the claim was contrary to or an unreasonable application of *Strickland*, or an unreasonable determination of the facts. Because Jeli-

nek's petition contains other unexhausted claims and will be stayed pending his presentation of those claims to the state courts, *this* particular claim need not be resolved at this time. In any event, it is in effect raisable as a variance claim.

### C. Confrontation Clause Claim

Jelinek's claim that his constitutional right to confront witnesses was infringed by the use of two-way, closed-circuit television during the testimony of G.B. was raised by counsel on direct appeal and is therefore properly before the court. This claim is, however, without merit. The decision was reasonable and within the court's discretion. The state made a sufficient showing of necessity justifying the use of this special procedure in the best interests of the child witness and with little adverse effect on defendant. *See Craig,* 497 U.S. at 855, 110 S.Ct. 3157.

■ Because the Appellate Division's decision denying Jelinek relief on this ground was not contrary to or an unreasonable application of clearly established Supreme Court law, and because its determination of the facts was reasonable, Jelinek is not entitled to habeas relief on the claim.

### D. Due Process Clause Claims

#### 1. Uncharged Crimes Evidence

Over defense counsel's objection, the trial court admitted into evidence testimony concerning uncharged crimes allegedly committed by Jelinek. In doing so, the court determined that such evidence supported the state's multiple charges against Jelinek of endangering the welfare of a child. Jelinek did not raise the claim on direct appeal that his due process rights to a fair trial were infringed by the state court's evidentiary decision, and he thereby forfeited the claim pursuant to New

York Criminal Procedure Law section 440.10(2)(c). Jelinek did, however, argue before the Appellate Division that appellate counsel was ineffective for failing to raise this claim; if the ineffective-assistance argument were persuasive, Jelinek might thereby establish cause for the default of the underlying substantive argument. The Appellate Division, however, rejected the ineffective-assistance claim on the merits.

Because the evidentiary decision by the trial court does not appear to have been erroneous under state law—the uncharged crimes evidence *was* used to establish Jelinek's guilt of the child endangerment counts—appellate counsel would not have been ineffective under *Strickland* for failing to claim on appeal that the evidentiary decision violated Jelinek's due process rights.

■ The Appellate Division's ruling that appellate counsel was not ineffective was therefore not contrary to or an unreasonable application of *Strickland,* nor was it an unreasonable determination of the facts. Jelinek has therefore not established cause for the procedural default of the underlying Due Process claim, and this court may not address it.

#### 2. Suggestive Questioning of Child Witnesses

Jelinek claims that his due process rights were violated when child witnesses were subjected to suggestive questioning by state investigators. He did not raise this claim on direct appeal, thereby forfeiting it pursuant to New York Criminal Procedure Law section 440.10(2)(c), as the trial court held in denying Jelinek's first section 440 motion. Jelinek argues that cause for the default lies in his appellate counsel's ineffective representation, a claim that he did present to the Appellate

Division but that was rejected by that court on the merits.

■ None of the evidence presented at trial or after comes near to establishing that there was any improper interrogation by investigators. Because the underlying due process claim is without merit, appellate counsel cannot be deemed ineffective under *Strickland* for failing to have raised it on appeal. The Appellate Division's denial of the ineffective assistance claim was not contrary to or an unreasonable application of clearly established Supreme Court law, nor was it an unreasonable determination of the facts. Since Jelinek cannot therefore show cause for his default of the underlying due process claim, this court may not address it.

### 3. Vulnerable Witness Inquiry

Jelinek urges that his due process rights were violated by the trial court's determination that G.B. was a "vulnerable witness" who should be allowed to testify via closed-circuit, two-way television. As with the similar due process video claim, Jelinek did not raise this claim on direct appeal and thereby forfeited it pursuant to New York Criminal Procedure Law section 440.10(2)(c), as the trial court held in denying Jelinek's first section 440 motion. He alleges here too that cause for the default lies in his appellate counsel's ineffectiveness, but when he raised this claim before the Appellate Division it was rejected on the merits.

The state trial court held an evidentiary hearing and made extensive findings of law and fact. It was within its discretion under both state statutory and federal constitutional law to allow G.B.'s testimony to be presented to the jury in this fashion.

■ Because Jelinek's underlying due process claim is without merit, appellate counsel could not have been ineffective under *Strickland* for failing to raise it on direct appeal. The Appellate Division's denial of the claim was not contrary to or an unreasonable application of clearly established Supreme Court law, and it was not an unreasonable determination of the facts. Jelinek cannot show cause for his default of this due process claim and this court may not entertain the claim directly.

### 4. Variance from the Indictment

Jelinek's petition does not raise the claim that his Fourteenth Amendment due process rights were violated and that he received a fundamentally unfair trial due to the state's arbitrary denial of his state constitutional right to indictment by a grand jury as a result of the variance between the crime alleged in the indictment and the evidence presented at trial. The argument, as founded on federal constitutional law, is moreover unexhausted because it has apparently never been presented to a state court. If Jelinek were to present it in a section 440 motion it would be procedurally defaulted. As already noted, it may be presentable as a coram nobis claim. *See* Part X.D.4, *supra.*

### E. Sixth Amendment Claim

Jelinek has also not raised the claim that his Sixth Amendment right to receive notice of the charges against him was infringed as a result of the variance between the indictment and the evidence presented at trial with respect to Count Seven (placing of penis to buttocks of J.C. at Tobay Beach) and Count Eleven (placing of mouth to penis of J.N.). This claim has not been exhausted in state court and would be procedurally defaulted if raised before the trial court in a section 440 motion. This claim may be presentable as a coram nobis claim. *See* Part X.D.4, *supra.*

## XI. Conclusion

This matter is stayed for a reasonable period of time in order to allow petitioner the opportunity to return to state court, if he so desires, to there present those constitutional claims that have not been properly exhausted.

SO ORDERED.

### Appendix
### Appellate Division Direct Appeal

ROGER JELINEK—SUMMARY OF TRIAL TESTIMONY OF PRIOR UNCHARGED ACTS

\* NOTE—IN MOST OF THE COUNTS OUTLINED BELOW IT WAS IMPOSSIBLE TO DISTINGUISH THE ACT REFERRED TO IN EACH COUNT OF THE INDICTMENT FROM THE UNCHARGED ACTS.

| Count | 1–Indictment | 2–Trial Testimony | 3–Prior Uncharged Acts (Not Included in Indictment). | 4–Sentence in years |
|---|---|---|---|---|
| | J.C. | | | |
| 2 | Sexual Abuse 1st "defendant touched the penis of John Doe" ... on or about 6/91. | Witness testified that defendant touched him on the penis and buttocks five times in June 1991 (T 398:2–9). | 9 prior uncharged acts of sexual abuse. | 1–3 Concur |
| 3 | Sexual Abuse 1st "defendant touched the penis of John Doe" ... on or about 7/91. | Witness testified that defendant touched him on the penis *and* buttocks in July 1991 (T 399:11–13). | 1 prior uncharged act of sexual abuse. | 1–3 Concur |
| 4 | Sexual Abuse 1st "defendant did rub his penis against the leg of John Doe" ... on or about 7/91. | NO EVIDENCE AT TRIAL | | 1–3 Concur |
| 5 | Sexual Abuse 1st "defendant touched the penis of John Doe ... on or about 6/90." | ·Witness testified that defendant touched him on both his penis and buttocks on three or four occasions in June 1990 (T 392:20–393:5). | 4–6 uncharged acts of sexual abuse. (2 of the 6–8 acts attested to by witness applied to counts 5 and 6) | 1–3 Consec |
| 6 | Sexual Abuse 1st "defendant touched the buttocks of John Doe ... on or about 6/90." | See Testimony for Count 5. | | 1–3 Concur |
| 7 | Sodomy 1st "defendant placed his penis to the anus of John Doe" ... on or about 7/91" at defendant's home. | NO EVIDENCE AT TRIAL Witness denied that sodomy occurred in the defendant's house in July 1991 as defendant was charged in the indictment *but* Witness testified that in July 1991, *on the beach,* defendant placed his penis to witness's anus and touched his buttocks and penis (T 398:17–399:13). | No testimony supporting count 7 of the indictment *but* 1 uncharged act of sodomy 2 uncharged acts of sexual abuse. | 2–6 Consec |

| | | | | |
|---|---|---|---|---|
| 8 | Endangering Welfare... "by engaging in sexual act in the presence of and upon the person of John Doe" in defendant's home. | Witness observed defendant put Jason Nolin's penis in his mouth in the presence of defendant's son, Jason Jelinek (T 393:8–13; T 396:16–22). | 1 uncharged act of endangering the welfare of defendant's son Jason. | 1 year Concur |
| | J.N. | Witness testified that in June 1991 he visited the Jelinek home almost every day when he came home from school *(10 days)* (T 597:24–598:2). * * * He further testified that in July of 1991 he visited the Jelinek home almost every day *(31 days)* (T 601: 21–23). | | |
| 11 | Sodomy 1st "defendant put his mouth *on the penis* of John Moe ... on or about 7/91." | NO EVIDENCE AT TRIAL *But* Witness testified that in June '91 defendant put his *penis in witness's mouth* (T 598:8–13) *and* Witness testified that in July '91 defendant put his *penis in witness's mouth* (T 601:18–25). | No testimony for count 11 of the indictment *But* 2 uncharged acts of sodomy. | 2–6 Consec |
| 12 | Sexual Abuse 1st "defendant touched the penis of John Moe ... between 6/15/91 and 7/91." | Witness testified that defendant touched his penis every time he came over in June 1991 (T 597:22–23) and most of the time when he came over in July 1991 (T 601:11–24). | 8 uncharged acts of sexual abuse in June 1991 (2 of the acts attested to by the witness apply to counts 12 and 15) *and* 31 (approx.) uncharged acts of sexual abuse in July 1991. | 1–3 Consec |
| 13 | Sexual Abuse 1st "defendant put his mouth on the buttocks of John Moe ... between 6/15/91 and 7/91." | Witness testified that defendant put his mouth on witness's buttocks every time he visited the Jelinek home in June 1991 (T 597:11–23) and on multiple occasions | 9 uncharged acts of sexual abuse from June 1991 *and* multiple uncharged acts of sexual abuse from July 1991. | 1–3 Concur |

in July 1991 (T 601:11–19).

| | | | | |
|---|---|---|---|---|
| 14 | Sexual Abuse 1st "defendant touched the buttocks of John Moe . . . between 6/15/91 and 7/91." | Witness testified that defendant touched the witnesses buttocks every time he visited the Jelinek home in June 1991 (T 597:22–23) and on multiple occasions in July 1991 (T 601:11–19). | 8 uncharged acts of sexual abuse in June 1991 (2 of the acts attested to by the witness apply to counts 14 and 16) *and* Multiple uncharged acts of sexual abuse in July 1991. | 1–3 Concur |
| 15 | Sexual Abuse 1st "defendant touched the penis of John Moe . . . on or about 6/91." | See Testimony for Count 12. | | 1–3 Consec |
| 16 | Sexual Abuse 1st "defendant touched the buttocks of John Moe". . . on or about 6/91." | See Testimony for Count 14. | | 1–3 Concur |
| | G.B. | | | |
| 18 | Sexual Abuse 1st "defendant touched the penis of John Poe" . . . on or about and between 2/91. | Testified that on at least four occasions ("more than three times") defendant put his mouth on witnesses buttocks, and touched his penis and buttocks in February 1991 (T 567:3–9). | 6 uncharged acts of sexual abuse (12 acts applied to counts 18, 19, 20, 21, 22, 23 of the indictment) | 1–3 Consec |
| 19 | Sexual Abuse 1st "defendant touched the penis of John Poe . . . on or about and between 2/91." | See Testimony for Count 18. | | 1–3 Concur |
| 20 | Sexual Abuse 1st "defendant touched the penis of John Poe . . . on or about and between 2/91." | See Testimony for Count 18. | | 1–3 Concur |
| 21 | Sexual Abuse 1st "defendant touched the buttocks of John Poe . . . on or about and between 2/91." | See Testimony for Count 18. | | 1–3 Consec |
| 22 | Sexual Abuse 1st "defendant touched the buttocks of John Poe . . . on or about and between 2/91." | See Testimony for Count 18. | | 1–3 Concur |
| 23 | Sexual Abuse 1st "defendant touched the buttocks of John Poe . . . on or about and between 2/91." | See Testimony for Count 18. | | 1–3 Concur |
| 24 | Sexual Abuse 1st "defendant touched the penis of John Poe . . . on or about and between 7/91" at the Jelinek home. | Witness testified that in July 91, while watching TV, defendant would rub witness's penis and butt (T 565:22–25). He testified that the defendant would perform these acts | 13–21 uncharged acts of sexual abuse. (16–24 acts applied to counts 24, 26, and 29 of the indictment). | 1–3 Consec |

*more than three times every visit (T 566:2–4). The witness testified that he visited the Jelinek home two or three times after his family moved to Buffalo (T 575:14–17).*

| 25 | Sexual Abuse 1st "defendant touched the penis of John Poe . . . on or about and between 7/91" at Tobay Beach. | Witness testified that defendant rubbed him on the penis and buttocks at Tobay Beach on more than three occasions in July 1991 (T 566:5–19). | 5 uncharged acts of sexual abuse. (8 acts of sexual abuse applied to counts 25, 27 and 28). | 1–3 Concur |
| 26 | Sexual Abuse 1st "defendant touched the penis of John Poe" . . . on or about and between 7/91 at Jelinek home. | See Testimony for Count 24. | | 1–3 Concur |
| 27 | Sexual Abuse 1st "defendant touched the buttocks of John Poe" . . . on or about and between 7/91 at Tobay Beach. | See Testimony for Count 25. | | 1–3 Consec |
| 28 | Sexual Abuse 1st "defendant touched the buttocks of John Poe" . . . on or about and between 7/91 at Tobay Beach. | See Testimony for Count 25. | | 1–3 Concur |
| 29 | Sexual Abuse 1st "defendant touched the buttocks of John Poe" . . . on or about and between 7/91 at the Jelinek home. | See Testimony for Count 24. | | 1–3 Concur |